207 N.J. Super. 388 (1984)
504 A.2d 692
AMG REALTY COMPANY, A PARTNERSHIP ORGANIZED UNDER THE LAWS OF THE STATE OF NEW JERSEY AND SKYTOP LAND CORP., A NEW JERSEY CORPORATION, PLAINTIFFS, JOAN H. FACEY, REDVERS S. FACEY, JOHN W. KRAUS, MARY HELEN TUCHEN, MYKOLA BOJCZUK AND MAE BOJCZUK, HIS WIFE, INTERVENORS,
v.
TOWNSHIP OF WARREN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT, AND TIMBER PROPERTIES, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
TOWNSHIP OF WARREN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLANNING BOARD OF THE TOWNSHIP OF WARREN, AND WARREN TOWNSHIP SEWERAGE AUTHORITY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided July 16, 1984.
*391 Joseph E. Murray for plaintiffs AMG Realty Co. and Skytop Land Corp. (McDonough, Murray & Korn, attorneys).
Raymond R. Trombadore for plaintiff Timber Properties (Trombadore & Trombadore, attorneys).
Robert H. Kraus for intervenors Joan H. Facey, Redvers S. Facey, John W. Kraus and Mary Helen Tuchen (Lieb, Kraus and Grispin, attorneys).
John T. Lynch for intervenors Mykola Bojczuk and Mae Bojczuk.
John E. Coley, Jr. for defendant Township of Warren (Kunzman, Coley, Yospin and Bernstein, attorneys).
Eugene W. Jacobs for defendant Planning Board of the Township of Warren (Handelman & Jacobs, attorneys).
J. Albert Mastro for defendant Warren Township Sewerage Authority.

*392
 Outline of Opinion
 Introduction 393
 I. Fair Share 397
 A. Fair Share Methodology 398
 1. Region 398
 2. Regional Need 400
 a. Present Need 401
 b. Prospective Need 403
 3. Allocation Factors 404
 a. Present Need 404
 b. Prospective Need 405
 B. Application of the Fair Share Methodology To Warren
 Township 410
 1. Region 410
 2. Regional Need 410
 3. Allocation Factors 410
 a. Present Need 410
 b. Prospective Need 411
 C. Justification of Methodology 412
 1. Region 412
 2. Regional Need 420
 a. Present Need 420
 b. Prospective Need 425
 c. Present and Prospective Need 428
 3. Allocation Factors 431
 a. Present Need 431
 (1) Growth Area 431
 (2) Present Employment 433
 (3) Median Income 434
 b. Prospective Need Factors 439
 (1) Applicability of the Three Present Need
 Factors 439
 (2) Employment Growth 440
 II. Compliance 443
III. Builder's Remedy 447
 IV. Conclusion 450
 Appendix
 A. Present Housing Need Regions 459
 B. Present Need Calculation 460
 C. Surplus Present Need Data 464
 D. Prospective Need Data 514
 E. Selected Urban Aid Municipalities 537
 F. Warren Township Commutershed Region 538

*393 SERPENTELLI, J.S.C.
This Mount Laurel case, the first to be fully tried since the decision of the New Jersey Supreme Court in Southern Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., 92 N.J. 158 (1983) (hereinafter Mount Laurel II) presents the court with the opportunity to start the process of developing a method of fair share allocation and eliminating the confusion surrounding the issue. The process is critical to the implementation of the Mount Laurel principle because as long as uncertainty regarding the fair share obligation prevails, "the weakness of the constitutional doctrine will continue". Id. at 253. The development of a fair share methodology constitutes a primary step in achieving the ultimate goal of Mount Laurel II  the actual construction of low and moderate income housing. Id. at 352. Only after the court quantifies the fair share obligation can it determine whether the municipal ordinance fully complies with Mount Laurel and thereafter whether the plaintiff is entitled to a builder's remedy.
Therefore, this opinion will address three issues in the following order:
I. Fair Share  What number of low and moderate income units of the regional need must Warren provide for through its land use regulations?
II. Compliance  Has Warren, through its present land use regulations, provided a realistic opportunity for the construction of its fair share and thereby satisfied its Mount Laurel obligation?
III. Builder's Remedy  Have plaintiffs demonstrated noncompliance, proposed a substantial lower income component for the project and can their plans be implemented without significant negative environmental or planning impact?
Based upon my analysis of the evidence, I hold that Warren Township has a fair share obligation of 946 dwelling units, for the decade of 1980-1990, that the township's land use ordinances do not comply with Mount Laurel II and that plaintiffs are entitled to a builder's remedy.
The opinion has the following structure. With respect to fair share, I will initially detail the methodology adopted before demonstrating how it produces Warren's obligation. This explanation *394 and application should enable any municipality affected by the methodology to understand the mechanics of it so that it can precisely identify its own obligation. Next, the opinion will elaborate on the justifications for the approach, the criticisms which have been voiced by others and any shortcomings the court perceives. This should facilitate refinement of the methodology. With respect to the compliance issue, the court will examine Warren's land use regulations to explain why they fail to make realistically possible the satisfaction of the township's fair share and identify some of the areas which should be addressed in the revision process. With respect to the builder's remedy, the court shall review the evidence which demonstrates that plaintiffs are entitled to the builder's remedy. Finally, the conclusion will explore the broader ramifications of this opinion.
Before proceeding to a discussion of each of these three issues, some background information is necessary. The trial began on January 3, 1984. Shortly after testimony commenced, the parties engaged in settlement negotiations. It appeared that the matter could be resolved if the township obtained a determination of its fair share and a declaration of compliance of its ordinances, which would provide it with repose from Mount Laurel litigation for a period of six years. Id. at 291-292. The court emphasized that it would only grant repose in a nonadversarial setting if defendant demonstrated to a court appointed master and then to the court, that the method used to calculate the fair share was reasonable.
As a first step, counsel authorized their planning experts to discuss an appropriate methodology for identifying Warren's fair share. Each of the experts had filed a report with the court setting forth their respective fair share analysis. Each of the experts possessed copies of expert reports filed by other court appointed experts in other pending Mount Laurel litigation. The consultants and the court had received the recently issued report of the Center for Urban Policy Research of Rutgers University, (hereinafter CUPR), entitled "Mount Laurel *395 II  Challenge and Delivery of Low-Cost Housing." During the process of discussions the consultants were given permission to confer freely with other recognized authorities in the field and individuals who have been involved in Mount Laurel litigation.
There evolved from the efforts of the experts a document which has become known as the "Warren Report." The planners developed a fair share allocation method applicable not only to the Warren Township case, but also, in their view, to municipalities throughout the State. Based upon the agreement of the planners, the parties were able to arrive at a fair share number for Warren and to resolve the other issues involved in the case including builder's remedies. Of course, the settlement was conditioned upon formal approval by Warren's governing body. The matter was adjourned for that purpose.
While the court awaited word as to the approval of the proposed settlement, it also received many inquiries concerning this first unified approach to fair share analysis. The Warren Report quickly became a topic of discussion in many case management conferences conducted by the court. One of those conferences took place in the matter of Urban League of Greater New Brunswick v. Borough of Carteret, one of the six consolidated cases in Mount Laurel II remanded to this court. Counsel in that case requested the opportunity to have all of the planners involved in that litigation attempt a consensus approach toward resolution of that case. Since there were eight plaintiffs and seven defendants joined in the suit, there was naturally some doubt as to whether the same sort of harmony was attainable. Nonetheless, the court agreed to the request made by counsel, and all of the planners were authorized by their respective attorneys to engage in a discussion toward the end of arriving at a fair share allocation approach which could be applied to that case.
*396 The planning group was chaired by Carla L. Lerman, the court appointed expert in the Urban League case. It initially consisted of all of the retained planners in that case and was expanded to include some of the court appointed experts functioning in other matters. In addition, the advisory group was addressed by Dr. Robert Burchell and Dr. David Listokin who participated in the preparation of the CUPR Report. The group also received the input of the Office of the Public Advocate. After several day long meetings, continuous private consultation among various planners, delegation of various data collection duties to individual members of the group and the formation of a subcommittee to deal with a specific factor in the fair share allocation, out of a series of preliminary drafts a final report evolved. That report, dated April 2, 1984, (hereinafter Urban League Report or ULR) established a method of fair share allocation not only applicable to the seven defendants in the Urban League litigation, but also, in the view of the planners, to any other municipality in the State.
While the Urban League advisory group was in the process of developing its report, the court was informed by counsel in the Warren case that the tentative settlement could not be consummated. Therefore, that case was brought to trial on March 15, 1984. The intervenors, who had not sought Mount Laurel relief, chose not to participate. The three remaining planners in the Warren matter had participated in the Urban League advisory group. When the trial in the Warren case recommenced, plaintiff's planners modified their original approach and espoused the methodology developed in the Urban League case. More specifically, Timber Properties' expert completely embraced the Urban League plan and AMG Realty's expert did so with one minor reservation. Defendants (hereinafter referred to collectively as defendant) used two experts who accepted some of the fundamental assumptions of the Urban League blueprint, but disagreed with others. Therefore, the court was able to test, in a truly adversarial setting, the value of the accord reached in Urban League. In fact, the *397 case was tried as a test of that approach since defendant sought to modify it, rather than setting forth a separate analysis of its own.

I.

FAIR SHARE
Before addressing the sub-issues of region, regional need, and allocation, the larger issue of fair share, which embodies these three issues, must be placed in its proper perspective. In an effort to provide this perspective, it would be helpful to define exclusionary zoning, to list the goals the Supreme Court felt it had to achieve through Mount Laurel II to eliminate exclusionary zoning, and to explain how the fair share methodology established in this opinion promotes the Court's goals.
Justice Pashman defined exclusionary zoning as involving two distinct, but interrelated practices:
(1) the use of the zoning power by municipalities to take advantage of the benefits of regional development without having to bear the burdens of such development; and (2) the use of the zoning power by municipalities to maintain themselves as enclaves of affluence or of social homogeneity. [So. Burl. Cty. N.A.A.C.P. v. Mt. Laurel Tp., 67 N.J. 151, 195 (1975) (Pushman, J., concurring) (hereinafter Mount Laurel I)].
In Mount Laurel II, Chief Justice Wilentz similarly expressed the two dimensional nature of exclusionary zoning:
But if sound planning of an area allows the rich and middle class to live there it must also realistically and practically allow the poor. And if the area will accommodate factories, it must also find space for workers. [92 N.J. at 211]
The Mount Laurel II Court determined that to eliminate exclusionary zoning, voluntary compliance with the constitutional obligation must be encouraged, litigation to enforce the obligation must be simplified and judicial remedies must be made more effective. Id. at 214. The development of a reasonable fair share methodology is, perhaps, the most important step in fulfilling these three purposes. First, the fair share methodology adopted in this opinion will promote voluntary compliance because each municipality now has the ability to calculate its fair share and thereafter design its land use regulations to *398 satisfy its responsibility. Second, the methodology will simplify litigation because the fair share number can be identified with ease, thereby limiting the remaining issues primarily to compliance and builder's remedy. Third, the methodology promotes the effectiveness of the judicial remedies which consist of three aspects: the grant of a builder's remedy, the appointment of a master, and the court imposed rezoning if the municipality fails in its effort to create a compliant ordinance. See generally Mount Laurel II at 278-292. The fair share methodology adopted here will render builder's remedies more effective because it will virtually eliminate the fair share issue which is the most time consuming and expensive component of the litigation. Experience has demonstrated that once the fair share is set, the other segments of the litigation require comparatively little time. The use of a master will be facilitated because just as demonstrating that the zoning ordinance is exclusionary is an element of the builder's remedy, it is also a prerequisite to the appointment of a master. Lastly, once the fair share number is established, the court is in a position to invoke its own remedies for noncompliance in the event that the municipality fails to satisfactorily revise its ordinance on its own.

A. The Fair Share Methodology

1. Region

The numerous expert reports received by the court in this and in other litigation generally demonstrate two different conceptual approaches to region, a fixed line approach and a commutershed approach. A fixed line approach defines a region through rigid lines derived by analyzing the standards for an appropriate region as articulated in Mount Laurel II. Id. at 256. In contrast, a commutershed approach defines a region by starting with the functional center of the municipality and identifying all points that could be reached during a reasonable commuting time by travelling outward in all directions on existing roadways. Thus, a commutershed approach requires *399 an individual analysis for each municipality to determine the points reached after a reasonable commute, whereas a fixed region approach merely requires an inquiry into which predetermined region the municipality falls.
I find that it is necessary to meld both concepts in order to arrive at the most equitable and accurate fair share number. Each municipality should have a present need region and a prospective need region. The present need region will be based on a large fixed area defined by county lines, intended to balance the high levels of need in the older urban core municipalities of that region and the resources to meet that need in the less dense and newer suburban areas of the region. The prospective need region shall be a modified commutershed area which reflects a predetermined commuting time from the functional center of any given municipality but it is intended to be large enough to account for special commuting patterns or employment concentrations ULR at 7.
The Urban League experts felt compelled to develop present need regions for the entire State so as to be sure that the present need region selected for the municipalities engaged in the Urban League litigation was compatible with the division of the balance of the State into fixed present need regions. The group divided the State into four present need regions as follows:
Region I  Bergen, Essex, Hudson, Hunterdon, Middlesex, Morris, Passaic, Somerset, Sussex, Union and Warren counties.
Region II  Monmouth and Ocean counties.
Region III  Burlington, Camden, Gloucester and Mercer counties.
Region IV  Atlantic, Cape May, Cumberland and Salem counties.
See Appendix A for a map depicting the regions. Regions II, III and IV are identical to CUPR's regions 4, 5, and 6.
I recognize it is not my prerogative to define regional configurations for counties not within my jurisdiction. However, I also recognize that to determine regions within my jurisdiction without evaluating their consistency with other potential regional configurations could promote the inconsistency which the *400 Supreme Court sought to avoid through the use of the three judge system. Mount Laurel II at 253-255. Given this disclaimer and based on the testimony given in the Warren case and the compatibility of Regions II, III and IV with the CUPR report, I believe that the recommendations of the consensus group are reasonable. Of course, my fellow Mount Laurel judges will address these regional configuration issues in their jurisdictions.
The prospective need region for any municipality shall be a commutershed measured in all directions from the functional center of a municipality based on a 30-minute drive time. The definition of functional center is three-tiered. The functional center shall be the generally recognized commercial-residential core of the community. Commonly referred to as the "downtown area," this center typically contains a commercial hub surrounded by residential development. In the absence of a commercial-residential core, the functional center shall be the municipal building. Absent either a recognized commercial-residential core or a municipal building, the functional center shall be the major crossroads within the municipality.
The 30-minute drive will be measured by the following speeds:
1. 30 miles per hour on local and county roads,
2. 40 miles per hour on state and federal highways,
3. 50 miles per hour on interstates, the Garden State Parkway and the New Jersey Turnpike.
The entire area of a county is to be considered included within the commutershed if the 30-minute drive time enters into that county at any point. Thus, the commutershed utilized here is a "modified" commutershed rather than a pure 30-minute commutershed because a pure commutershed would terminate wherever the 30-minute commute ended.

2. Regional Need

There shall be two separate methods for calculating present and prospective need.

*401 a. Present Need

Present need consists of the indigenous need of a municipality and the fair share of the reallocated excess need of the municipality's present need region. Indigenous need is defined as substandard housing currently existing in any municipality. Every municipality, regardless of its characterization in the State Development Guide Plan (hereinafter SDGP) is responsible for meeting its own indigenous need. However, certain municipalities, even though located in areas characterized as growth in the SDGP, have an indigenous need which far exceeds their fair share. They should not be expected to provide decent housing for a disproportionate share of the need. Id. at 243. Therefore, when the total regional housing stock is determined and the percentage of that stock which is substandard is identified, any municipality whose indigenous need in relationship to its housing stock is in excess of that regional percentage, will have its excess assigned to a reallocation pool. This pool will be distributed to all municipalities which contain any area designated as growth in the SDGP, excluding selected urban aid municipalities as hereafter identified.
A housing unit will be considered to fall into the indigenous need category if it has any one of the following characteristics:
1. Overcrowded units  defined as dwelling units occupied by more than 1.01 persons per room.
2. Units lacking complete plumbing facilities for the exclusive use of the occupants.
3. Units lacking adequate heating.
The number of such units can be obtained in an unduplicated count from the 1980 census figures in schedules STF-1 and STF-3. The identification of units lacking adequate heating requires a mathematical computation which need not be set forth here. An example of the process of deriving the total indigenous obligation is set forth in Appendix B. A total of the unduplicated count for these three categories will result in the total number of units hereinafter referred to as "substandard." To obtain the number of substandard units occupied by lower *402 income households, one additional adjustment is necessary. A study by the Tri-State Regional Planning Commission in 1978 reported that 18% of those people occupying substandard housing were not of low and moderate income. Therefore, to accurately compute the indigenous need, the gross number of substandard units must be multiplied times 82%.
As noted, the extent to which any municipality contributes to the present need pool depends on the relationship of its substandard housing percentage to that of its present need region. In order to arrive at that relationship and to establish the regional reallocation pool, the following steps must be taken. First, the total number of substandard units in the present need region must be identified and expressed as a percentage of the total housing stock of the region. For ease in discussion, this percentage will hereafter be referred to as the regional substandard housing percentage. Second, the total number of substandard units for each municipality in the present need region must be identified and expressed as a percentage of each municipality's housing stock. For ease in discussion, this percentage will hereafter be referred to as the municipal substandard housing percentage. Third, any municipality whose percentage of substandard housing exceeds the regional percentage shall have its number of substandard housing units reduced until it conforms to the regional percentage. The units subtracted from such a municipality shall form the pool of present need which will be reallocated to those towns containing any growth area, except for selected urban aid towns, through the use of the present need allocation factors discussed below. An appendix showing the surplus present need calculation by county, region and for each municipality in the State is annexed as Appendix C. It is included for the purposes of showing the derivation of Warren's present regional need discussed later and, as to all other municipalities not presumptively bound by this opinion, id. at 254, for informational purposes only.

*403 b. Prospective Need

The term prospective need refers to household formation expected to occur between 1980 and 1990. Any need generated prior to 1980 and still existing constitutes present need. In order to project household formation, utilize two methods of population projection prepared by the New Jersey Department of Labor, Office of Demographic and Economic Analysis (hereinafter ODEA). The first method is known as the ODEA Economic/Demographic Model 1 (Economic Model) and the second method is known as the ODEA Demographic Cohort Model 2 (Demographic Model). These models divide expected population growth into age groups known as cohorts. The CUPR report provides data which predicts the expected percentage of household formation in each age cohort. That data is known as a headship rate.
To determine the prospective regional need, project the total population by age cohort for 1990 by averaging the two models. Next, multiply each age cohort by the projected 1990 headship rate for that cohort, and total all the cohorts to produce the number of households expected to exist in 1990. Then, subtract the number of households existing in the region as published in the 1980 census in order to derive the net increase or decrease in households during the ten year projection period. Finally, obtain the number of low and moderate households within the total projected household increase or decrease by multiplying that total times 39.4%. That figure has been recognized in Mount Laurel II, at 221 n. 8, and by most experts as the proportion of units which will be occupied by lower income households. An appendix showing the prospective need calculation for each county in the State is annexed as Appendix D. It is included for the purposes of showing the derivation of Warren's prospective regional need discussed later, and as to all other municipalities not presumptively bound by this opinion, id. at 254, for informational purposes only.

*404 3. Allocation Factors

Having defined the present and prospective need regions and having identified a method for calculating the housing needs within those regions, I now turn to the appropriate formula to allocate the regional need among those municipalities having an obligation to assume a fair share. The present need allocation method uses three factors and the prospective need allocation method uses four factors.

a. Present Need
As noted above, all municipalities have the obligation to provide for at least some portion of their indigenous need and certain municipalities must provide for more than the indigenous need generated within the municipality. The surplus present need of certain municipalities forms the excess pool which is reallocated. The three factors used to reallocate are:
1. Growth Area: The percentage created by dividing the number of growth area acres within the municipality by the number of growth area acres within the present need region.
2. Present Employment: The percentage created by dividing the total number of private sector jobs as of 1982 covered by unemployment compensation within the municipality by the total number of covered jobs within the present need region.
3. Median Income: The ratio of municipal median income to the present need region median income.
In computing all three factors, exclude from the regional computation any data from any selected urban aid municipality as identified below or from any non-growth municipality.
Since the first two factors are expressed in terms of a percentage and the third factor in terms of a ratio, the third factor has to be expressed as a percentage so that the three factors can be averaged. This is accomplished by averaging the first two factors to create one percentage which is then multiplied by the median income ratio. The resulting percentage *405 should then be averaged along with the first two percentages by dividing factors one, two and the converted third factor, by three to create a single percentage. The resulting number should be multiplied times the total reallocation pool for the region to determine the municipality's fair share of that pool.
This method of calculation of the present need is illustrated in section I-B of this opinion which applies the entire fair share methodology to Warren Township.

b. Prospective Need

The projected lower income households to be formed during the decade of 1980 to 1990 should be allocated through the use of the following four factors:
1. Growth Area: The percentage created by dividing the number of growth area acres within the municipality by the number of growth area acres within the prospective need region.
2. Present Employment: The percentage created by dividing the total number of private sector jobs as of 1982 covered by unemployment compensation within the municipality by the number of covered jobs within the prospective need region.
3. Employment Growth: The percentage created by dividing the covered employment growth from 1972 to 1982 within the municipality by the covered employment growth within the prospective need region for the same period.
4. Median Income: The ratio of municipal median income to the prospective need region median income.
In computing all four factors, exclude from the regional computation any data from any selected urban aid municipality as identified below or from any non-growth municipality.
Again, to express the median income factor as a percentage, average the first three factors to obtain one percentage and multiply that percentage against the median income ratio to *406 create a percentage. Thereafter, average the first three factors and the new resulting fourth factor by dividing by four to create a single percentage. Multiply that percentage by the prospective regional need to obtain the municipality's prospective need obligation. This method of calculation of the present need is illustrated in section I-B of this opinion which applies the entire methodology to Warren Township.
To fully understand the application of the present and prospective need factors, further clarifications are necessary. With respect to the growth area factor, exclude from the regional acreage computation those municipalities designated as urban aid by the State for the funding year 1984-85, only if they have one of the following characteristics:
1. The municipal substandard housing percentage exceeds the regional substandard housing percentage; or
2. The population density of the municipality exceeds 10,000 people per square mile; or
3. The population density of the municipality falls between 6,000 and 10,000 people per square mile, and the "Revised Statewide Housing Allocation Report for New Jersey," dated May 1978 assigns a value of zero to the municipality's vacant developable land.
The Urban League Report states that the application of these criteria to the municipalities designated as urban aid in the eleven county present need region results in the following list:

 COUNTY MUNICIPALITY
 Bergen Garfield
 Lodi
 Essex Belleville
 Bloomfield
 East Orange
 Irvington
 Montclair
 Newark
 Orange
 Hudson Bayonne
 Hoboken
 Jersey City

*407
 North Bergen
 Union City
 Weehawken
 West New York
 Middlesex New Brunswick
 Perth Amboy
 Passaic Passaic
 Paterson
 Union Elizabeth
 Hillside
 Plainfield

These municipalities represent the traditional urban core areas, as well as other towns also not likely to attract high density Mount Laurel type housing. Appendix E contains a listing of all urban aid municipalities in the State meeting the criteria. It is provided for informational purposes only with respect to the counties not located in Warren's regions.
With respect to the employment factors in both present and prospective need regions, four clarifications must be made. First, exclude from the computation of regional employment figures the covered employment in any non-growth municipality and in the selected urban aid municipalities. Second, in calculating the total regional employment growth figure, subtract from the total positive employment growth any negative employment growth because what is being measured is the net growth of the municipality to the net growth of the region. Third, in calculating the employment growth for the municipality and the region, use a linear regression approach instead of a straight arithmetical measurement of employment growth. Finally, it should be noted that the job figures used in the employment factors are obtained through what is designated as covered employment data that is produced by the New Jersey Department of Labor and Industry. "Covered employment" *408 refers to all those private sector jobs qualifying for unemployment compensation.
With respect to the median income factor, the 1980 census reports both the median household income and the number of households by county and municipality. The municipal median income ratio is obtained as follows:
(1) Identify the municipal median income.
(2) Identify the median income of each county in the region. Multiply the median income for each county times the number of households in that county thereby producing a gross county income, excluding the gross income of any urban aid or non-growth municipality in the process. Aggregate all of the gross county incomes and divide that figure by the total number of households in the region to obtain the regional median income.
(3) Derive the municipal median income ratio by dividing the municipal median income by the regional median income.
Through the proper application of the factors, the fair share of the municipality can be obtained by totaling the indigenous, the surplus present and the prospective need figures. However, once those figures are obtained, adjustment must be made to the surplus present and the prospective need figures to reflect inadequate vacant developable land and needed vacancy rates.
To provide for those municipalities which have inadequate vacant developable land to absorb their full fair share, increase the surplus present and prospective need of every municipality by 20%. As will be more fully explained, any municipality lacking adequate vacant developable land to satisfy its full fair share shall have the right to seek an adjustment downward of its fair share. By increasing by 20% the obligation of every municipality having a fair share responsibility, the units which will be lost to the vacant developable land defense will be offset.
The surplus present need and prospective need, as increased by 20%, should be further increased by 3%. That increase will provide for sufficient vacancies, so as to facilitate mobility in housing choice.
*409 In order to round out the explanation of the fair share methodology, it is necessary to tie up some loose ends. First, the methodology which I have described assumes that all selected urban aid municipalities shall be exempt from any fair share obligation other than the portion of their indigenous need which represents the regional substandard housing percentage.
Second, Mount Laurel II requires the trial court to decide the proportion between low and moderate income housing in the process of determining fair share unless there are substantial reasons not to do so. Id. at 256-57. The evidence presented in this case justifies an equal division of Warren's fair share between low and moderate income housing, that is, 473 low and 473 moderate. Statewide, the Mount Laurel households are distributed approximately two-thirds low and one-third moderate. ULR at 29. However, expert testimony reveals that such a division is generally attainable only through the use of significant external subsidies in addition to the subsidies which the municipality may be called upon to provide. Cf. Mount Laurel II at 262-265. At the present time, the absence of subsidies requires the builders to internally absorb the loss involved in selling units below fair market value. Since there is greater loss on low income units than for moderate, the court must balance the needs of the builder against the needs of the poor and select a proportion which is most likely to result in actual construction of Mount Laurel housing. Id. at 257, 352.
Third, Mount Laurel II gives the trial judge the discretion to phase in the fair share obligation over a period of years. Id. at 219. Notwithstanding that phasing should be used with circumspection, Warren's fair share of the reallocated pool should be reduced from now to 1990 by approximately two-thirds. I do not address here phasing as it relates to the issue of when the lower income units must be completed in the construction schedule in a project consisting of lower and market value homes. Id. at 270, 281. Nor am I discussing the phasing which may be necessary to ameliorate the impact on the municipality which may occur because of the granting of a builder's remedy. *410 Id. at 331-332. Those aspects of phasing do not relate to development of a fair share methodology.

B. Application of the Fair Share Methodology to Warren Township

Warren Township is located entirely within a growth area and must provide for both indigenous and regional need. Consequently, all aspects of the fair share methodology described above apply to it.

1. Region

The present need region for Warren (Region I) consists of eleven counties: Bergen, Essex, Hudson, Hunterdon, Middlesex, Morris, Passaic, Somerset, Sussex, Union and Warren. Appendix A. The prospective need region for Warren consists of the following six counties: Essex, Hunterdon, Morris, Middlesex, Somerset and Union. Appendix F. Although the evidence created a dispute concerning whether the commutershed should also have included Hudson County, the court appointed an expert who, through the use of large scale maps, determined unequivocally that Hudson was not touched by the 30-minute commute.

2. Regional Need

The indigenous need of Warren is 52. The 11-county reallocated present need pool is 35,014, Appendix C, and the six-county prospective need is 49,004. Appendix D.

3. Allocation Factors

a. Present Need

Using the 11-county present need region, Warren's fair share of the reallocation pool of 35,014 is 162 for the decade of 1980-1990 based on the following calculation.
*411 Warren's present need percentage of the present regional need is 1.126%. That figure is arrived at as follows:

Growth Area = 1.780%
Present Employment = .179%
Median Income Ratio = 1.45
1.780 + .179 = .9795% × 1.45 = 1.420% (represents the percentage
____________ modified by
 2 the ratio)
1.780 + .179 + 1.420 = 1.126%
____________________
 3
Reallocation Excess Pool = 35,014
 × 1.126 (Fair Share %)
 _____
Municipal Share = 394
Phased in by one third (394/3) = 131
Additional 20% reallocation (131 × 1.2) = 157
Vacancy allowance (157 × 1.03) = 162
Total Present Need is:
Indigenous 52
Reallocated Present 162
 _____
 214

b. Prospective Need

Warren's fair share of the prospective regional need of 49,004 is 732 units for the decade of 1980-1990.
Warren's prospective need percentage of the prospective regional need is 1.208%. That figure is arrived at as follows:

Growth Area = 2.556%
Present Employment = .304%
Employment Growth = .428%
Median Income Ratio = 1.41
2.556 + .304 + .428 = 1.096% × 1.41 = 1.545% (represents
___________________ the percentage
 3 modifed by
 the ratio)

*412
2.556 + .304 + .428 + 1.545 = 1.208%
___________________________
 4
Prospective Regional Need = 49,004
 × 1.208 (Fair Share %)
 _____
Municipal Share = 592
Additional 20%
Reallocation (592 × 1.2) = 710
Vacancy Allowance (710 × 1.03) = 732
Summary
 Total Present Need = 214
 Total Prospective Need = 732
 ____
 Total Fair Share = 946

C. Justification of Methodology

1. Region

Mount Laurel II recognized the paramount importance of delineating regions in the development of a fair share methodology. Thus, referring to its opinion in Oakwood at Madison, Inc. v. Township of Madison, 72 N.J. 481 (1977), the Mount Laurel II Court said that:
We also noted that the determination of region was more important in achieving the goals of Mount Laurel than the fair share allocation itself ("harm to the objective of securing adequate opportunity for lower income housing is less likely from imperfect allocation models than from undue restriction of the pertinent region ...") [92 N.J. at 253]
However, to keep the importance of the regional definition in perspective, this language of the Court should also be noted:
Clearly, however, the method adopted was simply a judicial remedy of a constitutional injury. Achievement of the constitutional goal, rather than the method of relief selected to achieve it, was the constitutional requirement. [at 237]
Consequently, while the defining of regions is of paramount importance in designing a method to distribute fair share, it is only a vehicle towards accomplishing the ultimate goal  satisfaction of the constitutional obligation.
The Mount Laurel II Court provided some guidance towards the process of regional delineation. In its most direct statement, the Court reaffirmed its general approval of Judge *413 Furman's definition of region as "that general area which constitutes, more or less, the housing market area of which, the subject municipality is a part, and from which the prospective population of the municipality would substantially be drawn, in the absence of exclusionary zoning." Id. at 256. Yet, the Court also recognized that the trial judge could consider other factors and particularly those mentioned in Justice Pashman's concurring opinion in Mount Laurel I, 67 N.J. at 151. Justice Pashman cited the following relevant considerations which must be evaluated in fashioning regions:
1. the area included in the interdependent residential housing market;
2. the area encompassed by significant patterns of commutation;
3. the area served by major public services and facilities, and
4. the area in which the housing problem can be solved. [Id. at 215, n. 16]
The definitions provided by the Court highlight the conflicting goals which any methodology must accommodate. On the one hand, the Court stressed the strong connection between the housing market and commuting patterns by its reliance on Judge Furman's definition. That language provides support for a commutershed concept. On the other hand, the Court noted the importance of linking areas of significant need with the areas of significant resources to meet that need by its reference to Justice Pashman's concurring opinion. A needs-resources approach supports a large, fixed region concept.
This dichotomy reflects itself in an analysis of housing needs. The present housing needs arise out of substandard units which must be replaced or rehabilitated, and the shortage of decent housing units for lower income people. In contrast, the prospective housing needs arise out of a different aspect of the housing problem. The significant factors affecting future housing construction are location, availability and costs. Consequently, the problems are, where will housing be built for lower income people in relation to where they work, will supply meet the demand, and will the housing be affordable.
In light of the conflicting goals to be accommodated by the definition of region and given the difference between present *414 and prospective housing needs, there is practical difficulty in formulating one region which would achieve all the stated objectives. A region which focuses on enabling people to live in proximity to their work may satisfy prospective housing demands, but it may be too small to provide the resources necessary to absorb the excess present need generated by the urban areas. Conversely, a region which focuses on providing the resources necessary to absorb the excess present need of the urban areas may be too large to accurately address the prospective housing demand.
The answer to the problem is a dual region concept. A large region is needed to properly measure and allocate present housing needs. A smaller region, centered on the specific municipality involved, should be utilized to predict and allocate the future lower income housing demand generated by relationship of jobs to the place of residence. This will result in each municipality being part of fixed present need region and being at the heart of its own modified commutershed.
While one cannot find any literal support for this dual region concept, nothing in Mount Laurel II precludes such an approach. In fact, the Court provides support for both a commutershed and fixed region approach. Judge Furman's definition implicitly sanctions a commutershed theory. Since people would generally tend to live in proximity to where they work, the prospective population of a municipality would be drawn from the commutershed in the absence of exclusionary zoning. However, the Court also implicitly sanctions a fixed region concept:
Except for municipalities on the outer edges of a region, the regional determinations are not likely to be significantly varied by the judges.... [Mount Laurel II, 92 N.J. at 254-255]
Because a municipality is always at the center of its own region in a commutershed approach and thus never "on its other edges," this language strongly supports a fixed region concept.
I note parenthetically that since the dual region concept was first introduced in the Warren case and thereafter carried over *415 into the Urban League Report, it has been widely embraced by members of the planning community as being much more reflective of the goals expressed in Mount Laurel II than any single region concept.
Aside from the value of the dual region concept as it relates to the goals of Mount Laurel, the development of large metropolitan regions, the limitation of the number of present need regions in the State, and the marriage of the fixed present need regions with the commutershed prospective need regions should sharply reduce the potential for conflict as compared to the regional configurations which have been previously suggested to this court. Regarding the present need regions, the creation of a few large configurations minimizes the possible number of conflicts. Regarding the prospective need regions, the creation of the configuration is merely a component of developing the fair share allocation of that municipality. Once the allocation is developed, the prospective need region disappears and any conflict with another municipality's region disappears with it. Finally, since the prospective need region typically represents the largest portion of the municipality's fair share, the extent of any regional conflict is even further reduced.
Now I will move from the general justification for a dual region concept to the specific justifications for an 11-county present need region (Region I) and the modified commutershed explained above. The evidence reveals that Region I contains over 60% of the State's population, over 50% of the State's land area, over 50% of the State's growth area, and approximately 70% of the selected urban aid municipalities. These statistics demonstrate that the vast majority of the State's housing need exists in Region I, as well as the majority of the growth area necessary to accommodate that need.
The expansiveness of the region is dictated by the large concentration of lower income housing located within it. This bottled up need is the product of many years of exclusionary practices. It requires large land areas to release it. Counties *416 like Somerset, in which Warren is located, can contribute their resources to the need. But, because of the magnitude of the need, many other counties must be called upon to assist. Further support for the use of large regions is found in Oakwood at Madison, Inc. v. Township of Madison, supra. There the Court appeared to approve a region of at least seven counties. 72 N.J. at 528, n. 35.
The question remains is it necessary to create a region of the configuration of Region I? Should it be larger or smaller? Should it involve different counties?
Region I is part of the greater New York metropolitan area. It represents a classic core, suburb, exurb and rural configuration radiating outward from the urban core in concentric rings. It is tied together by a network of major highways, rail links and growth corridors. Approximately 90% of the surplus present need of Region I emanates from the core in Hudson, Essex, Passaic, and southern Bergen counties and seeks the resources lying in the outer rings.
Any reduction of Region I would require either a shrinkage of the radius of the region or a slicing of the pie into smaller pieces. Shrinking the radius, in this case, could cause the excluded counties to become out of balance in terms of the needs-resources goals which underlie the satisfaction of the present need within their own newly created regions. Conversely, the reduced Region I would be robbed of the resources it needs to satisfy its large existing demand. Specifically, the most likely reduction in the radius would exclude such counties as Sussex, Warren, and Hunterdon. While it is true that there is presently not a large amount of growth area in those counties, there is even less demand. Given the major highway links of Routes 80 and 78, the radiating of growth corridors from east to west and the magnitude of the need which must be satisfied, there is no reason to exclude these counties. Furthermore, examination of the 1980 census data concerning county commutation patterns reveals a substantial relationship of *417 these three counties to the remaining counties in Region I. Lastly, notwithstanding the limited growth acreage in these counties, one cannot ignore the rapid growth occurring there.
Slicing Region I in a manner which does not follow county lines creates significant problems in terms of reliable data. In contrast, slicing Region I along county lines disrupts the needs-resources balance both in the new region created and the leftover pieces of the excluded counties. This view is best illustrated by an evaluation of the region proposed for Somerset County by the CUPR. That area, designated as Region III, consists of Middlesex, Hunterdon, Warren and Somerset. Simply stated, it has significant resources but fails to capture a significant portion of the present need.
Any expansion of Region I to include either Mercer or Monmouth would also be inappropriate. While it may be conceded that either Mercer or Monmouth have substantial relationships with the counties bordering them on the north and beyond, their orientation makes them the logical division line between Region I and other regions. Monmouth County is linked to Ocean County by geography, transportation, and the sharing of the seashore corridor. The most vivid demonstration of Ocean's link to Monmouth is that approximately 44% of Ocean's residents travelling out of the county commute to Monmouth. Clearly, Ocean would not stand alone as a region. The CUPR designation of Region IV, consisting of Monmouth and Ocean further supports this conclusion.
Mercer County uniquely has its strongest commutation pattern internally. Nearly 90% of its residents commute within the county. Mercer and Burlington have a significant commutation relationship and, in the larger perspective, they can be viewed as part of the Philadelphia consolidated metropolitan area. The CUPR Region V supports this southern orientation of Mercer by including it in a region with Burlington, Camden and Cloucester. Thus while the outer lines of a region tend to be tenuous, I believe that Region I is properly balanced to meet *418 its needs and resources and that the division line between counties included and excluded is amply justified.
As is more fully discussed above, the modified commutershed used to delineate the prospective need region includes all counties touched by a 30-minute commute as measured from the functional center of the municipality. Various aspects of that somewhat novel concept deserve more detailed comment.
The three-tiered definition of functional center is designed to promote certainty. This certainty overcomes any objection of arbitrariness. While in physically small towns the distinction will make no difference, in physically large towns, the distance between the geographic center and the functional center could make the difference in whether a county is included in or excluded from the commutershed.
In designing an appropriate commutershed, the following factors must be considered:
1. It must be big enough to adequately reflect the large percentage of commutation occurring to and from the municipality.
2. It must have easily ascertained boundaries, and
3. Reliable data for the fair share analysis must be available.
The evidence reveals that in Warren Township, as in most other municipalities, approximately 59% of the population travels to work in 30 minutes or less, and that 84% of the population travels to work in 45 minutes or less. That means that close to half of the population is travelling more than 30 minutes and that a commutershed based on 45 minutes would be entirely reasonable. Indeed, it has been suggested in testimony before this court and in prior litigation elsewhere that even a sixty minute commute is a commonly acceptable limit for commutation. Cf. Oakwood at Madison, Inc. v. Township of Madison, supra at 528. The difficulty with using a pure 45-minute commutershed is that the configuration created will split municipal or county boundaries. That, in turn, creates two other difficulties. First, when a political subdivision is split, is it included or excluded and should that decision be based on the amount of land area touched, the amount of population involved, *419 or other factors? Second, even if this problem can be resolved, a more significant obstacle cannot be overcome. Specifically, most experts agree that municipally based data is not as reliable as that compiled for counties or other political subdivisions. Most federal and state data is gathered utilizing county lines. Therefore, the decision to use only a 30-minute commutershed, but to include the entire county if touched by that commute generates a region that has definite boundaries, has a reliable data base and generally reflects established patterns of commutation. Thus, the three ingredients of a sound commutershed are present.
I recognize that including the entirety of a county touched could create a travel time exceeding 45 minutes. As noted, a travel time beyond 45 minutes is not inherently unreasonable. For example, a significant employment center might be located a short distance beyond the 45-minute commute which would nonetheless attract job seekers. Also, the evidence before the court indicates that seldom will the travel time significantly exceed 45 minutes. Finally and most importantly, the reliability of the county data justifies any arbitrariness that may arise from the touch-the-county standard.
Two final details concerning the commutershed concept warrant attention. First, the use of specific speeds for various types of roads is based on accepted planning standards. That approach seems far more reliable than to depend upon the vagaries inherent in measuring the commute by actual driving experience. Today's commute may differ drastically from yesterday's based on the difference in weather, road conditions, the driving habits of the other people on the road or indeed, of the driver measuring the commute. Second, when the modified commutershed was first introduced, some suggested that this approach would create a multitude of overlapping regions. No overlap exists. Establishing a prospective need region is merely a step in the process of reaching a fair share number for a municipality. One planner has described the creation of the prospective need region as analagous to the construction of *420 scaffolding for a building. The scaffolding is constructed merely for the purposes of putting the building in place and thereafter removed to another location so that another building might be constructed. Similarly, the formulation of a commutershed is done solely for the purpose of permitting the computation of the fair share number. Once that has been accomplished the individual municipality's commutershed no longer has any relevance.

2. Regional Need

The determination of regional need has the potential, state-wide, to impact on each municipality's fair share number more significantly than any reasonable fair share factor which has been considered by this court. Therefore, the subject deserves a detailed analysis. I will first address issues directly related to present need, then prospective need. Thereafter, I will address issues that concern both.

a. Present Need

As noted, the present need of a municipality consists of two components. The indigenous need within the municipality must be added to that municipality's share of the reallocated excess regional need. Both the indigenous and reallocated excess need represents units lacking complete plumbing, or adequate heating or units that are overcrowded. The reallocated excess pool for Region I consists of 35,014 units.
The three categories used here to determine substandard units grow out of a recommendation contained in the Urban League Report. These categories represent readily identifiable classifications which can be obtained in an unduplicated count from the 1980 census. Moreover, few would argue that a unit lacking adequate plumbing or heating or which is overcrowded is not "substandard" as that word is commonly understood. The CUPR expands upon these categories. CUPR at 100-118. It establishes a two-level analysis depending on whether the *421 unit was built before 1940 or after. If the unit was built before 1940, it will be considered substandard if it has any one of six deficiencies. If built after 1940, the unit is substandard if it has any two of the same six deficiencies. These six deficiencies include the three categories used in the Urban League Report as well as lack of exclusive access, lack of complete kitchen facilities and lack of an elevator in a structure of four stories or more.
The CUPR acknowledge that there is no unambiguous way of testing the validity of these categories. CUPR at 111. It also recounts, at some length, the difficulties inherent in properly measuring the need. CUPR at 100 et seq. Unfortunately, it does not address the apparent anomaly that a unit which is substandard in 1939 may become standard in 1940. I find that the Urban League approach is less ambiguous, more accurately reflects substandardness and is easier to work with. Finally, an examination of the statistics contained in the CUPR reveals that the resulting pool of substandard units is substantially equivalent to that derived from the Urban League method.
Defendant's experts have not challenged the mathematical accuracy of the count in any of the three categories, they have not suggested utilizing any other categories, nor have they challenged the propriety of including overcrowded units in the present housing need. Defendant's experts argue against the inclusion of units lacking adequate heating or plumbing because they have been or can be rehabilitated or demolished. Depending on which of defendant's experts was relied upon, the present need pool would be reduced by 25% to 50%, to as low as 17,875 units.
One of defendant's experts cited figures as to the extent of rehabilitation or demolition which has occurred in Newark or Jersey City since 1980. However, he made no effort to ascertain whether that activity was offset since 1980 by further deterioration elsewhere in the urban core or in the ring of municipalities surrounding the core. It could as easily be *422 assumed that the pool number has increased since 1980 due to the continuing decay of the cities and the evaporation of subsidies. Furthermore, the identification of indigenous need does not include unoccupied units. Therefore, the demolition of unoccupied units would not reduce the pool number, as assumed by defendant's experts.
The effort to remove from the pool all units which can be rehabilitated fails for two reasons. First, there is no reason to believe that the urban aid towns which contain the vast majority of present need that must be reallocated, have the capacity to repair the physically deficient units. As mentioned, the ability of those municipalities to undertake substantial rehabilitation has decreased in recent years due to the paucity of governmental subsidies. Second, the approach taken by defendant's experts is fundamentally unfair because it places on the urban poor municipalities an obligation beyond their fair share of their indigenous need. Mount Laurel goes the other way and relieves the core cities of that obligation. Mount Laurel II, 92 N.J. at 243.
On the other side of the ledger, an argument was made that the present need count should not only include substandard units, but also include units in which lower income families are paying a disproportionate share of their income for housing. The Court has suggested that not more than 25% of a household's income should be spent for housing costs. Id. at 221, n. 8. The inclusion of the financial need category would dramatically increase the present need. The Urban League Report states that the regional percentage of substandard housing in Region I is 6.4%. ULR at 18. In contrast, the financial need in Region I ranges from 16% to 35% of lower income households paying in excess of 30% of income for housing. ULR at 18.
Some argue that to include all of those households in the fair share number would make that number unattainable. The testimony in this case indicates that Warren's fair share could increase as much as 380 units if a financial need category was *423 included. The sheer size of the numbers does not justify their exclusion from the formula. However, other more specific reasons support their exclusion. In the first instance, it must be recognized that many people do not fully report their income. Second, there are many people who by choice are willing to pay a disproportionate amount of their income for housing. Third, there is a considerable housing "mismatch." On the one hand, some rental units which meet the affordability standards are occupied by families not in a lower income category. On the other hand, lower income families are occupying units which they cannot afford. If the families and units could be matched up, more affordable units, particularly for moderate income households, could be occupied by needy families. Fourth, it must be recognized that many people of retirement age have developed substantial assets which allows them to acquire homes. However, based upon their reported income, they could nonetheless fall into the category of financial need at least within the Mount Laurel II definition. At 221, n. 8. Fifth, some argue that the needs of lower income households can be met more appropriately through income maintenance programs or other extended rent supplement programs rather than the construction of new housing. Sixth, many families in financial need are occupying substandard units thereby creating a duplication in the count of present need. For all of these reasons, it is most difficult to develop a trustworthy count of financial need which should be satisfied through Mount Laurel solutions. In summary, notwithstanding that there is some unmet need, the untrustworthiness of the data and the desire to avoid questionable assumptions compels me to not incorporate this category.
Assuming that all the reasons to exclude a financial component could be overcome, Mount Laurel II is not entirely clear as to whether the inclusion of a financial need category is expected. The Supreme Court mentioned the inclusion of a financial component in Mount Laurel's fair share number. Id. *424 at 299-300. However, the Court made no mention of that category when it directly discussed present need:
As noted before, all municipalities' land use regulations will be required to provide a realistic opportunity for the construction of their fair share of the region's present lower income housing need generated by present dilapidated or overcrowded lower income units, including their own. Municipalities located in "growth areas" may, of course, have an obligation to meet the present need of the region that goes far beyond that generated in the municipality itself.... [at 243; emphasis in original as to "all"; emphasis supplied as to "dilapidated or overcrowded"]
Nothing that has been said here concerning exclusion of a financial component should countenance a municipality's failure to undertake an aggressive program of pursuing any available rent supplement programs which may be available to assist those who are in financial need.
I now shift from a consideration of what constitutes the present need to a determination of what triggers the creation of the excess pool. As discussed earlier, the excess of deficient units in any municipality over the region's percentage of substandard units will be placed in the pool, which will be allocated to growth area municipalities at or below the regional percentage. In this case, I have found that the regional percentage of substandard housing in Region I is 6.4%. Thus, a contribution to the pool is triggered when a municipality's percentage of substandard housing stock exceeds 6.4%.
It should be kept in mind that the 6.4% is not a ceiling. The percentage is developed to create the pool and to exclude the selected urban aid municipalities from any obligation beyond that percentage. The percentage was not intended to exclude the possibility that a growth area municipality which was reduced to the 6.4% level in the process of forming the excess pool, but was not an a selected urban aid municipality, would still receive a reallocation taking it over 6.4%. Nor was the figure intended to preclude the possibility that a municipality which was under the 6.4% of substandard units would exceed that percentage by virtue of reallocation. No effort was made to make all municipalities a mirror image of each other. Cf. *425 Mount Laurel II at 350. The point is that the identification of the excess pool is merely a step in the process of determining a municipality's obligation. The final step is to make a fair distribution of the pool in a manner which reflects the Supreme Court's decision.
One final aspect of the calculation of the present need requires attention. The computation of Warren's fair share number allows for its reallocated excess obligation of 394 units to be phased in over 18 years in three almost equal portions of 131. That represents a reduction of the fair share to 1990 of 263. The concept of automatically phasing present need was developed by the Urban League Report, despite the Court's warning that the power should be exercised sparingly. Id. at 218-219. As noted above, I have allowed Warren Township's present need to be phased in over three, six-year periods. However, I do not support the concept of the automatic phasing of present need. The circumstances of each case should dictate the result. For example, it would seem questionable to phase a small present need number over a long period of time. In this case, however, the phasing is warranted. The present need pool has been accumulating over many decades. It should be our goal to empty that pool as rapidly as possible. I could not justify the automatic phasing of prospective need in this case or any other case based on the size of the number alone. There would have to be other circumstances to warrant it. Ibid. The prospective need number should be met, if it can be met, so as to prevent it from becoming part of the 1990 present need pool. It seems reasonable therefore, given the size of the present need number, to allow the township to satisfy its obligation over a longer period of time. That should further ensure Warren's ability to meet its prospective need, and start towards the goal of eliminating its present obligation.

b. Prospective Need

As explained earlier, the prospective need is calculated by projecting population increases by age cohort through the averaging *426 of two projection models, applying a headship rate to obtain the number of households expected to be formed and by multiplying that number by the percentage of the population which is classified as lower income. Defendant vigorously attacks the propriety of this method.
The two models used to project population are the Economic/Demographic (Model 1) and Demographic Cohort (Model 2). The central difference between the two models is the manner in which migration is projected. Model 1 projects migration of the population in response to labor market conditions. If the labor demand is higher than the supply then in-migration is projected to match the demand. If the labor demand is lower than the supply, out-migration occurs. Model 2 projects migration based on historical patterns of the prior decade. It assumes that the rate of increase or decrease of migration in the prior decade will be duplicated in the present decade.
Exclusive use of either model is risky. Model 2 predicts based on past trends. We do not know that what happened in the past will happen in the future. Some testimony suggested that the out-migration from the northeastern states to the sun belt is diminishing. Model 1 predicts the future based on economic and demographic analysis. Projections of what will happen without reference to history is also difficult. Some testimony suggested that the anticipated labor demand is overly optimistic. One of defendant's experts asserted that the Model 1 projections were so overstated that the 1980 projection developed during the 1970's was 238% higher than actual growth for the 1970 decade. It was his position that at most, New Jersey will grow at a pace equal to the 1970-1980 rate during the 1980's and in all likelihood, the rate would be even slower. Consequently, he suggested the use of historical growth rates similar to Model 2. Though he insisted that the growth rate of the 1970's was not likely to be duplicated during the 1980's, he agreed to assume the same rate of growth as a concession to those who would argue that he was underestimating. The approach suggested by this expert flies in the face of *427 Mount Laurel II. In addition to the inherent weaknesses of a purely historical approach outlined above, it is unknown to what extent the lack of household formation in the 1970's reflects exclusion.
The purpose of utilizing two population projection methods is to even out the possible wide fluctuations in those projections. The Urban League Report, through the averaging of the two models projected an increase in our State's population by 1990 to approximately 7,735,000. The accuracy of the result achieved by averaging is demonstrated by an analysis of census data. According to a publication of the bureau of census entitled "Estimates of Populations of States, by Age: July, 1981," the population of New Jersey as of April 1, 1980 was approximately 7,365,000. That same document projected a 1990 population of 7,513,000. The census estimates are periodically updated by provisional projections during the decade. The most recent estimates published in 1984, entitled "Estimates of Populations of States: July 1, 1981 to 1983" (advanced report) contain population estimates as of July 1, 1983, as well as information concerning the average annual percentage of change. Those figures show that the New Jersey population is estimated at 7,468,000 as of July 1, 1982. That represents an average annual growth of.464%  nearly 1/2% a year. That compares to the earlier projection of an average annual growth of .20%. If one accepts the census bureau estimate of New Jersey's population in 1980 as the most reliable data available and projects growth for the decade of the 1980's at the rate of .464% on a straight-line cumulative basis, the projected 1990 population would be 7,714,000  a figure virtually identical to the 7,735,000 projected by averaging the two models.
The only other criticism of the prospective regional need calculation which defendant vigorously pursued was the argument that defendant's prospective obligation should be reduced by 40% because it is being assessed in 1984 for the ten-year period from 1980 to 1990. As defendant concedes, its prospective need obligation did start in 1980. Any reduction of the fair *428 share based on the elimination of responsibility for the first four years would cause 40% of the decade's need to be lost. It would also encourage towns to hide from their obligation as long as they could, since the number would continue to reduce as long as it is based on a 1980-1990 projection. To the extent that defendant is arguing that the township cannot satisfy a need developed over ten years in six years, the issue is compliance. If, when the defendant submits revised land use regulations, it can demonstrate that it cannot satisfy its obligation by 1990, despite its best efforts, the court will have to fashion an appropriate schedule. To the extent that defendant suggests that the compliance period should be from 1984-1994, the argument fails for two reasons. First, as already explained, it will leave four years of need unaccounted for. Second, it will require projection of prospective need into the 1990's. That will force reliance upon a 1980 data base for projection into the 1990's. For example, a municipality sued in 1988 would have its prospective need projected to 1998 thereby creating an 18-year projection. It is obviously preferable to maintain as current a data base as possible by taking advantage of the 1990 Census. That is the reason why Warren's prospective need has been calculated to 1990.

c. Present and Prospective Need

Certain criticisms raised by defendant relate to both the present and prospective need methodology. Specifically, the defendant objects to the 20% adjustment for vacant developable land and the three percent adjustment for vacancies.
As discussed above, the methodology increases the surplus present and prospective need number of each municipality by 20% across the board. Underlying the concept of this adjustment is the desire to avoid the loss of housing units which occurs by virtue of the reduction of fair share obligations due to the absence of adequate land or credits given for prior Mount Laurel compliance. If the fair share methodology generates a number which a town cannot accommodate because *429 it has inadequate land or if the town is entitled to a credit against that number because it has already built some lower income housing, the obligation of the town must be reduced. However, the regional need remains. That need is not a theoretical number. It represents housing required for lower income households. Unless that responsibility is transferred elsewhere, it is lost.
This concept is not new. A similar approach was embodied in "A Revised Statewide Housing Allocation Report for New Jersey," dated May, 1978. In that report, the New Jersey Division of State and Regional Planning evaluated all municipalities to determine whether they had adequate vacant land to absorb the housing obligation which the report assigned to them. If a municipality lacked adequate land, that portion of its allocation which could not be absorbed was reallocated to the remaining municipalities. To prevent the possibility that reallocation brought borderline municipalities over their ability to absorb their allocation, a second evaluation was undertaken. This process was repeated until the entire need was satisfied without exceeding the capacity of any municipality. The judiciary cannot utilize this administrative technique because it does not have the opportunity to determine the fair share of all of the municipalities in the state in a single case. However, through the 20% readjustment a similar result can be accomplished.
The housing allocation report estimates that it was necessary to reallocate 23% of all presently needed housing units. Virtually all experts agree that there is no reliable statewide data concerning vacant developable land today. However, a reasonable assumption can be made that the need for reallocation is of approximately the same magnitude today as it was in 1978. Therefore, the Urban League Report recommended the use of a 20% reallocation across the board ULR at 12. I find the recommendation to be sound.
*430 One of defendant's experts agreed that some reallocation procedure was appropriate. The other defendant's expert asserted it should be eliminated. Both of them contended that the 20% adjustment makes the fair share number too large. It is not enough to say that the adjustment should be reduced or eliminated merely because it is one's subjective view that the resulting number is too high. The question is whether the adjustment is reasonable standing alone. Objective reasons have not been presented to me to justify its modification.
The reallocation procedure accomplishes several goals. It enables the judiciary to engage in statewide reallocation even though it is setting fair share obligations on a case-by-case basis. It avoids the loss of needed housing units. It permits the court to give repose to a municipality without concern that after repose the court might be required to reallocate additional housing to that municipality based on the inability of other towns in the region to absorb their fair share.
Note that the reallocation procedure is made necessary because of the absence of reliable vacant land data. At such time as verifiable data becomes available, the reallocation procedure might be revised.
In addition to the 20% adjustment, the methodology increases the fair share by 3% to allow for mobility in the housing market. If fair share numbers were designed to match evenly the need and the fair share numbers were satisfied, any family desiring to move could not do so unless another family also moved to make room for them. Therefore, there must be a reserve of unoccupied units to permit mobility. The planning community generally recognizes the need for a vacancy allowance of 1.5% in sales housing and 5% in rental housing. However, the Urban League Report, ULR at 25, and plaintiffs' experts noted the likelihood that presently, most Mount Laurel housing will be satisfied through sales units. Therefore, it recommended the use of 3%. Again, defendant's experts do not challenge the theory of the adjustment, but rather its result. *431 Again, they contend it makes the fair share number too large. The answer is the same. The question is whether the adjustment is reasonable standing alone.

3. Allocation Factors

The last step in this analysis of the fair share methodology is to examine the rationale for each of the factors selected.

a. Present Need Factors

(1) Growth Area

This factor measures the amount of growth area acres in a municipality as compared to the growth area acres in the region. Any reasonable methodology must account for a municipality's physical capacity to provide space for new construction. The growth area factor is designed to reflect that capacity. It identifies that area within the municipality which has been earmarked by the SDGP as an appropriate place for development. Moreover, the Supreme Court strongly supported the use of this factor when, in referring to circumstances in which exceptions would be made to SDGP classifications, it said:
The foregoing exceptions will allow a party to have the court impose a Mount Laurel obligation on a municipality that has no growth area as shown on the concept map, or to impose a greater Mount Laurel obligation by, in effect, proving that the growth area should be enlarged, or, conversely, to relieve a municipality from any Mount Laurel obligation even though the concept map shows it as including a "growth area," or to diminish the obligation by proving that the "growth area" shown on the concept map should be cut down. [Mount Laurel II at 241]
Also, the strong implications of the Supreme Court's instruction in two of its Mount Laurel remands was that the extent of the growth area should affect the extent of the fair share. In Round Valley v. Township of Clinton, the Court directed that:
On remand the trial court shall determine whether the fair share can be accommodated completely in the growth area consistent with sensible planning. If it can, then the fair share determination below shall stand; if not, it shall be revised appropriately. [Mount Laurel II at 329]
*432 In Urban League of Greater New Brunswick v. Borough of Carteret, the Court instructed:
In determining fair share, the trial court shall review the SDGP's characterization of each of the municipalities before it.... As previously stated, determination of fair share must take into consideration, where it is a fact, the inclusion within particular municipalities of non-growth areas where, according to the plan, growth is to be "discouraged." [Mount Laurel II at 351; Cf. 225, 227.]
It should be recognized that a municipality's capacity to accept lower income housing would be better measured by a factor which identifies the amount of vacant developable land within the growth area. Not all growth area land is vacant or suitable for development. Some towns designated as growth are fully developed. Other vacant land is either physically constrained due to slopes, watercourses or other conditions or is inappropriate for Mount Laurel high density development because of other planning or environmental concerns. The decision not to use vacant developable land is dictated by the inherent unreliability of that data. The last effort to compile such data was undertaken in the early 1970's. An aerial survey was made of the State. There is virtual agreement in the planning community that these photos are so outdated that they are unusable for allocation purposes. Therefore, despite the desirability of using only vacant developable land in a growth area as a land factor, I cannot utilize that alternative. To the extent that land within a growth area is developed or constrained, the vacant developable land defense can be raised to reduce the town's fair share.
A second alternative would be to use vacant developable land as a factor in lieu of growth area. Aside from the unreliability problem, the language of the Court just cited emphasizes the importance of linking the land factor to growth area considerations.
The last alternative is to eliminate any land factor on the theory that it cannot be assumed that a growth area designation assures that the land in the growth area is either vacant or developable for high density construction and on the theory *433 that no other land factor is suitable. This would leave the allocation of fair share heavily dependent upon employment factors. That, in turn, would shift the obligation to the already developed, industrialized municipalities  those municipalities least able to handle the responsibility. Conversely, those towns with substantial vacant land but little employment would have their fair share reduced. Finally, the fact of the matter is, no fair share methodology would be complete without a factor which assesses the physical capacity of a municipality to accommodate development in that area into which the Supreme Court sought to channel Mount Laurel growth.

(2) Present Employment

This factor measures the number of existing jobs in a municipality as compared to existing jobs in the region. The Supreme Court has singled out the importance of employment as an allocation factor, id. at 256, as have all planning experts before this court. A major goal of Mount Laurel is to enable people to live in decent housing near their place of employment. Id. at 210-211, n. 5. This factor represents a present housing demand since the existence of jobs creates the need for shelter. It may also reflect a policy of exclusion which has existed for many years because some towns have invited factories but excluded the workers. It is just as exclusionary to prevent workers from living near their workplace as it is to prevent the poor from living in more affluent communities. Id. at 211. Finally, to the extent that jobs create ratables, it affects the municipality's fiscal capacity.
Defendant's experts embrace the use of employment as a factor but assert that it should be more heavily weighted and question the adequacy of the data upon which it is based. While accepting the three present need factors, one of the experts contended that present employment should represent 50% of the equation rather than 33 1/3%. Regrettably, he provided no justification for weighting. In the absence of some clear reason to do so, it should not be done. There is a built-in *434 relationship of all of the factors in the methodology, a balance, which is crucial to its overall structure. As just discussed, overemphasizing employment tends to move the fair share back to the more industrialized towns which are usually developed. It would move it away from the suburban bedroom communities which have less employment but more land.
Defendant challenges the reliability of the data for this factor. The factor uses "covered employment" information provided by the New Jersey Department of Labor and Industry. Covered employment represents all private sector jobs covered by unemployment compensation. Consequently, the figures do not include military employment, state employees and some other smaller categories. Also, the data reports jobs based on a post-office address rather than actual location. Therefore, if a job is located in a town which uses another town's post office or if the place of employment crosses municipal boundaries but uses only one post office address, the figures can be misleading with respect to a municipality. From a regional standpoint, in most cases, the figures would not be misleading because they would be counted only once in the regional total. Despite the isolated problems with municipal data, the figures are the most reliable data available. They represent the vast majority of people in the work force and constitute a valid figure in most cases. In special circumstances, adjustments can be made on a case-by-case basis. No such circumstances exist in Warren. The critical importance of including a job factor mandates referral to some statistical base. No one has even suggested a better source.

(3) Median Income

This factor measures the relative position of a municipality's median income as compared to the regional median income. It is intended to account for the town's ability to defray the infrastructure costs of high density building, to identify prior exclusionary policies or to reward prior inclusionary efforts. This factor, like the other factors, has its roots in Mount *435 Laurel II. As to the ability to absorb infrastructure, the Court recognized that satisfaction of the Mount Laurel obligation may impose substantial financial burdens on a municipality. Id. at 265. The factor seeks to equitably distribute those burdens. As to exclusion, the Supreme Court emphasized that towns must plan for all income levels. Id. at 211. As to inclusionary efforts, fairness requires that prior inclusionary construction, even if it does not qualify for credit toward the fair share, should be rewarded.
The criticism leveled at this factor centers on the wisdom of using any economic factor and on its manner of implementation, if it is to be used at all. Those who would eliminate the median income factor argue that the mere existence of a higher median income does not support the conclusion that the municipality can absorb greater infrastructure costs, nor the conclusion that the municipality can absorb greater infrastructure costs, nor the conclusion that the municipality has been exclusionary in the past. The proponents of the use of the factor stress that insofar as Mount Laurel is an economic decision, the use of an income factor is entirely appropriate. They also contend that a municipality which has inclusionary zoning or assisted housing will probably have a lower median income than a municipality which has been more exclusionary. For example, a municipality that has permitted substantial multiple dwelling construction will likely have a lower median income than one which has restricted development to single family homes on large lots. Warren illustrates this proposition. It has no multiple dwelling developments. Most single-family zoning is large lot and its median income is over 140% of its regions.
While I have some reservations as to whether further experience will demonstrate that this factor will accomplish its objectives, those concerns are overridden by the importance of having an economic indicator which mirrors fiscal capacity, prior exclusion, and most importantly, past inclusion. Eventually, the planners and statisticians may develop data which will verify whether there is a connection between median income *436 and these objectives. At such time, the assumptions made here can be retested and the factor can be reevaluated.
Those who find the manner of implementing an economic factor troublesome argue that the median income should be computed in a different manner or that a different economic factor should be used.
The argument that the median income should be computed in a different manner arises out of the fact that, in the present formula, median income is initially expressed as a ratio whereas all other factors are expressed as a percentage. That is, the other factors represent the municipality's proportion of the regional growth area or employment while median income represents the position of the municipality in relationship to the regional median. Thus, factors expressed as percentages of a region will total 100% when the percentages for each municipality in the region are added. The same is not true with a ratio which, for example, in Warren's case is expressed as approximately 140% of its regions median income.
The methodology in this opinion uses the ratio as a modifier by multiplying it by the average percentage of the other factors. Two alternative means of calculation have been suggested. First, the ratio could be maintained as a ratio and multiplied times the fair share number produced by the other percentages. Second, the ratio could be converted to a percentage and multiplied directly times the fair share number rather than being incorporated into the formula and divided equally as in the methodology adopted in this opinion. The difference is most graphically illustrated using Warren's prospective need calculation. For ease of comparison, the examples shall not include the 20% vacant land or 3% vacancy adjustments.

1. The methodology used in this opinion

2.556 (Growth Area) + .304 (Present Emp.) + .428 (Emp. Growth) = 1.096
1.096 (sum of 3 factors divided by 3) × 1.41 (141% median income) = 1.545%

The fourth factor of 1.545%, which represents the three-factor percentage modified by the median income ratio, is then added to the equation and a final percentage obtained as follows:

*437
 2.556 + .304 + .428 + 1.545
 ___________________________ = 1.208%
 4

The new percentage of 1.208% is multiplied times the regional need to obtain the fair share as follows:

 Prospective Need = 49,004
 × 1.208
 _____
 Fair Share 592
 -----

2. As a ratio multiplied times the fair share produced by three factors

As noted in 1 above, the three factors divided by three generate a percentage of 1.096. When multiplied times the regional need of 49,004 they produce a fair share of 537. If the median income ratio is multiplied by that number, instead of being averaged as a fourth percentage, the following results:

 3 Factor Fair Share = 537
 × 1.41 Ratio
 ____
 New Fair Share = 757
 ----

3. As a fourth percentage multiplied times the fair share produced by three factors

As noted in 1 above, the three factors produce a percentage of 1.096 and the ratio modifies this percentage to 1.545. The three factors multiplied times the regional need produced a fair share of 537. If the median income ratio expressed as a percentage is multiplied times 537, instead of being averaged as a fourth percentage, the following results:

 3 Factor Fair Share = 537
 × 1.545 (modified %)
 _____
 New Fair Share = 830
 ___

To summarize, the fair share number without an income factor would be 537. With the median income as a modifier of the three-factor percentage, the number increases by approximately 10% to 592. The median income used as a ratio multiplier causes an increase of approximately 41% to 757. The median income ratio expressed as a percentage and used as a multiplier causes an increase of approximately 55% to 830.
*438 As has been repeatedly emphasized throughout this opinion, the touchstone of a well-designed methodology is that it relies on sound data and that no aspect of it overpowers the formula. It should be a system of checks and balances. The mathematical analysis set forth above demonstrates that the use of alternative means of calculating median income can have a disproportionate effect upon the overall fair share analysis. Furthermore, the mere fact that the median income factor is initially stated as a ratio and then used as a modifier of a percentage does not detract from its validity. The purpose of the use of a ratio is to reflect the position of a municipality in relation to other municipalities and to do it in a manner which does not skew the results.
Another alternative suggested by one of defendant's experts was to avoid expressing median income as a ratio altogether and instead create what he saw as a "true percentage." This expert would derive what he has labelled the municipal median income percentage by multiplying municipal median income times the number of households in the town to produce a gross municipal income. He would then follow the same procedure for all other municipalities in the region and aggregate the municipal totals to obtain a gross regional income. By dividing the municipal gross income by the regional gross income, a municipal median income percentage could be arrived at without ever using a ratio.
This method produces some obviously unsatisfactory results. An example will illustrate. Assume a region having a total gross median income of 60 million dollars. Assume next that Town A has a median income of $30,000 and 100 households. The gross median income of that town would be three million dollars. Assume that Town B has a median income of $20,000, but 1,000 households. The gross median income of that town would be 20 million dollars. Therefore, Town A's regional percentage of median income would be 5%, and Town B's would be 33 1/3%. Yet, by virtue of its substantial growth, Town B might very well have been less exclusionary than Town A. *439 This expert's approach would, in all likelihood, decrease the fair share number of those smaller, affluent towns having large vacant developable land and fewer households. In fact, if applied to Warren, the prospective fair share (without including the 20% vacant land or 3% vacancy adjustments) would be reduced by approximately 25%.
Having completed the analysis of the median income factor, two alternative economic factors should be considered. One recommendation is to use tax ratables as an economic factor. Another is to use the change in the proportion of lower income households in the municipality in relationship to all municipal households.
The use of a ratable factor tends to duplicate the employment growth factor, but less accurately, because of unavoidable deviations in assessment and equalization practices throughout the State. Empirical testing of the ratable factor by the Urban League group demonstrated its disparate results.
The use of a factor based on the change of the proportion of lower income households emanates from an analysis of footnote 49 in Mount Laurel II. Id. at 297. This factor appears to identify exclusion. However, not only does it have a tenuous connection to fiscal capacity but also there is a data problem. Footnote 49 refers to statistics for families. This information is now accumulated for households instead of families. Since this factor is intended to measure a trend over many years, insufficient comparable data is available. Alternatively, it would be necessary to convert the family figures to households and that conversion requires assumptions that would render the data base unreliable. The family to household ratio is a figure which is subject to much debate and frequent change.

b. Prospective Need Factors

(1) Applicability of the Three Present Need Factors

The methodology allocates the prospective regional need through the use of the three present need factors analyzed *440 above, as well as a fourth factor  employment growth. Before discussing the fourth factor, it should be noted that the rationale supporting the use of the three factors for allocation of present need apply equally to their use in the prospective need formula. The allocation of future housing, as with the distribution of present housing, is directly related to the availability of land, the financial capacity to absorb infrastructure costs and the extent of the municipality's past exclusionary practices. Thus, the growth area and median income factors are as appropriate for allocating prospective need as for present need. The present employment factor is intended to show the current job status of the municipality. It represents a present need for housing because the existence of jobs also dictates the need for housing. It also reflects prior employment history and to the extent that jobs create ratables, it reflects upon a municipality's financial capacity. The reasons supporting the present employment factor have equal applicablity to the prospective need and, as will be seen, the factor also serves as a balancing mechanism to the employment growth factor.

(2) Employment Growth

The employment growth factor is intended as a predictor of future job growth. It measures employment trends and mirrors the land use policies promoted by the municipality. It is tied together with the current employment factor by the fact that people are attracted to live in the area in which they are employed. As noted, Mount Laurel II specifically favors the use of employment factors in fair share allocation. Id. at 256. The presence of the two employment factors in the prospective need formula tends to avoid the unfair results which could occur if only employment growth were considered. For example, a municipality which historically had little employment, but has had a recent, sudden and possibly aberrant burst of employment could be assessed a fair share number which might be unrealistically high. Again, the two factors check and balance each other.
*441 Three criticisms of the employment growth factor should now be considered. Defendant suggests weighting the employment factors and also argues with the reliability of the employment data. Those arguments have been fully addressed above in the discussion of the present employment factors.
The last argument raised by defendant concerns the mathematical method by which employment growth is projected. Defendant contends that a straight arithmetic measurement is preferable to the linear regression method used in this opinion. The straight arithmetic approach involves identifying the job base in the first year of the period to be measured and the job base in the last year of the period to be measured. Assuming there has been any job growth, the number of jobs in the first year would be subtracted from the number of jobs in the last year. The number produced would be divided by the number of years spanned and would represent the average job growth over that period. The linear regression method involves a much more sophisticated statistical approach, the complexities of which need not be addressed in this opinion. Suffice it to say that the purpose of using linear regression analysis is to establish a trend line which is truly reflective of the employment growth picture. It does so by evening out sharp increases and decreases which occur over the trend period and by reducing the impact of a sharp increase or decrease occurring in the last year of the trend period.
The value of the linear regression method over the straight line method is amply demonstrated in this case and, indeed, to Warren's benefit. The testimony discloses that for the decade 1972-1973 to 1983-1984, Warren had an employment growth of 539 jobs or roughly 54 jobs per year. Plaintiff's rebuttal testimony, utilizing employment statistics which became available towards the close of the case, revealed that Warren had experienced a growth in the 1983-1984 period of 1786 jobs. If the projection decade is moved forward one year to include the new data, the average employment growth on a straight line for the new decade would be 242 jobs per year  almost a 350% *442 increase. If the full 11-year period for which covered employment figures are available was utilized on a straight line, the average growth would be 211 jobs per year or almost a 300% increase. The result of applying linear regression would be to soften the impact of the tremendous growth in 1983-1984. Again, the desire to avoid extreme results controls the selection of the proper method.
Before completing the discussion of the allocation factors, it is again necessary to tie up some loose ends. As to the calculation of all four factors, the regional figure, which is the denominator used to obtain the percentage, excludes data from all selected urban aid and non-growth municipalities. There is a common theme which justifies this exclusion as well as specific reasons pertinent to each factor.
The common theme evolves from the fact that non-growth municipalities have no responsibility to the regional need. Similarly, selected urban aid municipalities do not have an obligation to handle more than the regional average of substandard housing and, therefore, they have no regional obligation, because realism requires a recognition that their present circumstances render it impossible for them to absorb more than the regional average. Id. at 243. Since the fair share methodology seeks to distribute 100% of the obligation among those municipalities who have it, it is unreasonable to include the data of those municipalities which have no regional obligation. That is so because in dividing up the regional pie equitably, the primary consideration is the relationship of every municipality having the obligation to every other municipality having the obligation. Inclusion of municipalities having no obligation would distort that relationship.
Specific reasons concerning each factor also call for this exclusion. This formula excludes selected urban towns from the growth area calculation because they are the traditional core areas or similar towns not likely to attract Mount Laurel type housing and because they generally lack significant vacant *443 land. Non-growth municipalities obviously cannot contribute to a count of growth acreage. This formula excludes selected urban aid municipalities from both employment figures because it would unreasonably diminish the responsibility of towns having a fair share obligation. If the high concentration of employment, albeit declining, in the selected urban aid municipalities was included in the regional total it would decrease the percentage of all municipalities having a regional obligation. The formula excludes selected urban aid municipalities in the calculation of the regional median income in order to make it more likely that towns which have made inclusionary efforts will be rewarded. If the median income of the selected urban aid municipalities were included, it would probably depress the regional median income so low that virtually no town having a fair share obligation would fall below the median. Therefore, even the most commendable efforts would go unrewarded.

II.

COMPLIANCE
Having determined that Warren Township's fair share is 946, it is now necessary to evaluate Warren's ordinances to ascertain whether they meet the Mount Laurel obligation. A finding that the land use ordinances are compliant requires a showing that Warren has removed all excessive restrictions and exactions which would preclude actual construction of its fair share. Id. at 258-259. If the removal fails to generate compliance, then Warren must employ affirmative devices such as, subsidies and inclusionary zoning. Id. at 260-274.
With this legal framework in mind the township's response should be reviewed. On December 2, 1982, the township adopted ordinance 82-19 which amended its existing zoning ordinance. That amendment purports to establish two high density zones (R-20th and R-20tha) consisting of three parcels. The ordinance provides for density bonuses which, in one district, would allow a density level up to seven units per acre and, *444 in the other, up to eight units per acre. The amendment also rezoned three other parcels, only one of which was offered by defendant for Mount Laurel compliance purposes. That parcel was rezoned R-10 to allow 10,000-square foot lots which could be varied in size down to a minimum of 7,500 square feet if sufficient lots are increased in size to maintain an average lot size of 10,000 square feet. On December 1, 1983, ordinance 83-20 was adopted providing for the mandatory construction of 30% lower income homes in any developments constructed in R-20th and R-20tha zones created by ordinance 82-19 but not for R-10 zones. Ordinance 83-20 also provided for the submission of a pro forma statement concerning low and moderate income housing, mechanisms to guarantee the maintenance of housing at lower income levels, provision for a waiver or reduction of the 30% mandatory set aside and allowance for least cost housing, in lieu of lower income units.
By defendant's own admission these modifications would result, at best, in 324 units of lower income housing. In light of defendant's additional admission that the fair share obligation is at least 419 units, there is no question that the zoning ordinance does not comply with Mount Laurel. The conclusion is even more powerfully buttressed by the court's finding that Warren's fair share if 946 and by the finding that the modifications to the ordinance will not generate even the 324 units that defendant claims it will produce.
Given defendant's admissions that its modifications are inadequate to reach its fair share number, it is not necessary to spend a substantial amount of time analyzing Warren's land use regulations. However, to provide some guidance to the master and the township in its revision efforts, certain aspects of the ordinance warrant comment.

Removal of Excessive Restrictions and Exactions
The removal of excessive restrictions or exactions refers to both the zone plan and those provisions of the zoning ordinance which would prevent actual construction of lower *445 income housing. Id. at 258-259. Even if the zone plan allows for sufficient density, it may also be necessary to remove other provisions of the ordinance to insure actual construction. The vast majority of the residential zoning in the town is restricted to 1 1/2-acre lots. Such large lot zoning will not produce Mount Laurel housing. Furthermore, even the "smaller" lot zoning requires a minimum average of 10,000 square feet (approximately 1/4 acre) and imposes other conditions which render it useless for Mount Laurel compliance. Cf. Mount Laurel I, 67 N.J. at 183. The township's efforts at high density rezoning are also suspect. Ordinance 82-19 does not contain any density bonus for lower income housing. Rather, the bonuses are for such things as energy conservation, senior citizen housing, voluntary square footage limitation and open space. Finally, the multiple housing and density bonuses permitted in the high density zones are only permitted on a conditional use basis, thus requiring anyone seeking to construct lower income housing to undertake a possibly lengthy approval process.
Other excessive restrictions and exactions will merely be noted. As to chapter XVI of the township codification dealing with zoning, see the following:
1. § 16-4.5(b) requires all townhouses to have a private garage.
2. § 16-5.18 requires every townhouse to have a significantly different design from every other townhouse within 150 feet of the lot upon which the structure is erected.
3. § 16-10.3(b)(2) appears to require excessive setback provisions, which could be either cost generating or severely constrain the site layout thereby affecting densities.
As to chapter XV, see the following:
1. § 15-13(d)(3) requires parking and traffic problems to be "resolved". This vague language could inhibit the approval process.
2. § 15-13(d)(5), dealing with screening requirements, would appear to apply to high density development and apparently requires screening in the front yard of such developments.
3. § 15-13(d)(7) appears to give the broad discretion to deny an application if the use were not deemed to be in the public interest. Such site plan provisions are inherently suspect as a matter of law since the purpose of the site plan ordinance is not to countermand zoning provisions. Furthermore, that vague language could be used as a method of inhibiting the approval process.

*446 4. § 15-19, dealing with design standards of roads, appears to have inadequate flexibility concerning road widths and other requirements as it relates to multiple dwellings for Mount Laurel purposes. Mount Laurel construction frequently necessitates waiver or modifications of requirements for curbs, road construction standards and other design standards.
5. The provisions of § 15-20 dealing with environmental assessment should be reviewed. Some of the requirements apparently go beyond issues of environmental concern and speak to the question of whether the use should be allowed at all. Again, that is not the function of a site plan ordinance. There is also some very subjective and vague language including such terms as "disruption of desirable community and regional growth" in § 15-20(c)(5), evaluation of "social impact" in § 15-20(c)(7) and similar phrases which could disrupt the expeditious handling of applications. Note, additionally, § 15-20(c)(7) which requires the applicant to provide a statement of alternative uses in the event that the proposed use is not acceptable, including an alternative of no project at all. Such a provision is patently unreasonable and the requirement that the applicant must substantiate numerous alternatives is without bounds. A site plan ordinance should address planning standards and not the issue of whether the use should be permitted. It should address those standards in clear, concise language which avoids cost generation.

Using Affirmative Devices
With respect to the municipality's use of affirmative devices, ordinance 83-20 provides for a 30% mandatory set aside for lower income housing. Plaintiffs argue that a mandatory set aside of 30% is not feasible and that, in the absence of subsidies, not more than 20% of the housing can be devoted to lower income housing. For a mandatory set aside to be effective, the set aside must be reasonable and the unit density must be reasonable. If the set aside is reasonable and the density is reasonable, actual construction will result. If the set aside is too high or the density too low, no construction will occur because the project must be profitable. Cf., id. at 268, 279, n. 37. If plaintiff's argument in this case is correct, an issue not passed upon at this time, the 30% mandatory set aside could actually frustrate the construction of lower income housing. The township must reexamine its position. The provision in ordinance 83-20, which allows the waiver of the 30% requirement, may be an inadequate answer to this concern. As noted, the waiver is part of a conditional use procedure, which may be *447 cost generating and the existence of the waiver provision could be abused so as to result in no lower income housing at all.
The foregoing comments are not intended to pass upon the validity of any of the sections noted, nor are they intended to catalogue completely the potential inadequacies of the existing ordinance. The revision of the ordinance should not be done by court review or fiat at this time. Rather the governing body, planning board, the master and all those interested in the process should have the opportunity to submit a compliant ordinance to the court.

III.

BUILDER'S REMEDY
Mount Laurel II requires that a builder's remedy be granted if the builder has succeeded in the litigation and proposes to construct a substantial amount of lower income housing, and if the municipality has failed to prove that the proposed project would either substantially harm the environment or be otherwise clearly contrary to sound land use planning. Id. 92 N.J. at 279-280.
It is evident from what I have said that plaintiffs have succeeded in demonstrating that Warren's ordinances fail to comply with Mount Laurel guidelines. Furthermore, plaintiffs have demonstrated their intention to construct a minimum of 20% lower income housing units through concept plans and the testimony of their principals. The only defense raised to the builder's remedy concerns the suitability of the properties from an environmental standpoint. In that regard, Mount Laurel places a heavy burden on the defendant raising this defense to prove that the danger is substantial and very real. Mount Laurel I, 67 N.J. at 186-187; Mount Laurel II at 331, n. 68.
Defendants attempted to establish, through the testimony of an expert in waste water management, that the proposed projects would have a negative effect upon the Dead River and *448 also that there was inadequate sewer capacity within the township to accommodate the projects. Plaintiffs sought to counter that testimony through their own waste water expert who took the position that adequate existing capacity could be found or a method of treatment could be developed which would not degrade the water quality in the Dead River. Most of the testimony centered around the issues of whether governmental approval could be obtained by plaintiffs for the use or expansion of existing sewer facilities and the right to discharge the volume of effluent involved. Warren's expert pointed to the Wastewater Facility Plans affecting Warren (commonly known as the 201 studies) and the Water Quality Management Plans pertaining to Warren (commonly known as the 208 studies). Both studies are planning tools designed to establish a blue-print well into the twenty-first century for avoiding water pollution. The plans are developed based on expected water flow which, in turn, is extrapolated from population projection. The projections are made by the State predicated upon existing land use regulations in each municipality. Once the projections are aggregated, a total wastewater flow figure is obtained by using standard ratios of population to wastewater. Thereafter, the expected flows are disaggregated to the counties and ultimately to the municipalities. The municipalities or regional authorities, then develop wastewater management treatment plans utilizing their allocation of anticipated flow. Based on this allocation, Warren constructed its treatment plants through a subscription procedure which required landowners who desired sewer capacity to pay for a portion of the cost of the facility. In exchange, the property owner received a subscription contract which entitled the owner to a gallonage reserve. As a result, defendant argues that the growth of the township is necessarily limited by the wastewater allocation to Warren and the commitment Warren has made to its prospective users.
The reasoning is fallacious. The state population projections embody existing zoning patterns. In Warren's case *449 and others, that zoning is exclusionary. To permit Warren to hide behind a state policy which incorporates exclusionary zoning, is to permit Warren to do indirectly what it cannot do directly. Furthermore, testimony revealed that while these studies are useful long range planning tools, they are subject to modification upon proper application. As our Supreme Court has emphasized, without the assistance of the municipalities, the prospect of lower income housing is practically impossible. Id. at 263. The court expects that Warren will do whatever is necessary to help plaintiffs obtain modification of existing limitations.
At this posture the court will invite the master's opinion as to whether, notwithstanding the township's best efforts, the builders' projects are precluded by the unavailability of sewer capacity or the likelihood that no means are available to handle their effluent in the foreseeable future. Certainly, the court does not want to award a builder's remedy which cannot be fulfilled. The master should carefully scrutinize this issue so that the court can be assured that the builder's remedy received by plaintiffs is likely to be implemented within a reasonable time frame. If the court cannot be so assured, Warren will be called upon to satisfy its obligation elsewhere.
The court does not pass upon the densities requested by the builders or other specific aspects of the concept plans submitted. The governing body, planning board, plaintiffs, the master and other interested parties should all confer with respect to plaintiffs' proposed project for the purposes of attempting to agree upon appropriate development plans. Id. at 280. To the extent that the interest of the municipality and the parties can be accommodated within the bounds of Mount Laurel II requirements, the court should defer to those judgments. Of course, in the event that the positions of the parties cannot be reconciled, the master should recommend to the court a solution to the problem for the court's subsequent review.
*450 In light of the court's finding that the land development ordinances of Warren violate Mount Laurel II, Warren Township is hereby directed to revise its ordinances within a period of 90 days of the filing of this opinion. Warren shall eliminate from its ordinances all cost generating provisions which would stand in the way of the construction of lower income housing. If necessary it shall also incorporate in its revised ordinances all affirmative devices necessary to lead to the construction of its fair share of lower income housing. See generally Mount Laurel II at 258-278.
I shall appoint by separate order, a special master to assist the municipal officials in developing constitutional zoning and land use regulations in conformity with Mount Laurel II.

IV.

CONCLUSION
The authoring of this opinion has strained my literary capacity to make the subject matter easily intelligible while at the same time not sacrificing accuracy and thoroughness. No doubt the opinion has also strained the reader's patience. However, the tedium is now over, for this conclusion will address the broader issues underlying the technical concepts discussed above.
Notwithstanding the importance of a fair share methodology in fulfilling the stated purposes of Mount Laurel II, the bottom line to all those involved in the litigation is the number generated. Despite the imprecision of the tools used for calculating the number, the Supreme Court requires me to fix a precise number because it believes that requirement is most likely to achieve the goals of Mount Laurel. Id. at 257. As in other areas of the law, a plaintiffs' and defendants' bar has developed in Mount Laurel litigation. Plaintiffs complain that the numbers produced by most of the formulas suggested are too low because they will not meet the need, because they are too low in areas most suited for lower income construction and because *451 they are too low to attract builders to sue. Plaintiffs' first complaint assumes that, in the absence of governmental subsidies, not more than 20% of any project will consist of lower income units. Based on that assumption and the statement that 40% of the state's families qualify as lower income, id. at 221-222, n. 8, one-half of the need will not be met in each project. Plaintiffs' second complaint, that the allocation methods do not give the most suitable municipalities a larger burden, rests on their assertion that the methodology adopted emphasizes employment. They theorize that this emphasis shifts the obligation to the more industrialized and developed communities. Plaintiffs' third contention, that the numbers are too low to attract builders, rests on principles of economics. Where fair share numbers are low, the builders are not likely to be attracted to those communities. The low numbers mean that few parcels are available. This, in turn, can inflate the market price, cause the availability of the tracts to depend on the individual predilections of the owners, subject those owners to political pressures and otherwise depress the activity of the real estate market for Mount Laurel housing. Id. at 261-262, n. 26. In short, there must be a climate created that fosters Mount Laurel construction.
Defendant argues that the numbers are too high because it will be necessary to build more market units than are needed to satisfy the lower income demand, because the size of the obligation will discourage voluntary compliance and because the magnitude of the construction is bound to damage the environment. The first argument presupposes that, in order to build one lower income unit without external subsidies, it is necessary to construct an additional four market units. Hypothetically, if there is a total regional need for 100,000 housing units and 40,000 (40%  the approximate state average) of those are to be lower income units, it would be necessary to build 200,000 units to satisfy the lower income need. In the process of constructing the 40,000 Mount Laurel homes, a surplus of 100,000 market value homes would be built. A corollary argument *452 is that historically, building rates in New Jersey have never reached a level which could satisfy this volume of construction by 1990. Defendant's second argument, that the numbers discourage voluntary compliance, rests on the hypothesis that if the numbers were lower, the towns would be less prone to fight them. If they are too high, they must fight because the numbers are unattainable without degrading the quality of life in the municipality. The third environmental argument is related to the second in that defendant equates large construction with irreparable environmental damage.
While all of plaintiffs' and defendant's arguments concerning the numbers game have varying degrees of merit, it is not necessary to address them individually. Depending on one's philosophical bent, degree of concurrence with Mount Laurel's objectives and propensity for subjective analysis, one could easily join plaintiffs' or defendants' bar. However, while others may be entitled to such perspectives, I am not. The Supreme Court has charged the three Mount Laurel judges with the responsibility of formulating a methodology which identifies the housing needs of lower income people and thereafter fairly distributes the needs. Once the need is identified, it cannot be ignored to satisfy defendants or inflated to satisfy plaintiffs. The answer to the numbers game is squarely addressed by the Supreme Court:
The provision of decent housing for the poor is not a function of this Court. Our only role is to see to it that zoning does not prevent it, but rather provides a realistic opportunity for its construction as required by New Jersey's Constitution. The actual construction of that housing will continue to depend, in a much larger degree, on the economy, on private enterprise, and on the actions of the other branches of government at the national, state and local level. We intend here only to make sure that if the poor remain locked into urban slums, it will not be because we failed to enforce the Constitution. [Id. at 352]
In designing a fair share methodology, subjective preconceptions should not control. Rather, the methodology should seek to determine objectively the precise extent to which a municipality must open its doors to the poor. Once that need is identified and the obligation imposed, the economy, private enterprise and *453 other branches of government will decide whether the need will be satisfied.
The pivotal question is not whether the numbers are too high or low, but whether the methodology that produces the numbers is reasonable. Any reasonable methodology must have as its keystone three ingredients: reliable data, as few assumptions as possible, and an internal system of checks and balances. Reliable data refers to the best source available for the information needed and the rejection of data which is suspect. The need to make as few assumptions as possible refers to the desirability of avoiding subjectivity and avoiding any data which requires excessive mathematical extrapolation. An internal system of checks and balances refers to the effort to include all important concepts while not allowing any concept to have a disproportionate impact.
The emphasis on these three ingredients is the continuous thread weaving itself throughout the fabric of the justification of the methodology. For example, with regard to reliability, the methodology relies heavily on census data wherever possible since all concede it is generally the most trustworthy source. A primary reason for adopting a prospective need region based on county lines was to obtain the benefit of county data which is more reliable than municipal data. Cf. Mount Laurel II at 258. In choosing a land allocation factor, the formula utilized only growth area because it is significantly more reliable than the data on vacant developable land. Finally, the employment factors used covered employment data, by all accounts, the most accurate statistics available.
With regard to the effort to avoid assumptions, several examples will illustrate. The methodology avoids subjectivity by focusing the definition of substandard housing only on three factors because they are the clearest indicators of deficient housing. The inclusion of other categories of deficiencies are less certain indicators of substandardness. The methodology avoids excessive mathematical extrapolation by rejecting an *454 economic factor devised from Mount Laurel II. Id. at 297, n. 49. That factor would evaluate exclusionary or inclusionary efforts premised upon the changes in the percentage of lower income families residing in the town. One reason for dismissing it was that it involved a conversion of family data into household data since reporting methods have changed. That conversion requires assumptions which, if even slightly incorrect, can create a large margin of error.
With regard to internal checks and balances, two examples will suffice. The projection of population to determine prospective regional need averages two population models, one which is considered to be conservative and the other more liberal. The allocation factors contain numerous checks and balances. The growth factor tends to draw fair share to large areas of suitable land and thereby offsets the pull of the employment factors to more urban and developed areas. The two employment factors in the prospective need formula tend to check each other because one reflects past trends and the other, future projections. The median income and growth area factors tend to balance the absence of significant employment in the bedroom communities by their emphasis on greater wealth and greater land capacity.
Not only must any reasonable methodology have as its keystone the three ingredients just discussed, but also it must be sufficiently structured to produce consistent results and it must be sufficiently flexible to deal with extreme cases at both ends of the spectrum. In the Mount Laurel context, the need for a bright line standard is paramount because "confusion, expense and delay have been the primary enemies of constitutional compliance in this area." Id. at 292. Our Supreme Court has eloquently described the result:
The waste of judicial energy involved at every level is substantial and is matched only by the often needless expenditure of talent on the part of lawyers and experts. The length and complexity of trials is often outrageous, and the expense of litigation is so high that a real question develops whether the municipality can afford to defend or the plaintiffs can afford to sue. [Id. at 200]
*455 Such results compelled the Court "to put some steel," ibid, into the Mount Laurel doctrine by providing certainty in its implementation. The Court itself resorted to bright line standards. Thus, the SDGP replaced the developing standard. Id. at 225. The precise fair share number standard replaced the numberless approach. Id. at 222. The centralized management by three judges replaced the county based management of the cases. Id. at 253. Similarly, the methodology set forth in this opinion draws bright lines which should eliminate confusion and strengthen the doctrine.
Despite the imperative of certainty, the methodology is not blindly rigid. It recognizes that some towns will lack the vacant developable land to handle the fair share the formula would assign  and so creates the vacant developable land defense. It acknowledges that some towns have made inclusionary efforts  and so rewards them through the use of the median income factor and by direct credits where appropriate. It understands that the methodology will not produce equitable results in every case  and so in extreme cases the litigants shall have the opportunity to persuade the trial court that an adjustment is appropriate. Cf. Mount Laurel II at 239-240.
This opinion would not be complete without commenting upon the task which has confronted this court and the challenge that lies ahead. The Supreme Court aptly characterized the assignment as follows:
The most troublesome issue in Mount Laurel litigation is the determination of fair share. It takes the most time, produces the greatest variety of opinions, and engenders doubt as to the meaning and wisdom of Mount Laurel. ... Each of these issues (region, regional need and allocation) produces a morass of facts, statistics, projections, theories and opinions sufficient to discourage even the staunchest supporters of Mount Laurel. The problem is capable of monopolizing counsel's time for years, overwhelming trial courts and inundating reviewing courts with a record on review of superhuman dimensions. [Id. at 248]
While the Supreme Court provided some general guidance concerning fair share, it envisioned that the specialized trial court it created would undertake the task of devising a comprehensive approach to the subject. Id. at 253-255.
*456 Over the year which has elapsed since my assignment, I have had the opportunity to examine innumerable fair share reports, to engage in many court proceedings centering on fair share and have presided over two full blown trials which focused on fair share issues. This exposure has provided me with exactly the background which the Supreme Court foresaw as essential to resolving the difficult issues involved in fair share allocation. In that process, the Urban League Report has evolved. It has captured the attention of counsel in litigation and in conferences. I have become fully familiar with it, examined it as well as any other alternatives, in light of all of my experience. The methodology, both in its individual elements and as a whole, has survived every test and remains as the most carefully conceived approach presented to me. To those who would say that this opinion merely rubber stamps the Urban League approach, I invite them to examine the justifications for the methodology set forth in this opinion and, I urge them to offer a better alternative.
Indeed, the methodology represents the beginning of the refinement process. It is not written in stone and it should therefore provide the impetus for those in the legal and planning community, as well as others, to improve upon it or replace it with something better. However, in the interim, the Mount Laurel doctrine which has too long awaited a political consensus must not wait as long for a judicial resolution. Id. at 212. A substantial segment of the planning community has had its chance to achieve agreement and it has now done so. They could have debated for years over equally reasonable alternatives. Over the course of that debate, the uncertainty which has plagued the doctrine would have continued, the doctrine would have remained weak and the day when housing opportunities for lower income citizens became realistic would have been delayed. Instead, the planners have put aside their academic differences and taken a significant step towards the certainty contemplated by the Supreme Court, id. at 252-253, until a clearly preferable approach evolves. This decision is *457 intended to take another step toward the achievement of the goal of consistency, which is critical to the fulfillment of the constitutional obligation. Id. at 254.
This opinion has explored in depth the most minute aspects of fair share allocation and the broadest implications of the methodology espoused. Yet, it should not be forgotten that all that has been said most directly affects the residents of Warren Township. This community of approximately 20 square miles and 10,000 people is nestled in the Watchung range in a portion of our State known for its rural character and scenic beauty. It has significant undeveloped land, has relatively little commerce, has had comparatively slow population growth and its housing includes many high cost homes on spacious lots. In short, it is a very desirable place to live. Nonetheless, Warren is in the process of change. The construction of Route 78 and other factors have caused the entire Clinton corridor, of which Warren is a part, to burgeon. As a result Warren and its neighbors have drawn highly desirable commercial development along with the executives seeking to live in comfort near their place of employment. Absent Mount Laurel, Warren would experience substantial attractive ratable growth and continued exclusive residential development. With Mount Laurel, change will also occur, but of a different character. Warren is also appealing for Mount Laurel development because it is located entirely within a growth area, has an excellent employment picture and has a much higher income base than its regions. Although the exact affect of lower income development cannot be gauged, there will be demands on the infrastructure and the public services may require expansion. Warren complains that it must accept this alternative and that it must do so without assurance that other municipalities will do their part.
The issue is one of equity  the "fair" in fair share. Warren's complaints are understandable. Naturally it cherishes its character and it has a right to expect others to equally bear the burden of housing the poor. Warren's equity argument is *458 two-fold. It is unfair to require Warren to satisfy its fair share before other municipalities do their part. Secondly, it is unfair to bring such change to Warren.
As to the equity amongst municipalities, complete equity is not reachable, as the Supreme Court clearly stated:
There may be inequities between and among these municipalities located within growth areas, as there undoubtedly are between all of them and municipalities outside of growth areas, for the tax and other burdens caused by the location of lower income housing will not be fairly spread. [Id. at 239; cf. 304, n. 54]
As to the equity between those who live in Warren and those who do not, candor requires a recognition that when Warren fulfills its Mount Laurel obligation there will be significant change. However, this decision represents only the first step in an ongoing process. The real challenge lies ahead in sensibly and sensitively planning the change which must occur. Our Supreme Court emphasized that the change caused by the satisfaction of the fair share need not be destructive. All who are involved in the process  the governing body, the planning board, plaintiffs, the master and the court must strive to devise a solution which will maximize the housing opportunity for the poor and minimize the impact on Warren. In the final analysis, in striking the appropriate balance between the rights of the residents of Warren and the rights of those who have been excluded, Warren must make the changes necessary to receive our lower income citizens if their constitutional rights are to be enforced.
*459 

*460 APPENDIX B

 PRESENT NEED CALCULATION: TOWN X
 A B C D E F
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Cntr Room Units
 Ovrcrwded Lack Com Plumbing Heat not Heaters lck ctr
 Units Plumbing Not o/c o/c w/flue heating
 ---------------------------------------------------------------------------
 TOWN X 57 16 14 156 107 68
 G H I J K L M
 % Units Units
 w/o ctrl Lacking Total Adjusted Occupied Fair Surplus
 htn, with Adequate Present Present Dwelling Share Present
 inad.htng Heating Need Need Units Cap Need
 ---------------------------------------------------------------------------
 TOWN X .38857143 61 132 108 2591 166 -58

*461 EXPLANATION OF APPENDIX B

PRESENT NEED CALCULATION
A. To determine the number of substandard units in Town X, use the table shown on the previous page as follows:
1. Identify the number of overcrowded units by using column A.
2. Identify the number of units lacking complete plumbing for the household's exclusive use, but which are not overcrowded by using column C.
3. Identify the number of units reported in the 1980 census which qualify as substandard as a result of having one of three types of heating deficiencies: (1) have room heaters with no flue; (2) are heated by fireplaces, stoves or portable room heaters; or (3) have no heating whatsoever. The census also reports a fourth type of heating deficiency  room heaters with a flue. This fourth category is not considered substandard. To identify the substandard heating units in an unduplicated count, utilize columns D through H, which represent the following:

Column D  Represents units not overcrowded, with one of the four types of deficiencies.

Column E  Represents all units with the fourth type of heating deficiency  even if those units are also overcrowded.

Column F  Represents all units with any of the first three types of heating deficiencies  even if those units are also overcrowded.

Column G  Represents the percentage of units with the three types of heating deficiencies that qualify a unit as substandard, in relationship to the total number of units with the four types of heating deficiencies. This number is derived by dividing column F by the total of columns E and F.

Column H  Represents all units with the three types of heating deficiencies that render a unit substandard  which are NOT overcrowded. This number is derived by multiplying column G by column D.
Column D, E, and F represent data taken directly from the 1980 census. Columns G and H represent computations that must be done with the census data to identify those units, which have one of three heating deficiencies that render them substandard, and which also are not overcrowded.
*462 There are two reasons why these computations are necessary:
First: Column D cannot be used alone because it includes units having room heaters with flues  that is units with heating deficiencies which do not render them substandard.
Second: Column E cannot be subtracted from column D or, in the alternative, column F cannot be used alone to obtain a clear count of unit with the three heating deficiencies because columns E and F include units with heating deficiencies even if they are also overcrowded. Since column A already accounts for overcrowded units, inclusion of any of the overcrowded units in columns E and F would constitute double counting.
The computations involved in deriving columns G and H solve these two problems by initially determining the percentage of units with any of four deficiencies as compared to those having the three deficiencies considered substandard (column G). By multiplying this percentage times the number representing the total of units which have any of the four deficiencies and which are not overcrowded, (column D) the resulting number represents those units which have any of the three critical types of heating deficiencies and which are not overcrowded. Thus, those units that are substandard as a result of heating deficiencies are provided in an unduplicated count. However, there is implicit assumption in this calculation that the ratio of room heaters with flues (column E) as compared to the other units lacking adequate heating (column F) is the same in both overcrowded and non-overcrowded units.
Warren Township's data cannot be used to illustrate the procedures discussed above because none of the units that fall into any of the four categories of heating deficiency in columns E and F are also overcrowded. Thus, it is not necessary to go through the computations to determine the extent to which column D represents units with one of the three deficiencies which are not overcrowded. Instead, the extent to which *463 heating deficient units contribute to Warren's total count of substandard units comes directly from column F.
4. Determine Town X's total number of substandard units by adding columns A, C and H. Note that column B plays no role in the derivation of the municipality's obligation. This column represents a category of substandardness provided for informational purposes only. Note also that the data for Atlantic, Cape May, Cumberland, Monmouth, Ocean and Salem counties omits column B. Therefore, when using the Town X example for those counties treat the second column as column C, the third column as D and so forth.
B. Once the total number of substandard units is ascertained, Town X's indigenous need is determined by reducing that total by 18% to reflect those households living in substandard units that do not qualify as lower income. Column J reports Town X's indigenous need.
C. To determine whether Town X contributes to the present need pool, compare the municipal substandard housing percentage to the regional substandard housing percentage. The municipal substandard housing percentage consists of the indigenous need (reported in column J) divided by the total number of occupied units within the municipality (represented by column K). The regional substandard housing percentage is 6.4% for Region I of which Town X is assumed to be a part. By multiplying 6.4% times the number of occupied dwelling units within the municipality, the number of units that would have to be substandard within the municipality for the municipal substandard housing percentage to equal the regional substandard housing percentage can be ascertained. That number is reported in column L. Since column L exceeds column J, that means Town X has fewer substandard units than the number produced by the regional average. That number is shown with a minus sign in column M. Had column L been less than column J, then Town X would have had a higher number of substandard units than its number produced by the regional percentage. In such *464 a case, the difference between columns L and J would have represented Town X's contribution to the surplus present pool and would be shown in column M without a minus sign.

APPENDIX C

SURPLUS PRESENT NEED DATA

DISCLAIMER
This appendix is based on documents prepared by a member of the Urban League advisory group. It is provided for informational purposes only as to those municipalities not included in Warren Township's present need region.

PURPOSE OF APPENDIX C
The summary sheet on the following page is designed to enable the reader to understand the derivation of the surplus present need for each present need region set forth in Appendix A. The summary sheet also permits the reader to identify the surplus present need generated by any other regional configurations, providing those regions follow county lines and providing the same method for identifying surplus present need is used.
The five pages, which follow the summary sheet, lists by county each municipality having a present surplus need.
The remainder of Appendix C is the source data for the surplus present regional need for each municipality listed by county. With regard to Warren's present need region, no litigant has challenged the mathematical accuracy of the data. With regard to the counties not in Warren's present need region, the source data has not been the subject of adversarial litigation before this court.

*465
 SURPLUS PRESENT NEED TOTALS
 BY COUNTY AND REGION
 COUNTY
 1. Atlantic 714 12. Middlesex 1,463
 2. Bergen 229 13. Monmouth 1,827
 3. Burlington 832 14. Morris 89
 4. Camden 2,313 15. Ocean 735
 5. Cape May 239 16. Passaic 6,106
 6. Cumberland 762 17. Salem 222
 7. Essex 13,511 18. Somerset 0
 8. Gloucester 463 19. Sussex 348
 9. Hudson 10,718 20. Union 2,199
10. Hunterdon 174 21. Warren 177
11. Mercer 1,284
 REGION
 Region I: 35,014
 Region II: 2,562
 Region III: 4,892
 Region IV: 1,937
 REGION I
Bergen County
 Fairview 33
 Garfield 188
 Wallington 8
 ___
 229
Essex County
 East Orange 1,165
 Irvington 425
 Newark 11,406
 Orange 515
 ______
 13,511
Hudson County
 Bayonne 352
 East Newark 31

*466
 Guttenberg 68
 Harrison 203
 Hoboken 2,141
 Jersey City 4,921
 North Bergen 167
 Union City 1,732
 Weehawken 146
 West New York 957
 ______
 10,718
Hunterdon County
 Alexandria 13
 Bethlehem 5
 Califon 5
 East Amwell 12
 Glen Gardner 1
 Kingwood 36
 Lambertville 43
 Lebanon Township 58
 Union 1
 ___
 174
Middlesex County
 New Brunswick 701
 Perth Amboy 762
 _____
 1,463
Morris County
 Dover 36
 Jefferson 47
 Victory Garden 6
 __
 89
Passaic County
 Passaic 1,997
 Paterson 4,072
 Prospect Park 6
 West Milford 31
 _____
 6,106
Somerset County
 None
Sussex County
 Andover 1
 Frankford 31
 Hamburg 5
 Hardyston 18
 Lafayette 17

*467
 Montague 37
 Sandyston 47
 Stillwater 18
 Sussex 30
 Vernon 51
 Walpack 2
 Wantage 91
 ___
 348
Union County
 Elizabeth 1,975
 Plainfield 224
 _____
 2,199
Warren County
 Blairstown 47
 Franklin 4
 Frelinghuysen 13
 Hardwick 32
 Harmony 22
 Hope 9
 Knowlton 24
 Liberty 15
 Washington Twp. 1
 White 10
 ___
 177
 REGIONAL TOTAL = 35,014
 REGION II
Monmouth County
 Aberdeen Township 25
 Asbury Park 525
 Belmar 72
 Bradley Beach 77
 Englishtown 7
 Freehold Borough 56
 Highlands 14
 Howell 52
 Keansburg 150
 Keyport 44
 Long Branch 394
 Manasquan 21
 Millstone 52
 Neptune Township 201

*468
 Red Bank 48
 Roosevelt 3
 Shrewsbury Township 12
 South Belmar 11
 Union Beach 48
 Upper Freehold 15
 _____
 1,827
Ocean County
 Barnegat Township 19
 Barnegat Light 5
 Eagleswood 15
 Harvey Cedars 1
 Jackson Township 18
 Lacey Township 47
 Lakehurst 58
 Lakewood 219
 Little Egg Harbor 39
 Long Beach 3
 Ocean Township 9
 Ocean Gate 13
 Plumsted Township 89
 Seaside Heights 48
 Seaside Park 12
 Ship Bottom 13
 South Toms River 43
 Stafford Township 36
 Surf City 6
 Tuckerton 42
 ___
 735
 REGIONAL TOTAL = 2,562 dwelling units
 REGION III
Mercer County
 Hightstown 27
 Trenton 1,257
 _____
 1,284
Burlington County
 Bass River 25
 Beverly 20
 Bordentown City 30

*469
 Burlington City 42
 Burlington Township 21
 Fieldsboro 1
 Hainesport 11
 Mansfield 18
 Mt. Holly 61
 New Hanover 28
 No. Hanover 24
 Pemberton Borough 5
 Pemberton Township 340
 Riverside 24
 Riverton 4
 Shamong 12
 Springfield 26
 Tabernacle 25
 Washington 34
 Woodland 44
 Wrightstown 37
 ___
 832
Gloucester County
 Clayton 28
 Deptford 77
 Elk 36
 Franklin 109
 Glassboro 56
 Harrison 10
 Logan 10
 Monroe 8
 National Park 9
 Paulsboro 46
 S. Harrison 11
 Swedesboro 39
 Woolwich 24
 ___
 463
Camden County
 Barrington 19
 Camden 2,132
 Chesilhurst 7
 Gloucester City 20
 Lawnside 34
 Winslow 101
 _____
 2,313
 REGIONAL TOTAL = 4,892 dwelling units

*470
 REGION IV
Atlantic County
 Atlantic City 424
 Buena Vista 53
 Corbin City 1
 Egg Harbor City 8
 Estelle Manor 21
 Hamilton 29
 Mullica 142
 Port Republic 6
 Weymouth 30
 ___
 714
Cape May County
 Cape May Point 2
 Dennis 80
 Middle 44
 Upper 7
 West Cape May 9
 West Wildwood 2
 Wildwood 80
 Woodbine 15
 ___
 239
Cumberland County
 Bridgeton 81
 Commercial 186
 Deerfield 15
 Downe 75
 Fairfield 80
 Greenwich 20
 Lawrence 61
 Maurice River 104
 Stow Creek 16
 Vineland 124
 ___
 762
Salem County
 Alloway 30
 Lalloway Creek 20
 Mannington 37
 Penns Grove 52
 Pilesgrove 8
 Quinton 28
 Salem 35
 Upper Pittsgrove 12
 ___
 222
 REGIONAL TOTAL
 = 1937 dwelling units

*471
 ATLANTIC
 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 15 XII-35 X-17 X-17
 Units Units Other % Units
 Lack Com Lack Room Units w/o Ctrl
 Ovrcrwded Plumbing Ctrl Heat Heaters Lack Ctr Htn, With
MNCPLTY Units not o/c not o/c w/flue Heating Inad Htng
---------------------------------------------------------------------------
ATLANTIC
Absecon 30 11 60 65 46 .41441441
AtlantCity 956 333 1717 1658 765 .31572431
Brigantine 48 17 115 107 118 .52444444
Buena 41 17 44 42 12 .22222222
Buena Vista 108 18 253 197 135 .40662651
CorbinCity 1 4 12 20 15 .42857143
EggHarbor 198 37 543 416 215 .34072900
EggHrbCity 82 39 102 109 30 .21582734
EstelleMnr 10 3 59 30 41 .57746479
Folsom 21 2 39 21 18 .46153846
Galloway 111 34 334 224 171 .43291139
Hamilton 118 46 332 245 163 .39950980
Hammonton 157 55 178 152 60 .28301887
Linwood 20 3 44 27 17 .38636364
Longport 6 1 11 11 23 .67647059
MargateCty 32 16 159 167 138 .45245902
 Units
 Lacking Total Adjusted Occupied Fair Surplus
 Adequate Present Present Dwelling Share Present
MNCPLTY Heating Need Need Units Cap Need
---------------------------------------------------------------------------
ATLANTIC
Absecon 25 66 54 2297 148 -94
AtlantCity 542 1831 1502 16736 1078 424
Brigantine 60 125 103 3443 222 -119
Buena 10 68 56 1267 82 -26
Buena Vista 103 229 188 2085 134 53
CorbinCity 5 10 8 109 7 1
EggHarbor 185 420 344 6809 438 -94
EggHrbCity 22 143 117 1695 109 8
EstelleMnr 34 47 39 270 17 21
Folsom 18 41 34 566 36 -3
Galloway 145 290 237 3915 252 -15
Hamilton 133 297 243 3321 214 29
Hammonton 50 262 215 4099 264 -49
Linwood 17 40 33 1941 125 -92
Longport 7 14 12 561 36 -24
MargateCty 72 120 98 3844 248 -149

*472
 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 15 XII-35 X-17 X-17
 Units Units Other % Units
 Lack Com Lack Room Units w/o Ctrl
 Ovrcrwded Plumbing Ctrl Heat Heaters Lack Ctr Htn, With
MNCPLTY Units not o/c not o/c w/flue Heating Inad Htng
---------------------------------------------------------------------------
Mullica 114 15 267 136 248 .64583333
Northfield 38 3 96 86 34 .28333333
Pleasantvl 212 53 375 387 115 .22908367
PortRepub 1 1 34 6 31 .83783784
SomersPnt 67 19 129 121 34 .21935484
VentnorCty 46 49 194 195 152 .43804035
Weymouth 19 10 61 28 53 .65432099
TOTALS 2436 786 5158 4450 2634
 Units
 Lacking Total Adjusted Occupied Fair Surplus
 Adequate Present Present Dwelling Share Present
MNCPLTY Heating Need Need Units Cap Need
---------------------------------------------------------------------
Mullica 172 301 247 1626 105 142
Northfield 27 68 56 2518 162 -106
Pleasantvl 86 351 288 4662 300 -12
PortRepub 28 30 25 298 19 6
SomersPnt 28 114 94 4295 277 -183
VentnorCty 85 180 148 5031 324 -176
Weymouth 40 69 57 418 27 30
TOTALS 1895 5117 4196 71806 4624

*473
 BERGEN
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
BERGEN
Allendale 8 0 0 6 0 6
Alpine 1 1 0 18 2 18
Bergenfld 208 79 73 297 217 90
Bogota 71 33 31 46 34 18
Carlstadt 54 47 45 80 42 45
Cliffsd Pk 232 221 199 288 210 122
Closter 31 11 11 49 33 28
Cresskill 28 2 2 37 25 12
Demarest 9 1 1 17 17 0
Dumont 110 49 46 128 96 32
E Ruther 72 69 67 166 77 89
Edgewater 73 41 39 92 63 50
Elmwood Pk 181 80 74 128 89 39
Emerson 32 5 5 35 11 24
Englewood 384 129 111 327 235 159
Englwd Clf 20 4 3 19 19 0
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
BERGEN
Allendale 1 6 14 11 1700 109 -97
Alpine .9 16 17 14 495 32 -18
Bergenfld .29315961 87 368 302 8836 566 -264
Bogota .34615385 16 118 97 2856 183 -86
Carlstadt .51724138 41 140 115 2311 148 -33
Cliffsd Pk .36746988 106 537 440 9055 580 -139
Closter .45901639 22 64 53 2622 168 -115
Cresskill .32432432 12 42 34 2357 151 -116
Demarest 0 0 10 8 1520 97 -89
Dumont .25 32 188 154 6095 390 -236
E Ruther .53614458 89 228 187 3122 200 -13
Edgewater .44247788 41 153 125 2080 133 -8
Elmwood Pk .3046875 39 294 241 6715 430 -189
Emerson .68571429 24 61 50 2216 142 -92
Englewood .40355330 132 627 514 8612 551 -37
Englwd Clf 0 0 23 19 1751 112 -93

*474
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
Fair Lawn 98 49 48 140 104 36
Fairview 159 135 121 187 113 107
Fort Lee 411 230 209 343 233 134
Frnkln Lks 17 3 3 12 5 7
Garfield 363 345 321 821 479 422
Glen Rock 17 4 4 15 9 6
Hackensk 701 377 332 414 289 214
Harngtn Pk 12 1 1 14 7 7
Hsbrck Hts 47 42 41 63 32 31
Haworth 3 0 0 14 14 0
Hillsdale 32 18 18 37 6 39
Hohokus 7 3 2 0 0 0
Leonia 39 24 23 62 44 21
LttleFerry 129 67 58 100 86 42
Lodi 361 185 172 319 268 114
Lyndhurst 192 155 148 167 129 46
Mahwah 63 25 21 137 117 76
Maywood 43 41 40 26 17 22
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Fair Lawn .25714286 36 182 149 11571 741 -591
Fairview .48636364 91 371 304 4230 271 33
Fort Lee .36512262 125 745 611 14884 953 -341
Frnkln Lks .58333333 7 27 22 2504 160 -138
Garfield .46836848 385 1069 876 10754 688 188
Glen Rock .4 6 27 22 3740 239 -217
Hackensk .42544732 176 1209 991 15827 1013 -21
Harngtn Pk .5 7 20 16 1341 86 -69
Hsbrck Hts .49206349 31 119 98 4445 284 -187
Haworth 0 0 3 2 1087 70 -67
Hillsdale .86666667 32 82 67 3222 206 -139
Hohokus 0 0 9 7 1381 88 -81
Leonia .32307692 20 82 67 3095 198 -131
LttleFerry .328125 33 220 180 3751 240 -60
Lodi .29842932 95 628 315 9323 597 -82
Lyndhurst .26285714 44 384 315 7402 474 -159
Mahwah .39378238 54 138 113 3721 238 -125
Maywood .56410256 16 99 81 3630 232 -151

*475
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
Mdlnd Park 26 25 23 68 34 39
Montvale 15 7 7 37 19 18
Moonachie 25 11 9 63 54 14
New Milford 93 25 24 49 35 14
NArlington 120 75 72 106 74 32
Northvale 30 6 6 20 16 10
Norwood 19 4 4 23 0 23
Oakland 39 13 13 97 57 51
OldTappan 9 1 1 13 7 6
Oradell 22 3 3 27 24 6
Plsds Pk 172 130 122 140 75 65
Paramus 73 25 24 70 52 22
Park Ridge 29 16 16 58 17 46
Ramsey 29 9 9 96 64 32
Ridgefield 77 59 57 65 47 32
Rdgfld Pk 107 90 88 72 47 32
Ridgewood 61 35 35 140 55 91
River Edge 33 14 12 79 41 38
River Vale 18 6 6 24 0 27
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Mdlnd Park .53424658 36 85 70 2563 164 -94
Montvale .48643649 18 40 33 2276 146 -113
Moonachie .20588235 13 47 39 1003 65 -26
New Milford .28571429 14 131 107 6209 397 -290
NArlington .30188679 32 224 184 6471 414 -230
Northvale .38461538 8 44 36 1506 96 -61
Norwood 1 23 46 38 1292 83 -45
Oakland .47222222 46 98 80 3880 248 -168
OldTappan .46153846 6 16 13 1177 75 -62
Oradell .2 5 30 25 2769 177 -152
Plsds Pk .46428571 65 359 294 5520 353 -59
Paramus .29729730 21 118 97 7644 489 -393
Park Ridge .73015873 42 87 72 2758 177 -105
Ramsey .33333333 32 70 57 4134 265 -207
Ridgefield .40506329 26 160 131 3895 249 -118
Rdgfld Pk .40506329 29 224 184 4867 311 -128
Ridgewood .62328767 87 183 150 8318 532 -382
River Edge .48101266 38 83 68 4113 263 -195
River Vale 1 24 48 39 2850 182 -143
*476 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
RochellePk 24 16 16 33 27 6
Rockleigh 1 0 0 0 0 0
Rutherford 100 80 78 200 67 139
Saddle Brook 60 28 28 130 52 82
Saddle Rvr 0 3 3 35 23 12
S Hack 28 19 19 23 17 10
Teaneck 238 59 53 250 185 76
Tenafly 42 17 14 77 26 57
Teterboro 0 0 0 0 0 0
UpSdleRvr 15 8 7 31 16 41
Waldwick 58 10 10 42 29 21
Wallingt 109 112 107 286 142 157
Washington 23 4 2 46 43 7
Westwood 59 50 47 69 45 42
Wdcliff Lk 4 1 1 14 8 6
Wood Ridge 36 16 16 61 54 7
Wyckoff 15 9 0 63 30 39
TOTALS 6017 3462 3201 7213 4604 3356
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
RochellePk .18181818 6 46 38 2056 132 -94
Rockleigh 0 0 1 1 56 4 -3
Rutherford .67475728 135 313 257 6883 441 -184
Saddle Brook .61194030 80 168 137 4798 307 -170
Saddle Rvr .34285714 12 15 12 882 56 -44
S Hack .37037037 9 56 46 742 47 -2
Teaneck .29118774 73 364 298 12899 826 -527
Tenafly .68674699 53 109 89 4677 299 -210
Teterboro 0 0 0 0 10 1 -1
UpSdleRvr .71929825 22 44 36 2277 146 -109
Waldwick .42 18 86 70 3287 210 -140
Wallingt .52508361 150 366 300 4572 293 8
Washington .14 6 31 26 2811 180 -154
Westwood .48275862 33 139 114 3791 243 -128
Wdcliff Lk .42857143 6 11 9 1614 103 -94
Wood Ridge .11475410 7 59 48 2805 180 -131
Wyckoff .56521739 36 51 41 4749 304 -262
TOTALS 3032 12240 10037 300410 19226 -9096

*477
 BURLINGTON
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
BURLINGTON
Bass River 17 9 9 46 30 51
Beverly 36 9 8 89 77 37
Brdntn Cty 37 15 15 154 102 92
Brdntn Twp 38 14 14 105 97 17
BrlngtnCty 98 63 61 229 175 96
BrlngtnTwp 136 24 24 181 142 68
Chstrfld 10 4 4 35 14 21
Cinnamnsn 45 12 11 147 120 57
Delanco 16 15 15 17 17 0
Delran 64 26 25 127 74 84
Eastampton 18 14 14 50 45 24
Edgwtr Pk 61 27 25 71 53 23
Evesham 52 10 10 133 103 41
Fieldsboro 10 0 0 0 0 3
Florence 65 28 26 201 143 67
Hainesport 25 7 7 46 9 41
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
BURLINGTON
Bass River .62962963 29 55 45 489 20 25
Beverly .32456140 29 73 60 982 40 20
Brdntn Cty .47422680 73 125 103 1761 72 30
Brdntn Twp .14912281 16 68 55 2467 101 -46
BrlngtnCty .35424354 81 240 197 3783 155 42
BrlngtnTwp .32380952 59 219 179 3858 158 21
Chstrfld .6 21 35 29 735 30 -1
Cinnamnsn .32203390 47 103 85 4600 189 -104
Delanco 0 0 31 25 1282 53 -27
Delran .53164557 68 157 128 4768 195 -67
Eastampton .34782609 17 49 41 1473 60 -20
Edgwtr Pk .30263158 21 107 88 3374 138 -50
Evesham .28472222 38 100 82 6796 279 -197
Fieldsboro 1 0 10 8 184 8 1
Florence .31904762 64 155 127 3307 136 -8
Hainesport .82 38 70 57 1125 46 11

*478
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
Lumberton 36 11 9 57 24 45
Mansfield 14 11 8 55 15 48
MapleShade 142 49 48 158 105 53
Medford 47 13 13 144 60 108
MedfrdLkes 5 5 5 58 12 59
Moorestown 30 27 26 79 65 24
Mt. Holly 146 52 51 186 159 78
Mt. Laurel 40 23 23 160 48 116
NewHanover 64 15 13 57 49 14
NoHanover 86 25 23 154 105 67
Palmyra 44 15 15 119 85 41
PmbrtnBor 12 6 6 31 26 13
PmbrtnTwp 481 75 66 803 606 394
Riverside 57 30 30 252 191 100
Riverton 7 25 25 31 4 31
Shamong 14 8 8 117 60 64
Southamton 33 18 18 105 74 72
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Lumberton .65217391 37 82 67 2002 82 -15
Mansfield .76190476 42 64 52 827 34 18
MapleShade .33544304 53 243 199 8576 352 -152
Medford .64285714 93 153 125 5466 224 -99
MedfrdLkes .83098592 48 58 48 1483 61 -13
Moorestown .26966292 21 77 63 5268 216 -153
Mt. Holly .32911392 61 258 212 3679 151 61
Mt. Laurel .70731707 113 176 144 5429 223 -78
NewHanover .22222222 13 90 74 1107 45 28
NoHanover .38953488 60 169 139 2784 114 24
Palmyra .32539683 39 98 80 2707 111 -31
PmbrtnBor .33333333 10 28 23 450 18 5
PmbrtnTwp .394 316 863 708 8979 368 340
Riverside .34364261 87 174 142 2884 118 24
Riverton .88571429 27 59 49 1088 45 4
Shamong .51612903 60 82 68 1343 55 12
Southamton .49315068 52 103 84 3518 144 -60

*479
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
Sprngfield 22 14 13 60 25 46
Tabernacle 36 17 14 141 73 74
Washington 24 6 6 40 28 47
Westamton 11 2 2 51 21 30
Willingbor 300 4 4 226 138 90
Woodland 15 26 25 50 23 44
Wrightstwn 52 11 11 46 17 38
TOTALS 2446 765 730 4811 3214 2418
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Sprngfield .64788732 39 74 61 844 35 26
Tabernacle .50340136 71 121 99 1808 74 25
Washington .62666667 25 55 45 271 11 34
Westamton .58823529 30 43 35 1115 46 -10
Willingbor .39473684 89 393 322 10915 448 -125
Woodland .65671642 33 73 60 377 15 44
Wrightstwn .69090909 32 95 78 986 40 37
TOTALS 2052 5228 4287 114890 4710

*480
 CAMDEN
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
CAMDEN
Audubon 27 29 27 76 74 2
Audubon Pk 17 1 1 33 31 4
Barrington 45 16 16 114 22 149
Bellmawr 144 17 15 220 195 63
BerlinBor 32 16 16 89 92 26
BerlinTwp 57 10 10 45 63 7
Brooklawn 16 2 2 9 16 0
Camden 2455 440 375 4767 5108 1681
Cherry Hil 196 92 87 366 241 146
Chesilhrst 24 1 1 38 38 8
Clementon 64 19 17 71 67 22
Collingswd 91 74 69 245 160 92
Gibbsboro 10 1 1 47 31 16
Gloucester 251 55 51 504 453 104
GlcstrCity 111 45 41 354 279 114
Haddon 55 40 39 108 89 24
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
CAMDEN
Audubon .02631579 2 56 46 3592 147 -101
Audubon Pk .11428571 4 22 18 495 20 -2
Barrington .87134503 99 160 131 2744 113 19
Bellmawr .24418605 54 213 174 4462 183 -9
BerlinBor .22033898 20 68 55 1847 76 -20
BerlinTwp .1 5 72 59 1646 67 -9
Brooklawn 0 0 18 15 778 32 -17
Camden .24760642 1180 4010 3288 28204 1156 2132
Cherry Hil .37726098 138 421 345 21855 896 -551
Chesilhrst .17391304 7 32 26 467 19 7
Clementon .24719101 18 99 81 2202 90 -9
Collingswd .36507937 89 249 205 6469 265 -61
Gibbsboro .34042553 16 27 22 758 31 -9
Gloucester .18671454 94 396 325 15052 617 -292
GlcstrCity .29007634 103 255 209 4606 189 20
Haddon .21238938 23 117 96 6247 256 -160

*481
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
Haddonfld 18 20 20 42 26 16
HaddonHts 18 30 28 108 66 57
Hi-Nella 11 6 5 23 15 8
Laurel Spr 12 7 7 25 6 19
Lawnside 43 7 7 152 136 54
Lindenwold 192 32 29 291 283 83
Magnolia 43 5 5 69 69 0
Merchntvle 12 18 18 39 20 19
Mt. Ephraim 34 5 5 95 84 11
Onklyn 16 18 18 45 38 15
Pennsauken 179 57 54 351 290 101
Pine Hill 105 11 10 135 100 37
Pine Vally 0 0 0 0 0 0
Runnemede 73 25 23 97 79 18
Somerdale 45 11 11 112 91 29
Stratford 55 14 13 59 50 9
Tavistock 0 0 0 0 0 0
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Haddonfld .38095238 16 54 44 4486 184 -140
HaddonHts .46341463 50 96 79 3091 127 -48
Hi-Nella .34782609 8 24 20 487 20 0
Laurel Spr .76 19 38 31 770 32 0
Lawnside .28421053 43 93 76 1039 43 34
Lindenwold .22677596 66 287 235 7566 310 -75
Magnolia 0 0 48 39 1651 68 -28
Merchntvle .48717949 19 49 40 1572 64 -24
Mt. Ephraim .11578947 11 50 41 1865 76 -35
Onklyn .28301887 13 47 38 1765 72 -34
Pennsauken .25831202 91 324 265 11537 473 -208
Pine Hill .36305732 49 164 134 3304 135 -1
Pine Vally 11 0
Runnemede .18556701 18 114 93 3292 135 -41
Somerdale .24166667 27 83 68 1996 82 -14
Stratford .15254237 9 77 63 2605 107 -44
Tavistock 4 0

*482
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
Voorhees 58 9 7 100 75 37
Waterford 44 5 4 138 108 50
Winslow 153 132 128 333 216 164
Woodlynne 23 8 8 18 18 0
TOTAL 4729 1278 1168 9318 8729 3205
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Voorhees .33035714 33 98 80 4605 189 -108
Waterford .31645570 44 92 75 2462 101 -26
Winslow .43157895 144 425 348 6029 247 101
Woodlynne 0 0 31 25 947 39 -13
TOTAL 2510 8407 6894 162508 6663

*483
 CAPE MAY
 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 15 XII-35 X-17 X-17
 Units Units Other
 Lack Com Lack Room Units
 Ovrcrwded Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
CAPE MAY
Avalon 8 4 71 75 60
Cape May 36 18 97 97 51
CapeMayPt 2 0 14 5 15
Dennis 46 18 183 66 174
Lower 161 39 598 426 501
Middle 129 39 612 534 284
NWildwood 29 28 238 193 130
OceanCity 86 60 269 188 170
SeaIsleCty 13 12 68 60 25
StoneHrbr 3 6 51 32 34
Upper 34 19 200 71 168
WCapeMay 10 5 63 35 39
WWildwood 5 3 36 35 9
Wildwood 86 37 337 258 178
WildwdCrst 27 27 111 103 52
Woodbine 40 9 72 70 22
TOTALS 715 324 3020 2248 1912
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
 Total Surplus Present Need, Atlantic County 714
CAPE MAY
Avalon .44444444 32 44 36 927 60 -24
Cape May .34459459 33 87 72 1847 119 -47
CapeMayPt .75 11 13 10 131 8 2
Dennis .725 133 197 161 1268 82 80
Lower .54045307 323 523 429 6719 433 -4
Middle .34718826 212 380 312 4159 268 44
NWildwood .40247678 96 153 125 1992 128 -3
OceanCity .47486034 128 274 224 6255 403 -178
SeaIsleCty .29411765 20 45 37 1086 70 -33
StoneHrbr .51515152 26 35 29 581 37 -8
Upper .70292887 141 194 159 2361 152 7
WCapeMay .52702703 33 48 40 481 31 9
WWildwood .20454545 7 15 13 160 10 2
Wildwood .40825688 138 261 214 2081 134 80
WildwdCrst .33548387 37 91 75 1686 109 -34
Woodbine .23913043 17 66 54 613 39 15
TOTALS 1387 2426 1989 32347 2083

*484
 CUMBERLAND
 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 15 XII-35 X-17 X-17
 Units Units Other
 Lack Com Lack Ctrl Room Units
 Ovrcrwded Plumbing Heat not Heaters Lack Ctr
MNCPLTY Units not o/c o/c w/flue Heating
---------------------------------------------------------------------------
CUMBERLAND
Bridgeton 365 101 905 960 203
Commercial 102 125 340 335 192
Deerfield 43 11 79 63 36
Downe 34 38 119 109 150
Fairfield 152 29 250 273 75
Greenwich 10 7 52 27 49
Hopewell 25 11 87 66 34
Lawrence 42 34 83 62 89
MauriceRiv 48 29 265 149 179
Millville 239 12 628 458 263
Shiloh 3 2 19 121 9
Stewcreek 11 5 54 20 47
UpDeerfld 74 13 259 301 58
Vineland 914 204 1446 1263 481
TOTALS 2062 730 4586 4098 1865
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
CUMBERLAND
Bridgeton .17454858 158 624 512 6681 430 81
Commercial .36432638 124 351 288 1583 102 186
Deerfield .36363636 29 83 68 815 52 15
Downe .57915058 69 141 116 635 41 75
Fairfield .21551724 54 235 193 1754 113 80
Greenwich .64473684 34 51 41 331 21 20
Hopewell .34 30 66 54 1332 86 -32
Lawrence .58940397 49 125 102 651 42 61
MauriceRiv .54573171 145 222 182 1202 77 104
Millville .36477115 229 589 483 9007 580 -97
Shiloh .42857143 8 13 11 210 14 -3
Stewcreek .70149254 38 54 44 438 28 16
UpDeerfld .16155989 42 129 106 2255 145 -40
Vineland .27580275 399 1517 1244 17393 1120 124
TOTALS 1406 4198 3442 44287 2852

*485
 ESSEX
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
ESSEX
Bellevlle 354 233 220 504 365 193
Bloomfld 298 242 235 500 305 237
Caldwell 42 26 25 59 29 43
CedarGrove 23 19 19 48 44 6
E Orange 2021 889 785 1833 1146 951
EssexFells 6 0 0 22 16 6
Fairfield 23 15 14 56 39 29
Glen Ridge 18 4 4 24 11 19
Irvingtn 1280 626 572 1843 1551 739
Livingston 40 5 5 84 42 42
Maplewood 59 47 46 216 111 105
Millburn 26 20 20 55 27 32
Montclair 278 275 266 590 441 225
Newark 13665 5117 4184 10376 7807 6509
NCaldwell 8 4 3 11 11 0
Nutley 181 77 74 312 208 114
Orange 828 474 430 793 678 453
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
ESSEX
Bellevlle .34587814 174 748 614 13108 839 -225
Bloomfld .43726937 219 752 616 18587 1190 -573
Caldwell .59722222 35 102 84 3003 192 -108
CedarGrove 12 6 48 39 3792 243 -204
E Orange .45350501 831 3637 2983 28398 1817 1165
EssexFells .27272727 6 12 10 718 46 -36
Fairfield .42647059 24 61 50 2217 142 -92
Glen Ridge .63333333 15 37 31 2442 156 -126
Irvingtn .32270742 595 2447 2006 24714 1582 425
Livingston .5 42 87 71 8513 545 -473
Maplewood .48611111 105 210 172 8017 513 -341
Millburn .54237288 30 76 62 6969 446 -384
Montclair .33783784 199 743 610 14500 928 -318
Newark .45466611 4718 22567 18505 110912 7098 11406
NCaldwell 0 0 11 9 1589 102 -93
Nutley .35403727 110 365 300 10518 673 -373
Orange .40053050 318 1576 1292 12138 777 515

*486
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
Roseland 6 6 6 23 18 11
SOrange 43 53 52 132 91 62
Verona 43 22 22 108 61 53
WCaldwell 30 11 10 22 22 0
WOrange 207 127 122 379 261 146
TOTALS 19479 8292 7114 17990 13284 9975
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Roseland .37931034 9 21 17 1793 115 -98
SOrange .40522876 53 148 122 5173 331 -209
Verona .46491228 50 115 94 5197 333 -238
WCaldwell 0 0 40 33 3609 231 -198
WOrange .35872236 136 465 381 14027 898 -516
TOTALS 7675 34268 28100 299934 19196 8904

*487
 GLOUCESTER
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovcrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
GLOUCESTER
Clayton 78 17 16 109 75 38
Deptford 257 43 38 428 291 184
E. Greenwch 13 14 14 54 22 32
Elk 37 19 17 149 171 68
Franklin 155 44 38 291 172 145
Glassboro 200 45 39 247 219 80
Greenwich 22 7 6 75 51 24
Harrison 16 9 8 54 6 55
Logan 16 20 18 56 36 40
Mahtua 71 18 17 226 194 55
Monroe 179 47 44 559 525 173
Natl Park 53 5 4 52 49 9
Newfield 9 2 1 28 17 14
Paulsboro 103 22 21 276 263 59
Pitman 30 28 28 115 99 32
S Harrison 12 6 6 38 21 19
Swedesboro 25 25 22 102 86 50
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
GLOUCESTER
Clayton .33628319 37 131 107 1930 79 28
Deptford .38736842 166 461 378 7329 300 77
E. Greenwch .59259259 32 59 48 1311 54 -5
Elk .28451883 42 96 79 1054 43 36
Franklin .45741325 133 326 267 3856 158 109
Glassboro .26755853 66 305 250 4724 194 56
Greenwich .32 24 52 43 1778 73 -30
Harrison .90163934 49 73 60 1221 50 10
Logan .52631579 29 63 52 1016 42 10
Mahtua .22088353 50 138 113 2839 116 -3
Monroe .24785100 139 362 296 7039 289 8
Natl Park .15517241 8 65 53 1086 45 9
Newfield .45161290 13 23 19 520 21 -3
Paulsboro .18322981 51 175 143 2372 97 46
Pitman .24427481 28 86 71 3399 139 -69
S Harrison .475 18 36 30 458 19 11
Swedesboro .36764706 37 84 69 737 30 39

*488
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
Washington 92 16 16 214 158 70
Wenonah 4 3 3 23 14 11
W Deptford 100 19 19 218 183 51
Westville 28 10 10 106 107 12
Woodbury 76 65 64 194 187 58
Wdbry Hts 12 7 7 17 11 6
Woolwich 12 16 13 29 11 37
TOTALS 1600 507 469 3660 2968 1322
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Washington .30701754 66 174 142 8207 336 -194
Wenonah .44 10 17 14 775 32 -18
W Deptford .21794872 48 167 137 6415 263 -126
Westville .10084034 11 49 40 1838 75 -35
Woodbury .23673469 46 186 152 3827 157 -4
Wdbry Hts .35294118 6 25 20 1025 42 -22
Woolwich .77083333 22 47 39 373 15 24
TOTALS 1130 3199 2623 65129 2670

*489
 HUDSON
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
HUDSON
Bayonne 763 636 604 2170 1325 1232
E Newark 57 14 12 81 77 27
Guttenberg 153 96 87 217 126 104
Harrison 219 113 107 645 404 292
Hoboken 1604 789 672 3002 2011 2111
Jer Cty 7346 3227 2759 7987 6529 2477
Kearny 416 273 255 667 525 246
N Bergen 771 735 685 656 514 256
Secaucus 96 72 71 168 113 59
Union Cty 2127 1092 936 1780 1375 831
Weehawken 320 189 168 241 181 98
West NY 1245 749 669 1218 925 555
TOTALS 15117 7985 7025 18832 14105 8288
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
HUDSON
Bayonne .48181463 1046 2413 1978 25405 1626 352
E Newark .25961538 21 90 74 664 42 31
Guttenberg .45217391 98 338 277 3265 209 68
Harrison .41954023 271 597 489 4472 286 203
Hoboken .51213003 1537 3813 3127 15407 986 2141
Jer Cty .27503886 2197 12302 10087 80720 5166 4921
Kearny .31906615 213 884 725 12942 828 -104
N Bergen .33246753 218 1674 1373 18833 1205 167
Secaucus .34302326 58 225 184 4899 314 -129
Union Cty .37669991 671 3734 3061 20781 1330 1732
Weehawken .35125448 85 573 470 5050 323 146
West NY .375 457 2371 1944 15419 987 957
TOTALS 6870 29012 23790 207857 13303 10487

*490
 HUNTERDON
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
HUNTERDON
Alexandria 9 4 4 87 20 90
Bethlehem 12 6 5 66 6 68
Bloomsbry 7 5 4 16 8 10
Califon 3 4 4 31 5 30
Clinton 5 6 6 28 15 17
ClintonTwp 26 24 24 67 24 52
Delaware 18 17 16 86 26 70
EastAmwell 15 17 15 80 9 89
Flemington 30 47 45 89 62 27
Franklin 15 9 9 35 12 24
Frenchtown 8 10 10 25 14 14
Glen Gard 8 5 5 22 15 13
Hampton 12 7 7 22 7 17
HighBridge 18 14 13 53 0 53
Holland 15 8 8 94 12 99
Kingwood 22 20 16 111 39 91
Lambrtvle 34 31 29 253 90 75
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
HUNTERDON
Alexandria .81818182 71 84 69 877 56 13
Bethlehem .91891892 61 78 64 918 59 5
Bloomsbry .55555556 9 20 16 308 20 -3
Califon .85714286 27 34 28 352 23 5
Clinton .53125 15 26 21 697 45 -23
ClintonTwp .68421053 46 96 79 2110 135 -56
Delaware .72916667 63 97 79 1263 81 -2
EastAmwell .90816327 73 103 84 1134 73 12
Flemington .30337079 27 102 84 1794 115 -31
Franklin .66666667 23 47 39 752 48 -9
Frenchtown .5 13 31 25 586 38 -12
Glen Gard .46428571 10 23 19 278 18 1
Hampton .70833333 16 35 28 557 36 -7
HighBridge 1 53 84 69 1142 73 -4
Holland .89189189 84 107 88 1485 95 -7
Kingwood .7 78 116 95 922 59 36
Lambrtvle .45454545 115 178 146 1613 103 43

*491
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
Lebanon 5 0 0 14 13 9
LebanonTwp 29 32 29 181 48 207
Milford 9 4 4 28 10 18
Raritan 40 26 25 73 48 88
Readington 54 35 34 88 47 56
Stockton 1 2 2 29 16 14
Tewksbury 8 10 10 79 11 71
Union 9 10 9 81 16 65
WestAmwell 13 14 12 48 36 35
TOTALS 425 367 345 1786 609 1402
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Lebanon .40909091 6 11 9 279 18 -9
LebanonTwp .81176471 147 205 168 1719 110 58
Milford .64285714 18 31 25 484 31 -6
Raritan .64705882 47 112 92 2563 164 -72
Readington .54368932 48 136 111 3317 212 -101
Stockton .46666667 14 17 14 252 16 -3
Tewksbury .86585366 68 86 71 1285 82 -11
Union .80246914 65 83 68 1053 67 1
WestAmwell .49295775 24 49 40 775 50 -10
TOTALS 1218 1988 1630 28515 1825 -195

*492
 MERCER
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
MERCER
East Wnsr 124 33 32 190 98 115
Ewing 174 68 65 476 379 112
Hamilton 460 155 148 1065 908 366
Hightstown 45 16 13 127 69 62
HpwellBoro 5 12 12 25 11 17
HpwellTwp 21 27 27 151 66 110
Lawrence 83 27 26 129 73 70
Penington 3 3 3 24 12 14
PrnctnBor 62 32 28 39 27 17
PrnctnTwp 48 31 29 353 254 129
Trenton 1829 768 685 2652 2641 844
Washington 23 8 7 51 30 21
West Wnsr 32 11 11 52 19 33
TOTALS 2909 1191 1086 5334 4587 1920
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
MERCER
East Wnsr .53990610 103 259 212 7516 308 -96
Ewing .24351297 116 355 291 11660 478 -187
Hamilton .28728414 306 914 749 29356 1204 -454
Hightstown .47328244 60 118 97 1696 70 27
HpwellBoro .60714286 15 32 26 765 31 -5
HpwellTwp .625 94 142 117 3527 145 -28
Lawrence .48951049 63 172 141 6114 251 -110
Penington .53846154 13 19 16 752 31 -15
PrnctnBor .38636364 15 105 86 3179 130 -44
PrnctnTwp .33681462 119 196 161 4862 199 -39
Trenton .24218077 642 3156 2588 32463 1331 1257
Washington .41176471 21 51 42 1234 51 -9
West Wnsr .63461538 33 76 62 2695 110 -48
TOTALS 1600 5595 4588 105819 4339

*493
 MIDDLESEX
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
MIDDLESEX
Carteret 221 118 112 358 329 103
Cranbury 11 10 10 15 13 12
Dunellen 46 86 84 74 23 51
East Bruns 154 37 35 188 171 27
Edison 446 139 130 516 401 155
Helmetta 10 5 5 30 27 6
Hghland Pk 109 48 46 105 96 40
Jamesburg 60 15 14 80 72 13
Metuchen 70 27 27 57 41 36
Middlesex 91 22 22 87 79 15
Milltown 30 13 13 17 11 6
Monroe 91 33 29 76 55 68
New Bruns 1042 741 663 699 626 223
Nrth Bruns 703 85 81 127 112 47
Old Bridg 427 78 73 344 317 96
Perth Amb 1096 644 567 1216 1080 400
Piscataway 393 64 60 262 171 128
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
MIDDLESEX
Carteret .23842593 85 418 343 6919 443 -100
Cranbury .48 7 28 23 691 44 -21
Dunellen .68918919 51 181 148 2414 154 -6
East Bruns .13636364 26 215 176 11189 716 -540
Edison .27877698 144 720 590 23427 1499 -909
Helmetta .18181818 5 20 17 313 20 -3
Hghland Pk .29411765 31 186 152 5605 359 -206
Jamesburg .15294118 12 86 71 1398 89 -19
Metuchen .46753247 27 124 101 4959 317 -216
Middlesex .15957447 14 127 104 4478 287 -183
Milltown .35294118 6 49 40 2411 154 -114
Monroe .55284553 42 162 133 5765 369 -236
New Bruns .26266196 184 1889 1549 13244 848 701
Nrth Bruns .29559748 38 222 182 7484 479 -297
Old Bridg .23244552 80 580 476 16593 1062 -586
Perth Amb .27027027 329 1992 1633 13617 871 762
Piscataway .42809365 112 565 463 12299 787 -324

*494
 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
Plainsboro 25 14 13 67 47 25
Sayreville 184 45 44 319 246 92
SouthAmboy 92 54 50 137 86 72
Sth Bruns 92 32 27 137 84 73
SthPlnfld 114 24 22 153 116 51
SouthRiver 154 96 93 328 40 26
Spotswood 75 16 14 55 40 26
Woodbridge 572 185 172 760 579 250
TOTALS 5708 2631 2406 6207 4862 2041
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Plainsboro .34722222 23 61 50 3080 197 -147
Sayreville .27218935 87 315 258 9396 601 -343
SouthAmboy .45569620 62 204 168 2877 184 -16
Sth Bruns .46496815 64 183 150 5443 348 -199
SthPlnfld .30538922 47 183 150 6224 398 -249
SouthRiver .39393939 129 376 308 5091 326 -17
Spotswood .39393939 22 111 91 2494 160 -69
Woodbridge .30156815 229 973 798 29297 1875 -1077
TOTALS 1855 9969 8175 196708 12589 -4415

*495
 MONMOUTH
 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Lack Com Lack Room Units
 Ovrcrwded Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
MONMOUTH
Aberdeen 151 33 209 141 87
Allenhurst 1 0 13 10 5
Allentown 17 5 23 19 6
Asbury Pk 477 299 810 863 250
Atl Hghland 27 17 39 33 12
Avon 3 9 34 33 45
Belmar 55 55 191 152 209
Brdly Bch 71 37 124 76 113
Brielle 17 2 44 38 19
Colts Neck 12 12 7 7 0
Deal 3 4 0 0 0
Eatontown 83 27 69 73 25
Englshtwn 11 9 21 18 3
Fair Haven 11 1 69 44 25
Farmngdale 7 3 19 11 11
Freehld Br 148 35 137 148 68
Freehld Tp 57 30 107 113 39
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
MONMOUTH
Aberdeen .38157895 80 264 216 5293 191 25
Allenhurst .33333333 4 5 4 328 12 -7
Allentown .24 6 28 23 662 24 -1
Asbury Pk .22461815 182 958 786 7207 260 525
Atl Hghland .26666667 10 54 45 1776 64 -20
Avon .57692308 20 32 26 1004 36 -10
Belmar .57894737 111 221 181 3019 109 72
Brdly Bch .59788360 74 182 149 2013 73 77
Brielle .33333333 15 34 28 1489 54 -26
Colts Neck 0 0 24 20 2151 78 -58
Deal 0 0 7 6 650 23 -18
Eatontown .25510204 18 128 105 4959 179 -74
Englshtwn .14285714 3 23 19 339 12 7
Fair Haven .36231884 25 37 30 1895 68 -38
Farmngdale .5 10 20 16 521 19 -3
Freehld Br .31481481 43 226 185 3573 129 56
Freehld Tp .25657895 27 114 94 5565 201 -107

*496
 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 15 XII-35 X-17 X-17
 Units Units Other
 Lack Com Lack Ctrl Room Units
 Ovrcrwded Plumbing Heat not Heaters Lack Ctr
MNCPLTY Units not o/c o/c w/flue Heating
---------------------------------------------------------------------------
Hazlet 123 11 193 174 34
Highlands 48 17 244 240 62
Holmdel 18 5 22 15 7
Howell 226 48 384 290 156
Interlaken 1 1 7 3 4
Keansburg 182 34 421 337 131
Keyport 94 73 70 55 18
Lttle Slvr 6 0 30 11 19
Loch Arbr 0 0 9 5 4
Long Brnch 586 201 529 383 248
Manalapan 88 23 120 50 94
Manasquan 27 29 82 19 63
Marlboro 35 41 85 76 23
Matawan 63 19 48 26 22
Middletown 272 56 431 332 138
Millstone 35 15 118 54 64
Mon Beach 12 7 4 4 37
Nptne Twp 334 157 522 408 236
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Hazlet .16346154 32 166 136 6595 238 -102
Highlands .20529801 50 115 94 2216 80 14
Holmdel .31818182 7 30 25 2229 80 -56
Howell .34977578 134 408 335 7822 282 52
Interlaken .57142857 4 6 5 389 14 -9
Keansburg .27991453 118 334 274 3431 124 150
Keyport .24657534 17 184 151 2957 107 44
Lttle Slvr .63333333 19 25 20 1840 66 -46
Loch Arbr .44444444 4 4 3 125 5 -1
Long Brnch .39302694 208 995 816 11672 421 394
Manalapan .65277778 78 189 155 5578 201 -46
Manasquan .76829268 63 119 98 2119 76 21
Marlboro .23232323 20 96 79 4542 164 -85
Matawan .45833333 22 104 85 3086 111 -26
Middletown .29361702 127 455 373 18841 680 -307
Millstone .54237288 64 114 93 1146 41 52
Mon Beach .90243902 4 23 19 1336 48 -30
Nptne Twp .36645963 191 682 559 9917 358 201

*497
 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 15 XII-35 X-17 X-17
 Units Units Other
 Lack Com Lack Ctrl Room Units
 Ovrcrwded Plumbing Heat not Heaters Lack Ctr
MNCPLTY Units not o/c o/c w/flue Heating
---------------------------------------------------------------------------
Nptne City 44 18 107 99 20
Ocean Twp 67 40 149 122 53
Oceanport 13 3 19 7 12
Red Bank 135 62 209 161 96
Roosevelt 6 0 16 6 11
Rumson 23 4 58 42 35
Sea Bright 16 7 80 69 15
Sea Girt 3 1 11 9 2
Shrewsbury 11 0 10 4 6
Shrews Twp 22 3 17 11 9
S. Belmar 17 6 40 39 34
Spring Lke 12 3 66 46 39
S.L. Hghts 21 6 40 26 14
Tinton Fls 67 6 56 48 14
Union Bch 94 18 161 154 39
Up Freehld 16 14 47 26 37
Wall Twp 63 24 331 211 167
W Long Br 16 7 32 34 6
TOTALS 3947 1537 6684 5375 2886
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Nptne City .16806723 18 80 66 2204 80 -14
Ocean Twp .30285714 45 152 125 8449 305 -180
Oceanport .63157895 12 28 23 1768 64 -41
Red Bank .37354086 78 275 226 4908 177 48
Roosevelt .64705882 10 16 13 282 10 3
Rumson .45454545 26 53 44 2502 90 -47
Sea Bright .17857143 14 37 31 941 34 -3
Sea Girt .18181818 2 6 5 977 35 -30
Shrewsbury .6 6 17 14 995 36 -22
Shrews Twp .45 8 33 27 400 14 12
S. Belmar .46575342 19 42 34 654 24 11
Spring Lke .45882353 30 45 37 1476 53 -16
S.L. Hghts .35 14 41 34 2341 85 -51
Tinton Fls .22580645 13 86 70 2315 84 -13
Union Bch .20207254 33 145 119 1967 71 48
Up Freehld .58730159 28 58 47 892 32 15
Wall Twp .44179894 146 233 191 6533 236 -45
W Long Br .15 5 28 23 2241 81 -58
TOTALS 2295 7779 6379 170130 6142

*498
 MORRIS
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
MORRIS
Boonton 92 67 63 122 61 61
BoontonTwp 11 2 2 76 12 64
Butler 56 10 9 87 49 38
Chatham 15 11 11 56 38 18
ChathamTwp 7 6 6 18 6 12
Chester 5 3 3 16 27 47
ChesterTwp 14 5 5 62 9 9
Denville 60 12 11 144 89 75
Dover 277 104 84 216 200 88
EastHanovr 19 11 10 53 21 32
FlorhamPk 5 3 3 16 16 0
Hanover 26 10 10 19 6 13
Harding 7 2 2 0 0 0
Jefferson 144 55 45 407 142 341
Kinnelon 20 4 2 55 9 52
Lincoln Pk 45 17 16 38 26 13
Madison 73 51 49 42 37 11
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
MORRIS
Boonton .5 61 216 177 3035 194 -17
BoontonTwp .84210526 64 77 63 1040 67 -3
Butler .43678161 38 103 84 2567 164 -80
Chatham .32142857 18 44 36 3163 202 -166
ChathamTwp .66666667 12 25 20 2985 191 -171
Chester .63513514 10 18 15 469 30 -15
ChesterTwp .5 31 50 41 1507 96 -55
Denville .45731707 66 137 112 4571 293 -180
Dover .30555556 66 427 350 4901 314 36
EastHanovr .60377358 32 61 50 2576 165 -115
FlorhamPk 0 0 8 7 2357 151 -144
Hanover .68421053 13 49 40 3553 227 -187
Harding 0 0 0 0 1102 71 -71
Jefferson .70600414 287 476 391 5364 343 47
Kinnelon .85245902 47 69 56 2285 146 -90
Lincoln Pk .33333333 13 74 60 2610 167 -107
Madison .22916667 10 132 108 4878 312 -204

*499
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
Mendham 7 7 7 24 10 14
MendhamTwp 3 4 3 64 30 34
Mine Hill 19 14 14 27 38 7
Montville 45 11 10 110 55 80
Morris 45 30 28 103 57 50
MorrisPlns 17 8 7 27 22 5
Morristwn 225 154 138 206 153 67
Main Lakes 4 1 1 14 8 6
MtArlingtn 29 8 7 37 39 13
Mt Olive 82 32 31 182 104 99
Netcong 31 12 12 13 13 0
Parsippany 275 87 81 341 290 94
Passaic 25 5 5 48 43 15
Pequannock 44 11 11 49 25 24
Randolph 76 32 32 151 41 115
Riverdale 12 3 3 36 10 26
Rockaway 41 34 33 85 65 20
RocknwyTwp 82 32 27 239 143 153
Roxbury 102 40 36 125 29 110
VictGrdns 35 2 2 23 24 2
Washington 35 17 17 170 76 107
Wharton 59 13 12 47 21 26
TOTALS 2169 930 848 3548 2044 1941
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Mendham .58333333 14 28 23 1460 93 -70
MendhamTwp .53125 34 40 33 1408 90 -57
Mine Hill .15555556 4 37 31 1094 70 -40
Montville .59259259 65 120 99 4016 257 -158
Morris .46728972 48 121 99 5968 382 -283
MorrisPlns .18518519 5 29 24 1710 109 -86
Morristwn .30454545 63 426 349 6534 418 -69
Main Lakes .42857143 6 11 9 1180 76 -67
MtArlingtn .25 9 45 37 1395 89 -52
Mt Olive .48768473 89 202 165 6369 408 -242
Netcong 0 0 43 35 1297 83 -48
Parsippany .24479167 83 439 360 17374 1112 -752
Passaic .25862069 12 42 35 2326 149 -114
Pequannock .48979592 24 79 65 4139 265 -200
Randolph .73717949 111 219 180 5946 381 -201
Riverdale .72222222 26 41 34 842 54 -20
Rockaway .23529412 20 94 77 2323 149 -72
RocknwyTwp .51689189 124 233 191 6251 400 -209
Roxbury .79136691 99 237 194 5575 357 -163
VictGrdns .07692308 2 39 32 398 25 6
Washington .58469945 99 151 124 3341 214 -90
Wharton .55319149 26 97 80 1911 122 -43
TOTALS 1732 4740 3886 131820 8436 -4550

*500
 OCEAN
 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 15 XII-35 X-17 X-17
 Not Units Units Other
 Lack Com Lack Room Units
 Ovrcrwded Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
OCEAN
Brnegat Tp 45 10 203 132 110
Brnegat Lt 6 0 27 23 16
Bay Head 2 1 19 13 10
Bch Haven 11 4 46 57 33
Beachwood 44 6 113 67 62
Berkeley 110 25 388 260 227
Brick Twp 360 40 624 510 244
Dover Twp 316 53 860 747 373
Eagleswood 10 4 70 61 24
Harvey Ced 0 1 15 20 23
Island Hts 14 2 17 13 11
Jackson Tp 102 55 437 271 243
Lacey Twp 63 10 370 192 250
Lakehurst 59 18 89 75 44
Lakewood 669 125 377 287 119
Lavallette 9 6 44 67 37
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
OCEAN
Brnegat Tp .45454545 92 147 121 2820 102 19
Brnegat Lt .41025641 11 17 14 259 9 5
Bay Head .43478261 8 11 9 521 19 -10
Bch Haven .36666667 17 32 26 760 27 -1
Beachwood .48062016 54 104 86 2477 89 -4
Berkeley .46611910 181 316 259 9614 347 -88
Brick Twp .32360743 202 602 494 18930 683 -190
Dover Twp .33303571 286 655 537 22175 801 -263
Eagleswood .28235294 20 34 28 362 13 15
Harvey Ced .53488372 8 9 7 167 6 1
Island Hts .45833333 8 24 20 576 21 -1
Jackson Tp .47276265 207 364 298 7756 280 18
Lacey Twp .56561086 209 282 231 5107 184 47
Lakehurst .36974790 33 110 90 893 32 58
Lakewood .29310345 111 905 742 14489 523 219
Lavallette .35576923 16 31 25 916 33 -8

*501
 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 15 XII-35 X-17 X-17
 Not Units Units Other
 Lack Com Lack Room Units
 Ovrcrwded Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
Ltl Fgg Hr 62 7 201 91 128
Long Beach 15 7 77 77 136
Manchester 113 9 231 172 75
Mantolokng 1 0 2 0 20
Ocean Twp 21 7 152 107 51
Ocean Gate 14 11 40 28 18
Pine Beach 5 3 5 11 4
Plumsted 74 17 209 145 102
Pt Pleasnt 99 23 208 188 51
Pt Pls Bch 42 13 96 74 52
Seaside Ht 29 20 93 82 80
Seaside Pk 14 12 44 64 70
Ship Bottm 9 7 56 46 41
S Toms Rvr 87 3 41 40 10
Stafford 71 9 352 250 147
Surf City 8 6 46 35 41
Tuckerton 28 9 127 74 61
TOTALS 2512 523 5679 4279 2913
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Ltl Fgg Hr .58447489 117 186 153 3145 114 39
Long Beach .63849765 49 71 58 1543 56 3
Manchester .30364372 70 192 158 13863 500 -343
Mantolokng 1 2 3 2 184 7 -4
Ocean Twp .32278481 49 77 63 1492 54 9
Ocean Gate .39130435 16 41 33 560 20 13
Pine Beach .26666667 1 9 8 658 24 -16
Plumsted .41295547 86 177 145 1564 56 89
Pt Pleasnt 21338912 44 166 136 6561 237 -100
Pt Pls Bch .41269841 40 95 78 2167 78 -1
Seaside Ht .49382716 46 95 78 832 30 48
Seaside Pk .52238806 23 49 40 784 28 12
Ship Bottm .47126437 26 42 35 608 22 13
S Toms Rvr .2 8 98 81 1042 38 43
Stafford .37027708 130 210 172 3789 137 36
Surf City .53947368 25 39 32 709 26 6
Tuckerton .45185185 57 94 77 981 35 42
TOTALS 2254 5289 4337 128304 4632

*502
 PASSAIC
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
PASSAIC
Bloomngdle 57 16 14 156 107 68
Clifton 450 366 352 1114 655 539
Haledon 49 55 54 149 123 48
Hawthorne 87 92 91 161 109 59
LittleFalls 52 29 29 129 113 32
No Haledon 29 11 11 33 15 24
Passaic 1835 758 634 3008 1904 1801
Paterson 4723 1942 1653 6158 4968 2740
PomptonLks 47 23 20 47 31 16
ProspectPk 72 41 38 125 91 51
Ringwood 69 10 10 93 33 71
Totowa 54 24 21 83 49 34
Wanaque 86 27 25 131 100 43
Wayne 154 42 37 298 204 103
WMilford 179 60 50 452 130 390
WPaterson 85 66 61 75 66 22
TOTALS 8028 3562 3100 12212 8698 6041
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
PASSAIC
Bloomngdle .38857143 61 132 108 2591 166 -58
Clifton .45142379 503 1305 1070 28887 1849 -779
Haledon .28070175 42 145 119 2609 167 -48
Hawthorne .35119048 57 235 192 6871 440 -247
LittleFalls .22068966 28 109 90 4208 269 -180
No Haledon .61538462 20 60 49 2441 156 -107
Passaic .48609987 1462 3931 3224 19161 1226 1997
Paterson .35547483 2189 8565 7023 46113 2951 4072
PomptonLks .34042553 16 83 68 3570 228 -160
ProspectPk .35915493 45 155 127 1897 121 6
Ringwood .68269231 63 142 117 3617 231 -115
Totowa .40963855 34 109 89 3395 217 -128
Wanaque .30069930 39 150 123 3007 192 -69
Wayne .33550489 100 291 239 14298 915 -676
WMilford .75 339 568 466 6795 435 31
WPaterson .25 19 165 135 4003 256 -121
TOTALS 5017 16145 13239 153463 9822 3418

*503
 SALEM
 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 15 XII-35 X-17 X-17
 Units Units Other
 Lack Com Lack Room Units
 Ovrcrwded Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
SALEM
Alloway 14 17 127 76 99
CarneysPt 59 19 174 161 59
Elmer 13 7 25 32 2
Elsmboro 10 5 36 20 27
LAllowayCr 10 18 58 28 48
Mannington 24 20 67 36 63
Cldmans 16 7 47 40 18
PennsGrove 91 31 258 177 123
Pennsville 73 19 324 195 166
Pilesgrove 23 23 51 25 61
Pittsgrove 71 20 105 72 80
Quinton 35 17 85 39 79
Salem 89 27 393 350 170
UpPittsgrv 33 15 107 78 54
Woodstown 13 15 90 86 36
TOTALS 574 260 1947 1415 1085
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
SALEM
Alloway .56571429 72 103 84 850 55 30
CarneysPt .26818182 47 125 102 2977 192 -89
Elmer .05882353 1 21 18 561 36 -19
Elsinboro .57446809 21 36 29 489 31 -2
LAllowayCr .63157895 37 65 53 515 33 20
Mannington .63636364 43 87 71 532 34 37
Cldmans .31034483 15 38 31 589 38 -7
PennsGrove .41 106 228 187 2099 135 52
Pennsville .45983380 149 241 198 4835 311 -114
Pilesgrove .70930233 36 82 67 927 60 8
Pittsgrove .52631579 55 146 120 2189 141 -21
Quinton .66949153 57 109 89 959 62 28
Salem .32692308 128 244 200 2567 165 35
UpPittsgrv .40909091 44 92 75 987 64 12
Woodstown .29508197 27 55 45 1254 81 -36
TOTALS 836 1670 1370 22330 1438

*504
 SOMERSET
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
SOMERSET
Bedminster 6 9 9 34 5 37
Bernards 16 5 5 75 45 30
Brnrdsvlle 11 13 13 65 23 42
BoundBrook 134 73 67 107 81 56
Branchburg 17 7 7 46 29 17
Bridgewatr 97 28 28 135 71 76
Far Hills 1 1 1 7 0 7
Franklin 265 61 60 207 125 105
GreenBrook 15 3 3 28 7 21
Hillsbor 49 28 26 120 84 61
Manville 111 77 71 80 47 51
Millstone 2 1 1 2 2 0
Montgomery 17 19 19 37 26 36
NPlainfld 143 78 76 90 63 39
Peapk-Glad 5 16 15 21 13 14
Raritan 55 68 64 73 66 45
Rocky Hill 0 3 3 6 2 4
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
SOMERSET
Bedminster .88095238 30 45 37 884 57 -20
Bernards .4 30 51 42 3711 238 -196
Brnrdsvlle .64615385 42 66 54 2278 146 -92
BoundBrook .40875912 44 245 201 3564 228 -27
Branchburg .36956522 17 41 34 2396 153 -120
Bridgewatr .51700680 70 195 160 8804 563 -404
Far Hills 1 7 9 7 241 15 -8
Franklin .45652174 95 420 344 10060 644 -300
GreenBrook .75 21 39 32 1368 88 -56
Hillsbor .42068966 50 125 103 6439 412 -309
Manville .52040816 42 224 183 3878 248 -65
Millstone 0 0 3 2 171 11 -8
Montgomery .58064516 21 57 47 1975 126 -79
NPlainfld .38235294 34 253 208 7525 482 -274
Peapk-Glad .51851852 11 31 25 698 45 -19
Raritan .40540541 30 149 122 2212 142 -20
Rocky Hill .66666667 4 7 6 267 17 -11

*505
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
Somerville 119 58 53 69 58 18
SBndBrook 52 26 26 40 28 19
Warren 20 5 5 51 13 38
Watchung 11 2 2 47 45 9
TOTALS 1146 581 554 1340 833 725
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Somerville .23684211 16 188 154 4686 300 -145
SBndBrook .40425532 16 94 77 1582 101 -24
Warren .74509804 38 63 52 2999 192 -140
Watchung .16666667 8 21 17 1630 104 -87
TOTALS 626 2326 1907 67368 4312 -2404

*506
 SUSSEX
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
SUSSEX
Andover 12 8 6 10 6 7
AndoverTwp 19 6 5 68 32 48
Branchvlle 4 4 4 16 10 7
Byram 37 9 8 108 19 96
Frankford 42 29 25 100 28 130
Franklin 57 6 6 72 40 59
Fredon 9 2 2 28 6 28
Green 8 2 2 51 6 50
Hamburg 18 4 4 37 8 33
Hampton 23 7 6 80 33 57
Hardyston 38 13 10 100 5 128
Hopatcong 136 25 23 241 145 158
Lafayette 9 6 5 54 9 55
Montague 22 10 9 96 26 93
Newton 69 78 70 117 87 51
Ogdensburg 26 3 3 58 32 31
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
SUSSEX
Andover .53846154 5 23 19 289 18 1
AndoverTwp .6 41 65 53 1250 80 -27
Branchvlle .41176471 7 15 12 343 22 -10
Byram .83478261 90 135 111 2266 145 -34
Frankford .82278481 82 149 122 1435 92 31
Franklin .59595960 43 106 87 1540 99 -12
Fredon .82352941 23 34 28 692 44 -16
Green .89285714 46 56 46 727 47 -1
Hamburg .80487805 30 52 42 593 38 5
Hampton .63333333 51 80 65 1244 80 -14
Hardyston .96240602 96 144 118 1560 100 18
Hopatcong .52145215 126 285 233 4939 316 -83
Lafayette .859375 46 60 50 504 32 17
Montague .78151261 75 106 87 778 50 37
Newton .36956522 43 182 149 2889 185 -35
Ogdensburg .49206349 29 58 47 805 52 -4

*507
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
Sandyston 13 15 15 126 127 181
Sparta 26 26 25 141 32 114
Stanhope 27 16 15 31 19 12
Stillwater 24 14 14 104 24 101
Sussex 37 39 36 57 28 35
Vernon 85 19 19 390 61 408
Walpack 1 1 1 7 4 6
Wantage 54 26 24 250 49 217
TOTALS 796 368 337 2342 836 2105
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Sandyston .58766234 74 102 84 568 36 47
Sparta .78082192 110 161 132 4254 272 -140
Stanhope .38709677 12 54 44 1250 80 -36
Stillwater .808 84 122 100 1284 82 18
Sussex .55555556 32 105 86 873 56 30
Vernon .86993603 339 443 363 4886 313 51
Walpack .6 4 6 5 54 3 2
Wantage .81578947 204 282 231 2198 141 91
TOTALS 1692 2825 2316 37221 2382 -66

*508
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
UNION
BerklyHts 10 6 6 35 22 13
Clark 40 16 15 16 16 0
Crawford 83 44 42 95 72 23
Elizabeth 3143 1371 1160 3295 2726 1441
Fanwood 20 4 4 5 5 0
Garwood 14 25 25 48 24 29
Hillside 202 87 83 446 197 279
Kenilworth 37 15 15 82 85 22
Linden 409 195 185 555 399 242
Mntnside 8 3 3 0 0 0
NewProvdnc 19 25 25 24 14 10
Plainfld 985 294 247 1058 1005 284
Rahway 306 137 125 339 257 114
Roselle 278 93 81 198 185 63
RosellePk 95 57 56 65 49 23
ScotchPlns 54 30 29 84 44 40
Springfld 33 11 10 115 81 34
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
UNION
BerklyHts .37142857 13 29 24 3698 237 -213
Clark 0 0 55 45 5564 356 -311
Crawford .24210526 23 148 121 8232 527 -405
Elizabeth .34581234 1139 5442 4463 38878 2488 1975
Fanwood 0 0 24 20 2497 160 -140
Garwood .54716981 26 65 54 1736 111 -58
Hillside .58613445 261 546 448 7184 460 -12
Kenilworth .20560748 17 69 56 2751 176 -120
Linden .37753510 210 804 659 14232 911 -252
Mntnside 0 0 11 9 2362 151 -192
NewProvdnc .41666667 10 54 44 4135 265 -220
Plainfld .22032583 233 1465 1201 15269 977 224
Rahway .30727763 104 535 439 9793 627 -188
Roselle .25403226 50 409 336 7545 483 -147
RosellePk .31944444 21 172 141 5038 322 -182
ScotchPlns .47619048 40 123 101 6682 428 -327
Springfld .29565217 34 77 63 5538 354 -291

*509
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
Summit 75 80 77 172 132 43
Union 198 130 126 245 221 58
Westfield 83 67 64 183 142 44
Winfield 39 2 2 56 50 6
TOTALS 6131 2692 2380 7116 5726 2768
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Summit .24571429 42 194 159 7738 495 -336
Union .20788530 51 375 307 18132 1160 -853
Westfield .23655914 43 190 156 10271 657 -501
Winfield .10714286 6 47 39 698 45 -6
TOTALS 2324 10824 8876 177973 11390 -2363

*510
 WARREN
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
WARREN
Allamuchy 15 8 8 29 24 19
Alpha 13 7 7 33 10 23
Belvidere 14 19 19 12 12 13
Blairstown 14 21 20 134 4 160
Franklin 12 11 10 67 28 44
Frelnghysn 4 7 7 48 9 49
Greenwich 7 11 11 31 5 28
Hacketstwn 66 38 38 89 35 71
Hardwick 1 3 3 61 4 75
Harmony 19 16 16 75 18 68
Hope 14 8 8 42 24 46
Indepndnce 34 11 10 37 10 30
Knowlton 21 12 12 85 44 61
Liberty 11 3 3 70 23 55
Lopatcong 16 7 5 45 0 45
Mansfield 24 28 28 129 55 110
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
WARREN
Allamuchy .44186047 13 36 29 969 62 -33
Alpha .69696970 23 43 35 949 61 -25
Belvidere .52 6 39 32 935 60 -28
Blairstown .97560976 131 165 135 1380 88 47
Franklin .61111111 41 63 52 741 47 4
Frelnghysn .84482759 41 52 42 456 29 13
Greenwich .84848485 26 44 36 573 37 0
Hacketstwn .66981132 60 164 134 2863 183 -49
Hardwick .94936709 58 62 51 287 18 32
Harmony .79069767 59 94 77 865 55 22
Hope .65714286 28 50 41 494 32 9
Indepndnce .75 28 72 59 953 61 -2
Knowlton .58095238 49 82 68 682 44 24
Liberty .70512821 49 63 52 574 37 15
Lopatcong 1 45 66 54 1807 116 -62
Mansfield .66666667 86 138 113 2015 129 -16

*511
 STF-1 STF-1 STF-1 STF-3 STF-3 STF-3
 Tbl 18 Tbl 13 Tbl 15 XII-35 X-17 X-17
 Net Units Units Other
 Ttl Units Lack Com Lack Room Units
 Ovrcrwded Lack Com Plumbing Ctrl Heat Heaters Lack Ctr
MNCPLTY Units Plumbing not o/c not o/c w/flue Heating
---------------------------------------------------------------------------
Oxford 13 22 22 40 15 43
Pahaquarry 0 0 0 0 0 0
Phlpsburg 111 138 134 296 259 116
Pohatcong 23 14 14 105 51 64
Washington 53 42 40 125 80 52
WshngtnTwp 13 20 19 96 22 95
White 20 11 10 85 40 72
TOTALS 518 457 444 1734 772 1339
 % Units Units
 w/o Ctrl Lacking Total Adjusted Occupied Fair Surplus
 Htn, With Adequate Present Present Dwelling Share Present
MNCPLTY Inad Htng Heating Need Need Units Cap Need
---------------------------------------------------------------------------
Oxford .74137931 30 65 53 570 36 17
Pahaquarry 0 0 0 0 13 1 -1
Phlpsburg .30933333 92 337 276 6242 399 -124
Pohatcong .55652174 58 95 78 1315 84 -6
Washington .39393939 49 142 117 2414 154 -38
WshngtnTwp .81196581 78 110 90 1388 89 1
White .64285714 55 85 69 921 59 10
TOTALS 1104 2066 1694 29406 1882 -187

*512 APPENDIX D

PROSPECTIVE NEED DATA

DISCLAIMER
This appendix is based on documents prepared by members of the Urban League advisory group. It is provided for informational purposes only as to those municipalities not included in Warren Township's prospective need region.

PURPOSE OF APPENDIX D
The summary sheet is designed to enable the reader to understand the derivation of the need of Warren's prospective need region, as set forth in Appendix F. The summary sheet also permits the reader to identify the prospective need for any other municipality in the State, providing that the regional configurations selected follow county lines and providing that the same methodology is used to identify the prospective regional need.
The remainder of Appendix D is the source data for the prospective need for each county in the State. With regard to Warren's prospective need region, no litigant has challenged the mathematical accuracy of the data. With regard to the counties not in Warren's prospective need region, the source data has not been the subject of adversarial litigation before this court.

*513
 Projected Mt. Laurel Households, 1990, by County
 Additional
 1990 1980 Mt. Laurel
 County Households Less Households x .394 = Households
1. Atlantic 90,680 - 71,806 x .394 = 7,436
2. Bergen 340,666 - 300,410 x .394 = 15,860
3. Burlington 154,987 - 114,890 x .394 = 15,798
4. Camden 183,897 - 162,508 x .394 = 8,427
5. Cape May 40,186 - 32,347 x .394 = 3,089
6. Cumberland 51,940 - 44,287 x .394 = 3,015
7. Essex 287,009 - 299,934 x .394 = -5,092
8. Gloucester 84,892 - 65,129 x .394 = 7,787
9. Hudson 194,964 - 207,857 x .394 = -5,080
10. Hunterdon 37,857 - 28,515 x .394 = 3,680
11. Mercer 118,997 - 105,819 x .394 = 5,192
12. Middlesex 245,989 - 196,708 x .394 = 19,417
13. Monmouth 214,573 - 170,130 x .394 = 17,510
14. Morris 171,692 - 131,820 x .394 = 15,702
15. Ocean 170,941 - 128,304 x .394 = 16,798
16. Passaic 163,202 - 153,463 x .394 = 3,837
17. Salem 25,291 - 22,330 x .394 = 1,167
18. Somerset 89,681 - 67,368 x .394 = 8,791
19. Sussex 53,829 - 37,221 x .394 = 6,543
20. Union 194,487 - 177,973 x .394 = 6,506
21. Warren 35,306 - 29,406 x .394 = 2,325

*514
 FEBRUARY 15, 1984
 PROSPECTIVE NEED  AVERAGE OF ECONOMIC/DEMOGR
 AND DEMOGRAPHIC MODELS N.J. DEPT. OF LABOR
 ==========================================
 YEAR 2000 YEAR 1990
COUNTY MODEL 1 ECO/DEM MODEL 2 DEM AVERAGE MODEL 1 MODEL 2 AVERAGE
---------------------------------------------------------------------------
ATLANTIC 277400 245800 261600 240200 220000 230100
BERGEN 951400 707800 829600 915600 767100 841350
BURLINGTON 471900 487000 479450 407300 422300 414800
CAMDEN 555900 526400 541150 508900 497400 503150
CAPE MAY 91600 138300 114950 87800 109100 98450
CUMBERLAND 142600 153700 148150 139300 143700 141500
ESSEX 760700 739900 750300 789400 785400 787400
GLOUCESTER 269100 265700 267400 233200 233600 233400
HUDSON 516500 506000 511250 530500 524400 527450
HUNTERDON 112800 113200 113000 98600 101300 99950
MERCER 359400 301900 330650 340000 306300 323150
MIDDLESEX 757100 603300 680200 690400 601200 645800
MONMOUTH 588200 580800 584500 534400 546400 540400
MORRIS 511300 423900 467600 467700 418200 442950
OCEAN 447300 605700 526500 393500 470200 431850
PASSAIC 445100 421200 433150 451000 434800 442900
SALEM 69100 71400 70250 66600 68700 67650
SOMERSET 284000 199600 241800 246800 201700 224250
SUSSEX 172600 198200 185400 141200 156700 148950
UNION 518800 454200 486500 526500 467800 497150
WARREN 93800 107400 100600 89100 96300 92700
 NEW JERSEY 8396600 7851500 8124050 7898000 7572300 7735150

*515
 NEW JERSEY LOW AND MODERATE INCOME
 HOUSEHOLDS 1990
 **********************************
 1990 = LOW
COUNTY HOUSEHOLDS PCT. LOW AND MOD AND MODERATE
===========================================================================
ATLANTIC 90680 .394 35728
BERGEN 34066 .394 134222
BURLINGTON 154988 .394 61065
CAMDEN 183897 .394 72455
CAPE MAY 40186 .394 15833
CUMBERLAND 51940 .394 20464
ESSEX 287010 .394 113082
GLOUCESTER 84892 .394 33447
HUDSON 194965 .394 76816
HUNTERDON 37858 .394 14916
MERCER 118998 .394 46885
MIDDLESEX 245989 .394 96920
MONMOUTH 214573 .394 84542
MORRIS 171693 .394 67647
OCEAN 170941 .394 67351
PASSAIC 163202 .394 64302
SALEM 25291 .394 9965
SOMERSET 89682 .394 35335
SUSSEX 53829 .394 21209
UNION 194487 .394 76628
WARREN 35307 .394 13911
TOTAL STATE 2,951,074 .394 1,162,723.

*516
 COHORT PROJECTIONS 1990
 ***********************
 FEBRUARY 15, 1984
---------------------------------------------------------------------------
ATLANTIC COUNTY
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 15200 13900 14550
5-9 13000 12400 12700
10-14 12600 12300 12450
15-19 16000 14800 15400
20-24 16100 15700 15900 LESS THAN
 25 YRS .0453 71000 3216.30
25-29 18500 17600 18050 25-29 YEARS .4253 18050 7676.67
30-34 24000 21400 22700 30-34 YEARS .4972 22700 11286.44
35-39 28000 19400 23700
40-44 16900 15200 16050 35-44 YEARS .5408 39750 21496.80
45-49 11600 11200 11400
50-54 9800 9400 9600 45-54 YEARS .5623 21000 11808.30
55-59 9700 9200 9450
60-64 11100 10600 10850 55-64 YEARS .5844 20300 11863.32
65-69 11700 10900 11300
70-74 9300 9300 9300 65-74 YEARS .6305 20600 12988.30
75-79 7300 7300 7300
80-84 4600 4600 4600
85 + OVER 4800 4800 4800 75 + OVER .6194 16700 10343.98
 TOTALS 230100 90680.11
---------------------------------------------------------------------------

*517
---------------------------------------------------------------------------
BERGEN
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 47200 40400 43800
5-9 44400 42600 43500
10-14 47500 42600 45050
15-19 56300 46600 51450
20-24 69000 49700 59350 LESS THAN
 25 YRS .0453 243150 11014.70
25-29 78300 48700 63500 25-29 YEARS .4253 63500 27006.55
30-34 82000 59000 70500 30-34 YEARS .4972 70500 35052.60
35-39 81100 66300 73700
40-44 74600 63900 69250 35-44 YEARS .5408 142950 77307.36
45-49 61400 54600 58000
50-54 50300 46000 48150 45-54 YEARS .5623 106150 59688.15
55-59 49200 44800 47000
60-64 54200 47000 50600 55-64 YEARS .5844 97600 57037.44
65-69 46300 41000 43650
70-74 29400 29400 29400 65-74 YEARS .6305 73050 46058.03
75-79 21000 21000 21000
80-84 13600 13600 13600
85 + OVER 9800 9800 9800 75 + OVER .6194 44400 27501.36
 TOTALS 841300 340666.2
---------------------------------------------------------------------------

*518
---------------------------------------------------------------------------
BURLINGTON
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 25500 27200 26350
5-9 25100 25700 25400
10-14 26500 27100 26800
15-19 33100 33400 33250
20-24 32300 32700 32500 LESS THAN
 25 YRS .0453 144300 6536.79
25-29 26300 31200 28750 25-29 YEARS .4253 28750 12227.38
30-34 34600 35200 34900 30-34 YEARS .4972 34900 17352.28
35-39 36100 39000 37550
40-44 32800 34700 33750 35-44 YEARS .5408 71300 38559.04
45-49 26100 26700 26400
50-54 20700 20800 20750 45-54 YEARS .5623 47150 26512.45
55-59 20100 20000 20050
60-64 19400 19700 19550 55-64 YEARS .5844 39600 23142.24
65-69 17100 17600 17350
70-74 13100 13100 13100 65-74 YEARS .6305 30450 19198.73
75-79 8600 8600 8600
80-84 5200 5200 5200
85 + OVER 4700 4700 4700 75 + OVER .6194 18500 11458.90
 TOTALS 414950 154987.8
---------------------------------------------------------------------------

*519
---------------------------------------------------------------------------
CAMDEN
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 39000 38700 38850
5-9 36700 36500 36600
10-14 35200 34800 35000
15-19 35800 34700 35250
20-24 37200 33800 35500 LESS THAN
 25 YRS .0453 181200 8208.36
25-29 38600 37900 38250 25-29 YEARS .4253 38250 16267.73
30-34 49200 46300 47750 30-34 YEARS .4972 47750 23741.30
35-39 45800 45000 45400
40-44 37100 37200 37150 35-44 YEARS .5408 82550 44643.04
45-49 28800 28500 28650
50-54 22500 21900 22200 45-54 YEARS .5623 50850 28592.96
55-59 21400 20700 21050
60-64 22500 21800 22150 55-64 YEARS .5844 43200 25246.08
65-69 20400 20600 20500
70-74 16000 16000 16000 65-74 YEARS .6305 36500 23013.25
75-79 11200 11200 11200
80-84 6700 6700 6700
85 + OVER 5000 5000 5000 75 + OVER .6194 22900 14184.26
 TOTALS 503200 183897.0
---------------------------------------------------------------------------

*520
---------------------------------------------------------------------------
CAPE MAY
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 5300 6500 5900
5-9 5100 5600 5350
10-14 4800 5800 5300
15-19 5300 6600 5950
20-24 6000 7700 6850 LESS THAN
 25 YRS .0453 29350 1329.56
25-29 6100 8200 7150 25-29 YEARS .4253 7150 3040.90
30-34 6000 8900 7450 30-34 YEARS .4972 7450 3704.14
35-39 5900 8700 7300
40-44 5100 6700 5900 35-44 YEARS .5408 13200 7138.56
45-49 4100 5000 4550
50-54 3300 4300 3800 45-54 YEARS .5623 8350 4695.21
55-59 3300 4600 3950
60-64 3900 5700 4800 55-64 YEARS .5844 8750 5113.50
65-69 5500 6800 6150
70-74 6800 6800 6800 65-74 YEARS .6305 12950 8164.98
75-79 5400 5400 5400
80-84 3300 3300 3300
85 + OVER 2600 2600 2600 75 + OVER .6194 11300 6999.22
 TOTALS 98500 40186.05
---------------------------------------------------------------------------

*521
 COHORT PROJECTIONS 1990
 ***********************
 FEBRUARY 16, 1984
---------------------------------------------------------------------------
CUMBERLAND COUNTY
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 9800 10100 9950
5-9 9000 9400 9200
10-14 9600 9800 9700
15-19 11200 11500 11350
20-24 10800 11100 10950 LESS THAN
 25 YRS .0453 51150 2317.10
25-29 10500 11600 11050 25-29 YEARS .4253 11050 4699.57
30-34 11200 11500 11350 30-34 YEARS .4972 11350 5643.22
35-39 10500 11300 10900
40-44 9400 9700 9550 35-44 YEARS .5408 20450 11059.36
45-49 7800 7900 7850
50-54 6500 6600 6550 45-54 YEARS .5623 14400 8097.12
55-59 6100 6200 6150
60-64 6600 6600 6600 55-64 YEARS .5844 12750 7451.10
65-69 6300 6400 6350
70-74 5300 5300 5300 65-74 YEARS .6305 11650 7345.33
75-79 4100 4100 4100
80-84 2400 2400 2400
85 + OVER 2100 2100 2100 75 + OVER .6194 8600 5326.84
 TOTALS 141400 51939.63
---------------------------------------------------------------------------

*522
---------------------------------------------------------------------------
ESSEX
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 54300 55400 54850
5-9 54400 53500 53950
10-14 54100 53200 53650
15-19 59400 58400 58900
20-24 66400 63100 64750 LESS THAN
 25 YRS .0453 286100 12960.33
25-29 64300 63600 63950 25-29 YEARS .4253 63950 27197.94
30-34 62500 64800 63650 30-34 YEARS .4972 63650 31646.78
35-39 61800 61700 61750
40-44 55400 55300 55350 35-44 YEARS .5408 117100 63327.68
45-49 47400 46900 47150
50-54 40100 39400 39750 45-54 YEARS .5623 86900 48863.87
55-59 37900 37200 37550
60-64 38400 37700 38050 55-64 YEARS .5844 75600 44180.64
65-69 31800 33900 32850
70-74 24800 24800 24800 65-74 YEARS .6305 57650 36348.33
75-79 17700 17700 17700
80-84 10300 10300 10300
85 + OVER 8300 8300 8300 75 + OVER .6194 36300 22484.22
 TOTALS 787250 287009.8
---------------------------------------------------------------------------

*523
---------------------------------------------------------------------------
GLOUCESTER COUNTY
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 16500 16800 16650
5-9 16300 16100 16200
10-14 16200 16600 16400
15-19 16900 17300 17100
20-24 17700 17000 17350 LESS THAN
 25 YRS .0453 83700 3791.61
25-29 18100 18600 18350 25-29 YEARS .4253 18350 7804.26
30-34 27600 23100 25350 30-34 YEARS .4972 25350 12604.02
35-39 19500 22100 20800
40-44 16800 18200 17500 35-44 YEARS .5408 38300 20712.64
45-49 12900 13000 12950
50-54 9800 9900 9850 45-54 YEARS .5623 22800 12820.44
55-59 9500 9400 9450
60-64 9700 9700 9700 55-64 YEARS .5844 19150 11191.26
65-69 8600 8800 8700
70-74 6900 6900 6900 65-74 YEARS .6305 15600 9835.80
75-79 4600 4600 4600
80-84 2800 2800 2800
85 + OVER 2500 2500 2500 75 + OVER .6194 9900 6132.06
 TOTALS 233150 84892.09
---------------------------------------------------------------------------

*524
---------------------------------------------------------------------------
HUDSON
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 39000 38800 38900
5-9 36400 36000 36200
10-14 33700 32700 33200
15-19 36400 36000 36200
20-24 41300 41100 41200 LESS THAN
 25 YRS .0453 185700 8412.21
25-29 46700 46500 46600 25-29 YEARS .4253 46600 19818.98
30-34 47000 45400 46200 30-34 YEARS .4972 46200 22970.64
35-39 41400 40200 40800
40-44 35300 35300 35300 35-44 YEARS .5408 76100 41154.88
45-49 29500 29300 29400
50-54 26200 25700 25950 45-54 YEARS .5623 55350 31123.31
55-59 24800 24400 24600
60-64 25600 25200 25400 55-64 YEARS .5844 50000 29220.00
65-69 22800 23200 23000
70-74 18000 18000 18000 65-74 YEARS .6305 41000 25850.50
75-79 13100 13100 13100
80-84 7400 7400 7400
85 + OVER 6000 6000 6000 75 + OVER .6194 26500 16414.10
 TOTALS 527450 194964.6
---------------------------------------------------------------------------

*525
---------------------------------------------------------------------------
HUNTERDON COUNTY
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 6000 6200 6100
5-9 5800 6000 5900
10-14 6400 6700 6550
15-19 7600 8000 7800
20-24 7000 7200 7100 LESS THAN
 25 YRS .0453 33450 1515.29
25-29 5500 6600 6050 25-29 YEARS .4253 6050 2573.07
30-34 7700 7200 7450 30-34 YEARS .4972 7450 3704.14
35-39 9600 9100 9350
40-44 9600 10000 9800 35-44 YEARS .5408 19150 10356.32
45-49 8400 8900 8650
50-54 5900 6200 6050 45-54 YEARS .5623 14700 8265.81
55-59 4900 5000 4950
60-64 4400 4500 4450 55-64 YEARS .5844 9400 5493.36
65-69 3400 3400 3400
70-74 2500 2500 2500 65-74 YEARS .6305 5900 3719.95
75-79 1700 1700 1700
80-84 1100 1100 1100
85 + OVER 800 800 800 75 + OVER .6194 3600 2229.84
 TOTALS 99700 37857.77
---------------------------------------------------------------------------

*526
---------------------------------------------------------------------------
MERCER COUNTY
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 21000 18700 19850
5-9 19500 17300 18400
10-14 19300 17400 18350
15-19 27400 25000 26200
20-24 34200 30700 32450 LESS THAN
 25 YRS .0453 115250 5220.83
25-29 29200 24800 27000 25-29 YEARS .4253 27000 11483.10
30-34 28300 23200 25750 30-34 YEARS .4972 25750 12802.90
35-39 26700 24000 25350
40-44 23600 22300 22950 35-44 YEARS .5408 48300 26120.64
45-49 19500 18200 18850
50-54 15900 14700 15300 45-54 YEARS .5623 34150 19202.55
55-59 15600 14100 14850
60-64 17400 14800 16100 55-64 YEARS .5844 30950 18087.18
65-69 15400 14100 14750
70-74 10700 10700 10700 65-74 YEARS .6305 25450 16046.23
75-79 7700 7700 7700
80-84 4600 4600 4600
85 + OVER 3900 3900 3900 75 + OVER .6194 16200 10034.28
 TOTALS 323050 118997.7
---------------------------------------------------------------------------

*527
---------------------------------------------------------------------------
MIDDLESEX COUNTY
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 39000 35100 37050
5-9 34800 34200 34500
10-14 37200 33600 35400
15-19 50600 43900 47250
20-24 61500 53600 57550 LESS THAN
 25 YRS .0453 211750 9592.28
25-29 61200 51400 56300 25-29 YEARS .4253 56300 23944.39
30-34 67300 55400 61350 30-34 YEARS .4972 61350 30503.22
35-39 64300 51000 57650
40-44 53700 43400 48550 35-44 YEARS .5408 106200 57432.96
45-49 41300 34900 38100
50-54 33100 28600 30850 45-54 YEARS .5623 68950 38770.59
55-59 32000 28300 30150
60-64 34300 30200 32250 55-64 YEARS .5844 62400 36466.56
65-69 30700 28200 29450
70-74 21300 21300 21300 65-74 YEARS .6305 50750 31997.88
75-79 14100 14100 14100
80-84 7800 7800 7800
85 + OVER 6000 6000 6000 75 + OVER .6194 27900 17281.26
 TOTALS 645600 245989.1
---------------------------------------------------------------------------

*528
---------------------------------------------------------------------------
MONMOUTH COUNTY
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 31700 32700 32200
5-9 31600 31800 31700
10-14 33100 33400 33250
15-19 36400 36800 36600
20-24 33900 33500 33700 LESS THAN
 25 YRS .0453 167450 7585.49
25-29 30700 34300 32500 25-29 YEARS .4253 32500 13822.25
30-34 42700 43500 43100 30-34 YEARS .4972 43100 21429.32
35-39 47400 49900 48650
40-44 44300 46000 45150 35-44 YEARS .5408 93800 50727.04
45-49 36300 36800 36550
50-54 28000 28300 28150 45-54 YEARS .5623 64700 36380.81
55-59 26600 26800 26700
60-64 27500 28000 27750 55-64 YEARS .5844 54450 31820.58
65-69 25800 26200 26000
70-74 21800 21800 21800 65-74 YEARS .6305 47800 30137.90
75-79 16200 16200 16200
80-84 10400 10400 10400
85 + OVER 10000 10000 10000 75 + OVER .6194 36600 22670.04
 TOTALS 540400 214573.4
---------------------------------------------------------------------------

*529
---------------------------------------------------------------------------
MORRIS COUNTY
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 27800 24900 26350
5-9 24900 24700 24800
10-14 26700 25300 26000
15-19 31000 29300 30150
20-24 35200 28800 32000 LESS THAN
 25 YRS .0453 139300 6310.29
25-29 39700 29200 34450 25-29 YEARS .4253 34450 14651.59
30-34 40400 36000 38200 30-34 YEARS .4972 38200 18993.04
35-39 52500 40800 46650
40-44 42600 38100 40350 35-44 YEARS .5408 87000 47049.60
45-49 33700 32700 33200
50-54 25100 24400 24750 45-54 YEARS .5623 57950 32585.29
55-59 22100 21300 21700
60-64 20800 19400 20100 55-64 YEARS .5844 41800 24427.92
65-69 17300 15500 16400
70-74 10400 10400 10400 65-74 YEARS .6305 26800 16897.40
75-79 7300 7300 7300
80-84 5200 5200 5200
85 + OVER 4900 4900 4900 75 + OVER .6194 17400 10777.56
 TOTALS 442900 171692.7
---------------------------------------------------------------------------

*530
---------------------------------------------------------------------------
OCEAN COUNTY
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 25200 29800 27500
5-9 23600 26800 25200
10-14 24400 30000 27200
15-19 26400 32600 29500
20-24 27000 31600 29300 LESS THAN
 25 YRS .0453 138700 6283.11
25-29 26200 32300 29250 25-29 YEARS .4253 29250 12440.03
30-34 24300 32400 28350 30-34 YEARS .4972 28350 14095.62
35-39 26200 35500 30850
40-44 27500 35200 31350 35-44 YEARS .5408 62200 33637.76
45-49 20800 25100 22950
50-54 15300 18900 17100 45-54 YEARS .5623 40050 22520.12
55-59 14000 18400 16200
60-64 15000 20300 17650 55-64 YEARS .5844 33850 19781.94
65-69 19200 22900 21050
70-74 25900 25900 25900 65-74 YEARS .6305 46950 29601.98
75-79 25000 25000 25000
80-84 16800 16800 16800
85 + OVER 10800 10800 10800 75 + OVER .6194 52600 32580.44
 TOTALS 431950 170941.0
---------------------------------------------------------------------------

*531
---------------------------------------------------------------------------
PASSAIC COUNTY
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 32800 31500 32150
5-9 30400 29800 30100
10-14 28900 27800 28350
15-19 32000 30700 31350
20-24 35800 34300 35050 LESS THAN
 25 YRS .0453 157000 7112.10
25-29 38500 36700 37600 25-29 YEARS .4253 37600 15991.28
30-34 39200 38100 38650 30-34 YEARS .4972 38650 19216.78
35-39 35600 34100 34850
40-44 31600 30100 30850 35-44 YEARS .5408 65700 35530.56
45-49 26500 25600 26050
50-54 21600 20900 21250 45-54 YEARS .5623 47300 26596.79
55-59 20400 19500 19950
60-64 21100 20100 20600 55-64 YEARS .5844 40550 23697.42
65-69 19800 18800 19300
70-74 14100 14100 14100 65-74 YEARS .6305 33400 21058.70
75-79 10400 10400 10400
80-84 6600 6600 6600
85 + OVER 5600 5600 5600 75 + OVER .6194 22600 13998.44
 TOTALS 442800 163202.1
---------------------------------------------------------------------------

*532
---------------------------------------------------------------------------
SALEM COUNTY
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 4800 4900 4850
5-9 4800 4900 4850
10-14 4900 5000 4950
15-19 5100 5200 5150
20-24 3900 4400 4150 LESS THAN
 25 YRS .0453 23950 1084.94
25-29 4000 4400 4200 25-29 YEARS .4253 4200 1786.26
30-34 4900 5300 5100 30-34 YEARS .4972 5100 2535.72
35-39 5800 5900 5850
40-44 5000 5100 5050 35-44 YEARS .5408 10900 5894.72
45-49 3900 3900 3900
50-54 3300 3300 3300 45-54 YEARS .5623 7200 4048.56
55-59 3100 3100 3100
60-64 3200 3200 3200 55-64 YEARS .5844 6300 3681.72
65-69 3200 3200 3200
70-74 2700 2700 2700 65-74 YEARS .6305 5900 3719.95
75-79 1900 1900 1900
80-84 1100 1100 1100
85 + OVER 1100 1100 1100 75 + OVER .6194 4100 2539.54
 TOTALS 67650 25291.41
---------------------------------------------------------------------------

*533
---------------------------------------------------------------------------
SOMERSET COUNTY
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 15100 11600 13350
5-9 12000 12000 12000
10-14 13200 12100 12650
15-19 13800 12500 13150
20-24 15700 11800 13750 LESS THAN
 25 YRS .0453 64900 2939.97
25-29 25600 13600 19600 25-29 YEARS .4253 19600 8335.08
30-34 22100 18200 20150 30-34 YEARS .4972 20150 10018.58
35-39 29800 19800 24800
40-44 20900 17300 19100 35-44 YEARS .5408 43900 23741.12
45-49 15700 14800 15250
50-54 12800 12400 12600 45-54 YEARS .5623 27850 15660.06
55-59 12600 11700 12150
60-64 12000 10700 11350 55-64 YEARS .5844 23500 13733.40
65-69 10500 8400 9450
70-74 5900 5900 5900 65-74 YEARS .6305 15350 9678.18
75-79 4000 4000 4000
80-84 2600 2600 2600
85 + OVER 2400 2400 2400 75 + OVER .6194 9000 5574.60
 TOTALS 224250 89681.78
---------------------------------------------------------------------------

*534
---------------------------------------------------------------------------
SUSSEX COUNTY
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 10700 11600 11150
5-9 9800 11000 10400
10-14 10600 12400 11500
15-19 11000 12500 11750
20-24 9800 10600 10200 LESS THAN
 25 YRS .0453 55000 2491.50
25-29 8600 10600 9600 25-29 YEARS .4253 9600 4082.88
30-34 10500 11600 11050 30-34 YEARS .4972 11050 5494.06
35-39 14200 15200 14700
40-44 14000 16100 15050 35-44 YEARS .5408 29750 16088.80
45-49 10300 11500 10900
50-54 6800 7300 7050 45-54 YEARS .5623 17950 10093.29
55-59 5200 5700 5450
60-64 5000 5500 5250 55-64 YEARS .5844 10700 6253.08
65-69 4700 4900 4800
70-74 3900 3900 3900 65-74 YEARS .6305 8700 5485.35
75-79 2700 2700 2700
80-84 1800 1800 1800
85 + OVER 1700 1700 1700 75 + OVER .6194 6200 3040.28
 TOTALS 148950 53829.24
---------------------------------------------------------------------------

*535
---------------------------------------------------------------------------
UNION COUNTY
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 31900 28300 30100
5-9 29100 28300 28700
10-14 29800 27900 28850
15-19 34500 30800 32650
20-24 40200 32800 36500 LESS THAN
 25 YRS .0453 156800 7103.04
25-29 43200 32800 38000 25-29 YEARS .4253 38000 16161.40
30-34 46600 37400 42000 30-34 YEARS .4972 42000 20882.40
35-39 43300 38700 41000
40-44 39800 36500 38150 35-44 YEARS .5408 79150 42804.32
45-49 33100 30900 32000
50-54 27600 25500 26550 45-54 YEARS .5623 58550 32922.67
55-59 27500 24800 26150
60-64 29900 26100 28000 55-64 YEARS .5844 54150 31645.26
65-69 27000 24000 25500
70-74 17500 17500 17500 65-74 YEARS .6305 43000 27111.50
75-79 12400 12400 12400
80-84 7700 7700 7700
85 + OVER 5500 5500 5500 75 + OVER .6194 25600 15856.64
 TOTALS 497250 194487.2
---------------------------------------------------------------------------

*536
---------------------------------------------------------------------------
WARREN COUNTY
COHORT MODEL 1 MODEL 2 AVERAGE COHORT HEADSHIP NUMBER HOUSEHOLDS
 AGGREGATE RATE
---------------------------------------------------------------------------
UNDER 5 6000 6200 6100
5-9 5500 5900 5700
10-14 5900 6300 6100
15-19 6800 7100 6950
20-24 6200 6700 6450 LESS THAN
 25 YRS .0453 31300 1417.89
25-29 5800 6500 6150 25-29 YEARS .4253 6150 2615.60
30-34 6300 8000 7150 30-34 YEARS .4972 7150 3554.98
35-39 7800 9200 8500
40-44 7300 8000 7650 35-44 YEARS .5408 16150 8733.92
45-49 5900 6200 6050
50-54 4200 4400 4300 45-54 YEARS .5623 10350 5819.81
55-59 4100 4200 4150
60-64 4300 4500 4400 55-64 YEARS .5844 8550 4996.62
65-69 4100 4200 4150
70-74 3500 3500 3500 65-74 YEARS .6305 7650 4823.33
75-79 2600 2600 2600
80-84 1500 1500 1500
85 + OVER 1300 1300 1300 75 + OVER .6194 5400 3344.76
 TOTALS 92700 35306.90
---------------------------------------------------------------------------

*537 APPENDIX E

 SELECTED URBAN AID MUNICIPALITIES
ATLANTIC COUNTY HUDSON COUNTY SALEM COUNTY
 None Bayonne None
 Hoboken
BERGEN COUNTY Jersey City SOMERSET COUNTY
 North Bergen
 Lodi Union City None
 Garfield Weehawken
 West New York SUSSEX COUNTY
BURLINGTON COUNTY None
 None HUNTERDON COUNTY
 None UNION COUNTY
CAMDEN COUNTY Elizabeth
 Hillside
 Camden MERCER COUNTY Plainfield
 Winslow
 Trenton
CAPE MAY COUNTY WARREN COUNTY
 None MIDDLESEX COUNTY None
 New Brunswick
 Perth Amboy
CUMBERLAND COUNTY
 Vineland MONMOUTH COUNTY
 Bridgeton
 Asbury Park
 Keansburg
ESSEX COUNTY Long Branch
 Belleville
 Bloomfield MORRIS COUNTY
 East Orange
 Irvington None
 Montclair
 Newark OCEAN COUNTY
 Orange
 Lakewood
GLOUCESTER COUNTY PASSAIC COUNTY
 Glassboro Passaic
 Paterson
 DISCLAIMER
This appendix was prepared by a member of the Urban League advisory group.
It is provided for informational purposes only as to those municipalities
not included in Warren Township's present and prospective need regions.

*538